1   Robert J. Nelson (CA 132797)
    rnelson@lchb.com
2   Nimish R. Desai (CA 244953)
    ndesai@lchb.com
3   LIEFF CABRASER HEIMANN &
    BERNSTEIN, LLP
4   275 Battery Street, 29th Floor
    San Francisco, CA  94111-3339
5   Telephone:  415.956.1000
    Facsimile:  415.956.1008
6
7   *Attorneys for Relator*

```
┌─────────────────────────────────────┐
│            F I L E D                  │
│   CLERK, U.S. DISTRICT COURT          │
│                                       │
│       March 29, 2019                  │
│                                       │
│  CENTRAL DISTRICT OF CALIFORNIA       │
│  BY: _____ rrp _____ DEPUTY    │
└─────────────────────────────────────┘
```

8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10

11   UNITED STATES ex rel.                **No 8:18-cv-00203** JVS (KESx)
12   TERRENCE BARRETT, and on
     behalf of various States,            **SECOND AMENDED
13                                        COMPLAINT**
                    Plaintiff,
14                                        False Claims Act, 31 U.S.C. § 3729, *et
     v.                                   seq.*
15
     ALLERGAN, INC.,                      **DEMAND FOR JURY TRIAL**
16
                    Defendant.
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...............................................................1

II.   JURISDICTION, VENUE AND STATUTORY REQUIREMENTS ......................................................2

III.  THE PARTIES.................................................................3

IV.   BACKGROUND AND REGULATORY FRAMEWORK ..................4

    A.    Medicare Part B Average Sales Price.........................................4

    B.    The Medicaid Drug Rebate Program and Best Price Requirements ................................................................6

    C.    Additional Government Health Insurance Programs ...............9

    D.    The Anti-Kickback Statute ......................................................10

V.    FACTUAL ALLEGATIONS ...........................................11

    A.    Botox is a major source of revenue for Allergan. ...................11

    B.    Dual marketplaces for Botox create a conundrum on pricing. .................................................................13

    C.    Allergan provided countless samples to reduce the effective price of Botox for private purchasers, without including the value of those samples in it price reporting to the government. .........................................................14

    D.    The Natrelle Gel Breast Implant Trial Program was a vehicle for kickbacks and price reporting violations...............23

    E.    Allergan regularly provides Botox samples to providers as compensation for valuable services. .........................................31

    F.    The Brilliant Distinctions program delivers still additional price reduction to physicians that goes unreported by Allergan. ......................................................33

    G.    Allergan offered Botox and Juvederm in "bundled" arrangements to deliver discounted Botox while evading price reporting requirements.......................................37

VI.   MATERIALITY ........................................................39

VII.  CLAIMS FOR RELIEF ...............................................42

    CLAIM 1 Violation of False Claims Act,  31 U.S.C. § 3729, *et seq*. ..............................................................42

    CLAIM 2 Violation of the California False Claims Act,  Cal. Gov't Code § 12650, *et seq*. .............................................43

    CLAIM 3 Violation of the Colorado Medical False Claims Act, Colo. Rev. Stat.  § 25.5-4-305, *et seq*. ....................................45

    CLAIM 4 Violation of the Connecticut False Claims Act for State-Administered Health or Human Services Programs Conn. Gen. Stat. § 4-274, *et seq*. ............................................47

    CLAIM 5 Violation of the Delaware False Claims and Reporting Act,  Del. Code Ann. Tit. 6, § 1201 *et seq*. ............48

SECOND AMENDED COMPLAINT

1
2

**TABLE OF CONTENTS**
(continued)

Page

3  CLAIM 6 Violation of the District of Columbia False Claims
   Act,  D.C. Code  § 2-381.03, et seq. ...........................................50

4  CLAIM 7 Violation of the Florida False Claims Act,  Fla. Stat.
5     § 68.081 et seq. ......................................................................51

   CLAIM 8 Violation of the Georgia False Medicaid Claims Act,
6     Ga. Code Ann. § 49-4-168 et seq. ..............................................54

7  CLAIM 9 Violation of the Hawaii False Claims Act,  Haw. Rev.
      Stat. § 661-21 et seq. ...............................................................55

8  CLAIM 10 Violation of the Illinois False Claims Act,  740 Ill.
      Comp. Stat. § 175/1 et seq. ......................................................56
9
   CLAIM 11 Violation of the Indiana False Claims and
10    Whistleblower Protection Act,  Ind. Code § 5-11-5.5 et
      seq. .........................................................................................58

11 CLAIM 12 Violation of the Iowa False Claims Act,  Iowa Code
      § 685.1, et seq. ........................................................................60
12
   CLAIM 13 Violation of the Louisiana Medical Assistance
13    Programs Integrity Law,  La. Rev. Stat. Ann. § 46:437.1
      et seq. .....................................................................................61

14 CLAIM 14 Violation of the Maryland False Health Claims Act,
      Md. Code Ann. Health-Gen. § 2-601, et seq. ...........................63
15
   CLAIM 15 Violation of the Commonwealth of Massachusetts
16    False Claims Act,  Mass. Gen. Laws ch. 12, § 5A et seq. .........65

   CLAIM 16 Violation of the Michigan Medicaid False Claims
17    Act,  Mich. Comp. Laws § 400.601 et seq. ...............................66

18 CLAIM 17 Violation of the Minnesota False Claims Act,  Minn.
      Stat. § 15C.01, et seq. .............................................................68

19 CLAIM 18 Violation of the Montana False Claims Act,  Mont.
      Code Ann. § 17-8-401 et seq. ...................................................70
20
   CLAIM 19 Violation of the Nevada False Claims Act,  Nev.
21    Rev. Stat. § 357.010, et seq. ....................................................72

22 CLAIM 20 Violation of the New Jersey False Claims Act,  N.J.
      Stat. Ann. § 2A:32C-1, et seq. .................................................73

23 CLAIM 21 Violation of the New Mexico Medicaid False Claims
      Act,  N.M. Stat. Ann. § 27-14-1, et seq. ...................................75

24 CLAIM 22 Violation of the New York False Claims Act,  N.Y.
      State Fin. Law § 187 et seq. .....................................................77
25
   CLAIM 23 Violation of the North Carolina False Claims Act,
26    N.C. Gen. Stat. § 1-605, et seq. ...............................................78

   CLAIM 24 Violation of the Oklahoma Medicaid False Claims
27    Act,  Okla. Stat. tit. 63, § 5053, et seq. ...................................80

28 CLAIM 25 Violation of the Rhode Island False Claims Act,
      R.I. Gen. Laws § 9-1.1-1 et seq. ..............................................82

SECOND AMENDED COMPLAINT

1

2

**TABLE OF CONTENTS**
**(continued)**

**Page**

3    <u>CLAIM 26</u> Violation of the Tennessee Medicaid False Claims
Act, Tenn. Code Ann. § 71-5-181, *et seq.* ............................... 83

4    <u>CLAIM 27</u> Violation of the Texas Medicaid Fraud Prevention
Act, Tex. Hum. Res. Code Ann. § 36.001 *et seq.* ................... 85

5

6    <u>CLAIM 28</u> Violation of the Vermont False Claims Act, 32
V.S.A. § 630, *et seq.* .................................................................. 87

7    <u>CLAIM 29</u> Violation of the Virginia Fraud Against Taxpayers
Act, Va. Code Ann. § 8.01-216.1, *et seq.* ............................... 88

8    <u>CLAIM 30</u> Violation of the Washington Medicaid Fraud False
Claims Act, Wash. Rev. Code § 74.66.005, *et seq.* ................. 90

9    VIII.    PRAYER FOR RELIEF ....................................................................... 92

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED COMPLAINT

1         Plaintiff Terrence Barrett ("Plaintiff" or "Relator") files this *qui tam*

2    Complaint against Defendant Allergan, Inc. ("Allergan") and alleges as follows:

3    **I.    INTRODUCTION**

4         1.    This case involves Allergan's failure to report to the government a true

5    and accurate price for one of its most profitable and expensive drugs, Botox®.  This

6    false reporting, in turn, caused the government to overpay for the drug under

7    Medicare Part B, Medicaid, and various other government funded health programs.

8         2.    Botox is a popular injectable toxin with both cosmetic (e.g. wrinkles)

9    and therapeutic (e.g. bladder dysfunction) applications. The cosmetic market for

10    Botox is more well-known, but the therapeutic market is actually larger. Within that

11    therapeutic market, the government is one – if not the biggest – of Allergan's

12    customers. In 2017, for example, Medicare Part B reimbursement for Botox

13    reached $325 million, and from 2012-2017, the program's total reimbursement

14    approached $1.5 billion. Medicaid's spend is also significant, reaching $110 million

15    in 2017 alone. With so much money at stake, even small changes in the price the

16    government pays per unit of Botox have big impacts on its spend and on Allergan's

17    revenue.  Critically, that price per unit is determined by information Allergan

18    controls and reports to the government under the Medicare Part B Average Sales

19    Price and Medicaid Best Price statutes.

20         3.    Allergan's violations of these price reporting requirements stem from a

21    far-reaching set of formal and informal free product and cash rebate programs for

22    Botox. These programs successfully reduced the price of the drug for private

23    providers, thus helping Allergan maintain and build market share for its drug. But

24    Allergan failed to include the value of these programs in its price reporting

25    obligations, thus falsely elevating the price of Botox reported to the government,

26    and causing the government to overpay for it.

27         4.    First, Allergan provided substantial free Botox to providers through

28    ostensible new patient and provider training programs, and in connection with sales

SECOND AMENDED COMPLAINT

of Allergan's breast implant product, Natrelle Gel. Second, Allergan provided Botox to physicians in bundled deals with Natrelle Gel implants and Juvederm® that also served to reduce the price of Botox. Third, Allergan condoned abuse of Botox-related programs designed to meet physicians' demand for reduced price, including the Brilliant Distinctions "customer" rewards programs, which placed cash incentives meant for consumers directly into providers' pockets.

5.    These price reduction efforts were improperly excluded from Allergan's statutory price reporting for Botox, causing the government to significantly overpay for the drug. In addition, the provision of reduced-price Botox and Natrelle Gel implants through the NGTP constituted unlawful kickbacks to induce prescriptions of Allergan products.

6.    Due to these pricing violations and kickbacks, Allergan has submitted or caused to be submitted false or fraudulent claims within the meaning of the federal False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA") and numerous state law analogues (*see* § VIII, *infra*).

## II.    <u>JURISDICTION, VENUE AND STATUTORY REQUIREMENTS</u>

7.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732.

8.    This Court has supplemental jurisdiction over the subject matter of the claims brought pursuant to the false claims acts of the States pursuant to 28 U.S.C. § 1367(a).

9.    This Court has personal jurisdiction over Defendant, because Defendant has systematically, continuously, and purposefully availed itself of the privilege of doing business in California and in this District, and because Defendant's acts giving rise to the violations alleged occurred in California and in this District.  This Court also has personal jurisdiction over the Defendant pursuant to 31 U.S.C. § 3732(a), which provides that "[a]ny action under section 3730 may be brought in any judicial district in which the defendant, or in the case of multiple

defendants, any one defendant can be found, resides, transacts business or in which

any act proscribed by section 3729 occurred." During the relevant period,

Defendant transacted business in this District.

10.    Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28

U.S.C. § 1391(b) because Defendant can be found in, resides in, and transacts

business in the this District, because a substantial part of the events or omissions

which give rise to the claims alleged herein occurred in this District, and because

Defendant is subject to this Court's personal jurisdiction with respect to this action.

## III.    THE PARTIES

11.    Relator Terrence Barrett ("Relator") is a former Regional Sales

Manager at Allergan who worked in its sales division from 2008-2018. During that

entire period, Relator managed a team of sales representatives with responsibility

over Botox and other aesthetics products. He has nearly twenty years of experience

total in the pharmaceutical sales industry.

12.    Relator has personal knowledge of the Defendant's practices as a

result of his extensive experience on its pharmaceutical sales team, including

extensive documentation of the policies, practices and occurrences described

herein, compiled throughout the course of his employment. As explained below, in

response to numerous complaints to managers identifying the troublesome practices

described herein and frequent entreaties for remedial measures, Relator was

repeatedly rebuffed and dismissed.

13.    Relator is not aware of any "public disclosure" in connection with the

false claims alleged in this Complaint, as defined in 31 U.S.C. § 3730(e)(4)(A), and

this action is not based upon any such public disclosure of the information herein.

Further, Relator is an "original source" of the information alleged herein on the

grounds that he has knowledge which is both direct and independent of any public

disclosures to the extent any may exist. In particular, Relator's first-hand

knowledge was acquired through years of direct participation and access to internal

1   documentation of the formal and informal programs described herein, as well as

2   related private conversations with Allergan corporate leadership and employees.

3       14.     Defendant Allergan, Inc. ("Allergan" or "Defendant") is a Delaware

4   Corporation with its principal place of business at 2525 Dupont Drive, Irvine,

5   California 92612. Allergan is principally engaged in the development, manufacture,

6   and sale of pharmaceuticals, including prescription pharmaceuticals subject to

7   regulation by the FDA.

8       15.     During the time period relevant to this Complaint, Allergan owned,

9   manufactured, and sold the prescription drug Botox. In 2016 alone, Botox sales

10  generated over $1.98 billion in revenue for Allergan.

11  **IV.    BACKGROUND AND REGULATORY FRAMEWORK**

12      **A.    Medicare Part B Average Sales Price**

13      16.     Medicare Part B is a federally subsidized insurance program that

14  covers certain non-hospital medical services and products, including the therapeutic

15  treatments with Botox at issue in this complaint.  42 U.S.C. §§ 1395(k), 1395(i),

16  1395(s).

17      17.     The government pays for most Part B-covered drugs, including Botox,

18  under the "buy-and-bill" model.  This means that doctors first purchase the drug

19  from Allergan. Doctors then recoup on that purchase when they administer the drug

20  to a patient and bill for it – either billing the patient for aesthetic uses, or billing the

21  government or other insurance programs for covered therapeutic uses.

22      18.     When the government reimburses for a Part B buy-and-bill drug like

23  Botox, it does so using the statutorily defined Average Sales Price ("ASP"). A

24  drug's ASP is defined as a volume-weighted average of the total sales for all

25  National Drug Codes ("NDCs") assigned to that particular drug.  42 U.S.C.A. §

26  1395w-3a(c); 42 C.F.R. § 414.904(c)(1).

27      19.     As explained by the HHS Office of Inspector General in a February

28  2006 report: "[M]anufacturers submit ASPs by NDCs, and more than one NDC

- 4 -                          SECOND AMENDED COMPLAINT

may meet the definition of a HCPCS code. These multiple NDCs are then used to calculate an ASP for the HCPCS code. However, each NDC does not contribute equally toward the payment amount for a HCPCS code. Consistent with section 1847A(b)(3) of the Act, when payment amounts for HCPCS codes are calculated, ASPs at the NDC level must be weighted by the amount of the drug sold during the quarter." Calculation of Volume-Weighted Average Sales Price for Medicare Part B Prescription Drugs at p.3, HHS OIG, February 2006, available at https://oig.hhs.gov/oei/reports/oei-03-05-00310.pdf; s*ee also id*. at 5 (providing mathematical formula).

20.     The ASP reported to the government for a drug must account for various financial arrangements that lower the net or effective price of the drug in the marketplace.  "In calculating the manufacturer's average sales price under this subsection, such price shall include volume discounts, prompt pay discounts, cash discounts, free goods that are contingent on any purchase requirement, chargebacks, and rebates (other than rebates under [the Medicaid Best Price program])." 42 U.S.C.A. § 1395w-3a(c)(3). The ASP statute also gives CMS the discretion to "include in such price other price concessions, which may be based on recommendations of the Inspector General, that would result in a reduction of the cost to the purchaser." *Id.*

21.     This framework aims to ensure that the amount the government pays for a drug reflects the drug's actual price in the marketplace, putting the government insurance programs on even footing with the pricing incentives and discounts routinely offered to private practitioners.  Where the ASP reported by the manufacturer is inflated – i.e. does not reflect the effective price paid by providers in the private market – the government suffers damages through excessive payments.

22.     As relevant here, Botox is sold under four NDCs – two therapeutic and two cosmetic. The pricing for each of these NDCs impacts the Average Sales Price

SECOND AMENDED COMPLAINT

for Botox by volume-weighted average.  It is that single, volume-weighted ASP – which is influenced by cosmetic and therapeutic prices alike – that governs reimbursement for therapeutic indications under Medicare Part B.

23.     Allergan tried to exclude Botox Cosmetic from its ASP reporting obligations through litigation. Unsurprisingly, it lost at summary judgment based on a plain reading of the statute, which the district court found was "clear" on Allergan's obligation to include Botox Cosmetic in its reporting. *Allergan, Inc. v. Burwell*, No. CV 13-00264 (RJL), 2016 WL 1298960, at *4 (D.D.C. Mar. 31, 2016).

24.     Thus, the practices detailed in § V – which are offered to physicians also paying for Botox (i.e. contingent on their purchase of an Allergan product) – must be accounted for in the ASP Allergan reports to CMS. If these practices are not accounted for, as alleged below, then the reported price will be artificially inflated. As a result, the government will pay more for each therapeutic Botox prescription it reimburses than it would have had Allergan honored its price reporting obligations.

**B.     The Medicaid Drug Rebate Program and Best Price Requirements**

25.     The Medicaid program was created in 1965 when Congress enacted Title XIX of the Social Security Act to expand the nation's medical assistance program to cover the medically needy, aged, the blind, the disabled, and needy families with dependent children. 42 U.S.C. §§ 1396-1396v. The Medicaid program is funded by both federal and state monies, with the federal contribution computed separately for each state. 42 U.S.C. §§ 1396b; 1396d(b). At the federal level, Medicaid is administered by The Centers for Medicare & Medicaid Services ("CMS"). Each state pays a portion of the Medicaid costs for goods and services provided to the state's Medicaid beneficiaries.

26.     Congress enacted the Medicaid Rebate Program, 4 U.S.C. § 1396r-8, as part of the Omnibus Budget Reconciliation Act of 1990. The Medicaid Rebate

SECOND AMENDED COMPLAINT

1   Program is a cost-savings measure passed in response to increasing Medicaid

2   expenditures for prescription drugs. See H.R. Rep. No. 101-881, at 96 (1990),

3   reprinted in 1990 U.S.C.C.A.N. 2017, 2108. In passing the Act, Congress

4   concluded that "Medicaid . . . should have the benefit of the same discounts on

5   single source drugs that other large public and private purchasers enjoy." 1990

6   U.S.C.C.A.N. at 2108.

7       27.    Under the Medicaid Drug Rebate Statute, 42 U.S.C. § 1396r-8(a)(1)

8   (the "Rebate Statute"),  drug manufacturers who want their drugs covered by

9   Medicaid and Medicare must enter into a "Rebate Agreement" with the Secretary of

10  HHS in order for federal matching funds to be made available under these programs

11  for that manufacturer's covered outpatient drugs.

12      28.    Under the Rebate Statute and the Rebate Agreement, a manufacturer of

13  a brand name drug, such as Botox, has two primary obligations. First, the

14  manufacturer must report on a quarterly basis to the Secretary the drug's average

15  manufacturers price ("AMP") and "Best Price." 42 U.S.C. § 1396r-8(b)(3)(A).

16  Second the manufacturer must pay a quarterly rebate to each state based on all of

17  the manufacturer's drugs purchased by that state pursuant to its Medicaid plan

18  during that quarter.  The rebate amount owed from the manufacturer to the

19  government is calculated by the total number of drug units (e.g., pills, vials)

20  purchased by the state times the greater of (1) 15.1% of the drug's AMP, or (2) the

21  difference between the AMP and the Best Price. 42 U.S.C. § 1396r-8(c)(1)(A).

22      29.    Congress defined Best Price to represent "the lowest price available

23  from the manufacturer during the rebate period to any wholesaler, retailer, provider,

24  health maintenance organization, [or] nonprofit entity . . . within the United States."

25  42 U.S.C. § 1396r-8(c)(1)(C)(i). The Best Price for a given drug must account for

26  "cash discounts, free goods that are contingent on any purchase requirement,

27  volume discounts, and rebates." 42 U.S.C. § 1396r–8(c)(1)(C)(ii). The Best Price is

28  also determined without regard to special packaging, labeling, or identifiers on the

dosage form or product or package, such as private labeling arrangements. Best Price calculations do not distinguish between approved and unapproved usages of a drug.

30.     The Best Price excludes sales of a drug at a "merely nominal" price. 42 U.S.C. §§ 1396r-8(c)(1)(c)(ii)(III). A "nominal" price is any price less than 10% of AMP in the same quarter for which the AMP is computed. Congress intended this "nominal price" exception to exclude from Best Price calculation "those prices that are merely nominal in amount that manufacturers offer to special purchasers, such as the sale of birth control pills for a penny a pack to Planned Parenthood." See 136 Cong. Rec. S12954-01, *S12962 (Sept. 12, 1990). Notwithstanding the exception for prices that are "merely nominal," Best Price must be adjusted if "cumulative discounts, rebates or other arrangements subsequently adjust the prices actually realized."[1]

31.     The Average Manufacturer Price ("AMP") means, with respect to a covered outpatient drug of a manufacturer for a rebate period, the average price paid to the manufacturer for the drug in the United State by wholesalers for drugs distributed to the retail pharmacy class of trade, after deducting customary prompt pay discounts. 42 U.S.C. § 1936r-8(k)(1).

32.     In calculating the Best Price and AMP, a drug manufacturer must take into account pricing arrangements involving "bundled sales." Bundled sales include "the packaging of drugs of different types where the condition of rebate or discount is that more than one drug type is purchased, or where the resulting discount or rebate is greater than that which would have been received had the drug products been purchased separately." In order to report the prices actually realized where a sale of two drugs is bundled, the manufacturer must allocate the discount on each

---

[1] *See* Letter dated September 3, 2005 from CMS Administrator Mark McClellan to W.J. "Billy" Tauzin, President and CEO, Pharmaceutical Research and Manufacturers of America.

SECOND AMENDED COMPLAINT

1    drug proportionately to the dollar value of the units of each drug sold under the

2    bundled program. *See* Medicaid Rebate Agreement, I (d)-(e).[2]

3         33.    Based on the drug manufacturer's reported Best Price and AMP, the

4    Secretary, through CMS, computes the rebate amount, which the states then use to

5    invoice the manufacturer for the rebate owed. Any rebate amount paid by a

6    manufacturer to a state reduces the amount of money spent by the state under its

7    Medicaid program, and accordingly reduces the medical assistance that the federal

8    government provides to the state. 42 U.S.C. § 1396r-8(c)(1)(C)(i).

9         34.    The federal government has a significant financial interest in the Best

10    Price Rebate program. Amounts received by the states from the manufacturers as

11    rebates are "considered to be a reduction in the amount expended under the state

12    plan in the quarter for medical assistance purposes of section 1396b(a)(1) of this

13    title." 42 U.S.C. § 1396R-8(B)(1)(b).

14        **C.**    **Additional Government Health Insurance Programs**

15         35.    In addition to Medicare and Medicaid, the government subsidizes

16    health care services, including inpatient and outpatient pharmaceutical products,

17    under a variety of other programs. On information and belief, some of these

18    programs rely on statutory drug pricing to set reimbursement prices.

19         36.    For example, under the Civilian Health and Medical Program of the

20    Department of Veterans Affairs (CHAMPVA), "pricing is either negotiated based

21    on vendor's most favored commercial customer pricing or statutorily-required

22    pricing calculations." *See* Pharmacy Benefits Management Services,

23    https://www.pbm.va.gov/PBM/PharmaceuticalPrices.asp (last visited Aug. 22,

24    2018). Indeed, the Operational Policy Manual includes information that drugs are

25    priced using the same HCPCS "J" code pricing as ASP calculations. Pharmacy

26    Reimbursement § 03.05.11, CHAMPVA Operational Policy Manual,

27

28

[2] Sample Medicaid Rebate Agreement available at:
https://www.medicaid.gov/medicaid-chip-program-information/by-
topics/prescription-drugs/downloads/samplerebateagreement.pdf

    SECOND AMENDED COMPLAINT

1  https://www.vha.cc.va.gov/system/templates/selfservice/va_ssnew/help/customer/lo

2  cale/en-US/portal/554400000001036/content/554400000009415/030511-

3  PHARMACY-REIMBURSEMENT (last visited March 24, 2018).

4  37. Likewise, TRICARE – the health program for military personnel,

5  retirees and their families – calculates drug reimbursement using the Medicare

6  ASP. As the TRICARE Reimbursement Manual sets out, drugs "administered other

7  than oral method . . . are to be priced from the Medicare Average Sales Price." *See*

8  § 3.3.1.1 TRICARE Reimbursement Manual 6010.61-M, April 1, 2015,

9  http://manuals.tricare.osd.mil/pages/DisplayManualFile.aspx?Manual=TR15&Chan

10  ge=25&Type=AsOf&Filename=C1S15.PDF (last visited August 22, 2015).

11  38. Accordingly, to the extent other government health insurance

12  programs rely upon Medicaid Best Price or Medicare Part B ASP pricing, or

13  otherwise rely upon cosmetic Botox pricing, those programs will have also

14  overpaid for therapeutic Botox for the reasons set forth below.

15  **D. The Anti-Kickback Statute**

16  39. Under the Medicare and Medicaid Patient Protection Act, 42 U.S.C.

17  § 1320a-7b(b) (the "Anti-Kickback Statute" or "AKS"), it is unlawful to knowingly

18  offer or pay any remuneration in cash or in kind in exchange for the referral of any

19  product for which payment is sought from any federally-funded health care

20  program, including Medicare, Medicaid, and TRICARE. Violation of the statute

21  can subject the perpetrator to criminal and civil penalties, as well as exclusion from

22  participation in federally-funded healthcare programs.

23  40. A claim "that includes items or services resulting from a violation of

24  [the AKS] constitutes a false or fraudulent claim" for purposes of the False Claims

25  Act. 42 U.S.C § 1320a-7b(g).

26  41. The AKS is designed to, *inter alia*, ensure that patient care will not be

27  improperly influenced and corrupted by compensation arrangements which are not

28  directly related to the care of patients or which influence patient care decisions.

SECOND AMENDED COMPLAINT

1  Payment of remuneration of any kind violates the statute if one of the purposes of
2  the payment is to induce referrals.

3        42.    The Government has deemed such misconduct to be material to its
4  decision to pay healthcare claims, in part through its requirement that providers
5  certify compliance with this law as a condition of payment under, and participation
6  in, Government healthcare programs. If the Government had been aware that drugs
7  were prescribed as a result of such prohibited conduct, the Government would not
8  have paid the claims submitted as a result of Allergan's wrongdoing.

9  **V.    FACTUAL ALLEGATIONS**

10       **A.    Botox is a major source of revenue for Allergan.**

11       43.    OnabotulinumtoxinA injection, or "Botox," is a prescription injection
12  utilized for various therapeutic and cosmetic purposes. Allergan first received FDA
13  approval for Botox in December 1991.[3]

14       44.    Botox is registered with the FDA and marketed under at least three
15  separate names: Botox Cosmetic, Botox Therapeutic, and Botox Hyperhidrosis,
16  each comprised of the same prescription Botulinum Toxin Type A. National Drug
17  Codes ("NDC") for Botox in 2017 included at least the following: 0023-3921-02;
18  0023-1145-01; 0023-9232-01; 0023-3919-50. The ASP, Best Price, and AMP for
19  Botox are reported to CMS under these numbers.

20       45.    Botox Therapeutic and Hyperhidrosis are FDA-approved for a total of
21  nine therapeutic indications. Government health insurance programs, such as
22  Medicare and Medicaid cover Botox prescriptions for these indications, including:

23   • to treat overactive bladder symptoms such as a strong need to urinate with
24        leaking or wetting accidents (urge urinary incontinence), a strong need to
25        urinate right away (urgency), and urinating often (frequency) in adults 18
26        years and older when another type of medicine (anticholinergic) does not
27        work well enough or cannot be taken;

28  ---
[3] FDA approval information available at: https://www.accessdata.fda.gov

- 11 -                                    SECOND AMENDED COMPLAINT

- to treat leakage of urine (incontinence) in adults 18 years and older with overactive bladder due to neurologic disease who still have leakage or cannot tolerate the side effects after trying an anticholinergic medication;

- to prevent headaches in adults with chronic migraine who have 15 or more days each month with headache lasting 4 or more hours each day in people 18 years or older;

- to treat increased muscle stiffness in elbow, wrist, finger, thumb, ankle, and toe muscles in people 18 years and older with upper and lower limb spasticity;

- to treat the abnormal head position and neck pain that happens with cervical dystonia (CD) in people 16 years and older;

- to treat certain types of eye muscle problems (strabismus) or abnormal spasm of the eyelids (blepharospasm) in people 12 years and older; and

- to treat the symptoms of severe underarm sweating (hyperhidrosis) when topical medicines do not work well enough in people 18 year or older. [4]

46.    Botox Cosmetic is an elective prescription medicine injected into the muscle to improve the look of moderate to severe frown lines between eyebrows; and injected into the area around the side of the eyes to improve the look of moderate to severe crows' feet lines in adults.[5] Government health insurance coverage does not apply to these elective, cosmetic applications of Botox.

47.    Botox is a relatively expensive drug which generates enormous revenue for Allergan. In 2016, cumulative Botox sales generated $1.9 billion in revenue for Allergan, an increase from $1.39 billion in 2015. Therapeutic usages, which are eligible for reimbursement by government programs, accounted for more than half (63%) of that total revenue in 2016.

---

[4] Therapeutic indications available at: http://www.botox.com/
[5] Cosmetic indications available at: http://www.botox.com/

SECOND AMENDED COMPLAINT

48.     The government spends heavily on the drug. Medicare Part B spent $295 million in 2016 and $325 million in 2017. Medicaid spent $85 million in 2016 and $110 million in 2017.[6]

**B.     Dual marketplaces for Botox create a conundrum on pricing.**

49.     With Botox, a single toxin used for both therapeutic and cosmetic applications, Allergan faced competing incentives on pricing: in the therapeutic space, it benefitted from higher prices so that the government's reimbursement rate would stay elevated, but in the cosmetic space, lower prices were needed to fend off ever growing competition.

50.     These competing tensions were summarized by Evolus – an aesthetics pharmaceutical company with an injectable toxin (prabotuliumtoxinA) competing for Botox cosmetic market share.  Evolus recently discussed in its August 2018 10-Q whether to pursue a therapeutic market in addition to cosmetic uses for this toxin. If they chose that route:

> [w]e will be required to calculate [the toxin's] average sales price, inclusive of both aesthetic and therapeutic sales, for purposes of therapeutic reimbursement. *As a result, we may limit our aesthetic neurotoxin discounting to protect our therapeutic neurotoxin reimbursement rate, which many of our competitors currently do*.

51.     Unable to exempt Botox Cosmetic from its statutorily mandated price reporting, Allergan tried to have the best of both worlds: keeping the listed price high to ensure maximal therapeutic reimbursement, while reducing the effective cost to cosmetic practitioners through the unreported free sample and rebate programs described herein. These programs were designed, and operated, to hide cosmetic price reduction from the government.

---

[6] Medicaid spend data available at: https://data.medicaid.gov; Medicare spend data available at: https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Information-on-Prescription-Drugs/MedicarePartB.html.

SECOND AMENDED COMPLAINT

52.     As detailed below, Allergan operates programs enabling the provision of free Botox samples and other consideration to physicians contingent on their purchase of Allergan products – namely, more Botox.  These sampling programs are purportedly aimed at new patients, physician training, and customer loyalty. In fact, the programs are all chiefly designed and implemented to achieve reduced prices for cosmetic providers without leading to a decrease in reimbursement from the government. And, as discussed below, even if the programs were honestly implemented to further the stated goals, Allergan would still not be excused from its price reporting obligations.

C.     **Allergan provided countless samples to reduce the effective price of Botox for private purchasers, without including the value of those samples in it price reporting to the government.**

53.     Competitors aggressively target Botox revenues with less expensive cosmetic toxins, such as Xeomin and Dysport. Currently, for example, Botox's list price is approximately $600 per vial, compared to approximately $482 per vial and $541 per vial for Xeomin and Dysport, respectively. This competition strongly incentivizes Allergan to reduce the effective price of Botox to physicians in the aesthetic market. But it does not want to pass on that reduced price to the government, which reimburses Allergan hundreds of millions a year for Botox. One of Allergan's key strategies for meeting these competing goals is to supply providers with free Botox samples without including them in its price reporting.

54.     The largest of Allergan's sample programs are those ostensibly reserved for training and new patients, sometimes referred to as the "Physician Experience" and "Naïve Patient" programs, respectively. For example, in 2017, Allergan provided approximately $105 million worth of free samples just under these two programs.

55.     Notably, Allergan's announcement of 2017 sample volumes coincided with a price increase for Botox Cosmetic, and in the context of discussions within the company regarding providers' anticipated negative reaction to that increase.

- 14 -                     SECOND AMENDED COMPLAINT

1    Similarly, Allergan would often increase Botox samples to counteract price
2    pressure in response to the launch of new, competitive toxins such as Dysport and
3    Xeomin.

4         56.    The $105 million in free samples corresponded to almost 350,000
5    50ml sample vials available to the sales team in 2017, with each sample vial
6    capable of providing (albeit not legally) multiple cosmetic treatments. Allergan's
7    sample volumes under these two programs were at a similar level every year for the
8    relevant period, though as described above, Allergan would often increase samples
9    in anticipation of upcoming competitive pressure, such as a new toxin entering the
10   cosmetic market.

11        57.    These samples are distributed through Allergan's approximately 35
12   regional managers.  On average, each regional manager received roughly 10,000
13   samples to distribute to his or her sales representatives throughout the year in 2017,
14   again, with similar numbers at play throughout the relevant time period. Using
15   Allergan's centralized sample management system, managers would allocate
16   samples to their sales representatives, who could then draw on their allocated
17   amounts.

18        58.    Not surprisingly, the samples were viewed by the sales teams as sales
19   resources designed to garner favor with their accounts and help them meet quarterly
20   and annual sales targets, which in turn drove sales compensation. Regional
21   managers like Relator had substantial discretion in allocating the samples to achieve
22   these targets, and viewed samples as the largest resource at their disposal.

23        59.    Regional managers principally, if not exclusively, considered the
24   "return on investment" as the criteria informing where and to whom to distribute
25   samples – i.e., which sales representatives would be able to leverage samples to
26   lock in new purchasers or new orders from existing purchasers (with special
27   emphasis on high volume purchasers).

28

SECOND AMENDED COMPLAINT

60.    Often, managers would reallocate samples midway through the quarter to reflect that evolving assessment, sometimes accompanied by requests to their sales representatives to advise if they had extra samples to repurpose toward representatives and accounts with greater ROI potential. By contrast, though the programs were cast as being related to new patients and provider training, regional managers rarely, if ever, sought or received related documentation of any sort.

61.    Tellingly, if a regional manager had exhausted the quarterly sample allocation from these two sample programs, he or she could simply request more samples from various Allergan corporate divisions, most often, the Marketing department. In a conversation in or about April 2017, one compliance department employee told Relator that the Marketing team often lobbied them to find ways to increase the flow of samples into the market. Similarly, the Sales Training division had yet additional samples to contribute. Requests to these corporate divisions were near uniformly granted, adding significant additional sample volume to the private market.

62.    Sales representatives, in turn, frequently courted their regional managers for additional samples to help land large sales, often advising that they needed more "sample support" to close a deal. At times, sales representatives would promise their accounts samples they anticipated receiving in the future, thus creating "debt" that would be owed when subsequent sample distributions were made.

63.    When sales representatives expressed concerns about the practice of using samples to reduce prices, management dismissed them. Indeed, one compliance employee told Relator in late 2017 that sales representatives often reported that they felt pressured by regional managers to misuse samples. Ultimately, sales representatives that could not effectively leverage samples had difficulty staying with, let alone succeeding at, the company. One Allergan sales representative based in California informed Relator of an instance in which her

SECOND AMENDED COMPLAINT

1   manager warned her that "not being able to play the same game is going to be the

2   death of your career at Allergan," or words to that effect.

3       64.    Providers grew accustomed to and expected effective reduced prices

4   through the provision of free samples, and openly demanded that the practice

5   continue. In one instance, in early 2017, a medical spa chain threatened to call

6   Allergan corporate to complain that the samples promised by a sales representative

7   had not materialized. And, the provider continued, absent delivery of the samples, it

8   would switch to a competitor. This provider, which had multiple locations

9   throughout the country, was known to receive more Botox and filler samples than it

10  purchased, and to sell samples. Senior Allergan management was advised of this

11  practice, but did nothing. Indeed, a Sales Vice President took over management of

12  the account when he felt that his subordinates were too resistant to maintaining the

13  flow of samples to the account. Complaints to Allergan management about this

14  misconduct were ignored.

15      65.    Similarly, when sales representatives went out on a leave of absence or

16  resigned, accounts they had serviced would frequently contact managers and

17  customer service stating that the absent representative "owed" them samples.

18  These situations would often prompt reallocation of samples by regional managers,

19  or requests to corporate divisions for additional samples.

20      66.    In another instance, a provider in Los Angeles, Dr. A.C., complained

21  to one of Relator's superiors about not receiving sufficient sample "support." Upon

22  review, Relator and his sales representative learned that this provider was receiving

23  half of its Botox vials for free. In a subsequent in person meeting with the provider,

24  the physician said that the practice counted on samples to "pay the bills," or words

25  to that effect.

26      67.    Many providers learned that end-of-quarter sales quota pressure

27  provided an opportune time to demand samples from sales representatives. One

28  large provider in Southern California told an Allergan Sales Director in or about

- 17 -

May 2017 that this was "how the game works," or words to that effect, and that at the end of quarters, sales representatives would be more inclined to negotiate the effective price using samples to bring the price down.

68.    Similar complaints were often received by Allergan's inside sales representatives, who would frequently field sales calls for territories lacking staffing, whether due to vacancies or vacation. Providers would often demand the same deal they were receiving from the sales representatives, i.e., an effective lower price through samples.

69.    Through these sample programs, sales representatives reduce the overall effective cost of Botox to prescribers, but do not report that reduction to the government. This failure to report the impact of samples on ASP is evident not only from Relator's conversations with Allergan personnel (as discussed below), but also by comparing the reported Medicare reimbursement rate to Allergan's list price.

70.    In 2017, Medicare reported a reimbursement rate of $603 per 100 ml Botox vial.  That figure ($603), in turn, is defined by statute to be 106% of the ASP Allergan reported for Botox in that timeframe. Thus, Allergan reported a Botox ASP of $569.[7]  During this same time period, the list price for Botox was $601, meaning Allergan reported an ASP – required to be inclusive of discounts, rebates, and samples contingent on purchase requirements – which represented a 5.3% reduction from the list price.

71.    Notably, a reported ASP of $569 off a list price of $601 is readily and fully accounted for by Botox's above the books, formal percentage discount programs for both cosmetic and therapeutic purchasers.  Specifically, separate from the sample and rebate programs at issue herein, Allergan also operates a portfolio-wide percentage discount program (the Allergan Partner Privileges program) – in

---

[7] $569 per vial reported rate x 1.06 (statutory definition for ASP) = $603 reported reimbursement rate.

1   which purchasers of significant amounts of aesthetic Allergan products receive a

2   discount on their orders ranging from 4-18%.  Therapeutic purchasers were also

3   eligible for list price discounts through various industry standard drug purchase

4   arrangements, for example, by purchasing through wholesalers obtaining volume

5   and prompt pay discounts.

6        72.    Accordingly, the reported ASP could not have accounted for the robust

7   sample programs, which would have instead reduced the ASP even further. On

8   information and belief, and in light of the nature of the programs detailed herein,

9   this conclusion holds true for the entire relevant time period.

10       73.    The math is corroborated by Relator's experience at the company. For

11  example, the Western Area Director acknowledged that samples lead to price

12  reduction in several conversations with Relator. In one instance, while visiting an

13  account in Los Angeles, the practice manager there reported a Botox price lower

14  than could be explained by any formal discount program offered by Allergan. As he

15  acknowledged to Relator, that price was possible *only* through the use of samples

16  for cost reduction. To Relator's knowledge, despite this information, the Director

17  took no action to remedy or report this price reduction or ensure it was reported as

18  part of the ASP and other price data.

19       74.    In or about 2017, during a Managers Meeting, the same Director told

20  the Western Area Management Team that when Botox samples are used as a form

21  of price reduction, it is "the exact same thing the Plastic Surgery team is doing with

22  the NGTP" (described below) or words to that effect.

23       75.    In or about November 2017, the same Director informed Relator and

24  others of an issue with Dr. D.Y., a prominent physician account at a West Area

25  Management team meeting. Specifically, Dr. D.Y. emailed David Moatazedi, the

26  former Senior Vice President of Allergan Medical, questioning some charging

27  discrepancies.  During an investigation of the claim, involving the Director, it was

28  uncovered that Dr. D.Y. was in possession of a text message from an Allergan

SECOND AMENDED COMPLAINT

1   Representative, dated September 23, 2017, stating "Botox is $414 a vial like last

2   time."  As this message demonstrated, the Representative was reducing the price of

3   Botox by nearly a third – from a list price of $601 to $414. This price was not

4   available through any formal portfolio discount or rewards program, and could only

5   have been attained through the use of samples to reduce cost.  As the Director

6   related to the team, Allergan was forced to provide that doctor a $63,000 credit to

7   make the "problem" – including potential allegations of kickbacks and price

8   reporting issues –  "go away."

9        76.    In addition, Relator also spoke to a former national sales account

10   manager about a conference call in which David Moatazedi, former Senior Vice

11   President of Allergan Medical, promised a vendor (an injector training school that

12   also sold Botox) that he would "make up" for the high price of Botox by providing

13   free samples. Following that statement, the colleague muted the phone and

14   informed Mr. Moatazedi that they could not provide the samples as a cost

15   reduction, to which Mr. Moatazedi replied that she should "figure it out" and

16   provide the samples. This same manager once noted that Allergan was intent on

17   keeping list prices high in order to prop up the ASP reported to CMS, which in turn

18   allowed physicians to receive greater government reimbursement for each injection

19   sold.

20        77.    When viewed, as they are provided, in connection with purchased

21   product, the net effect of free samples for physicians is to reduce the overall price

22   of Botox they have to buy (e.g., buy ten, and get one free). Put another way, if a

23   sales representative visited an office and sold Botox, and also provided free samples

24   to that same office, those samples must be accounted for due to the overall effect

25   that exchange has on the price of Botox to the practice.

26        78.    Allergan was required to include all samples offered in connection

27   with purchased product in calculating ASP and Best Price.  When viewed in total,

28   these massive sampling endeavors have a significant impact on ASP and Best Price.

SECOND AMENDED COMPLAINT

1    Instead, Allergan promoted the disingenuous narrative that the samples were not

2    provided to deliver an economic benefit to private providers, but rather for some

3    alternate purpose (such as to try out for a new patient or train a new provider) that,

4    according to Allergan, did not impact Best Price or ASP reporting requirements.

5          79.    Importantly, however, the purported focus on new Botox patients and

6    provider training, even if legitimate, would not excuse excluding these vast samples

7    from Allergan's price reporting obligations. Allergan is required to include in ASP

8    calculations any and all free goods offered in exchange for some consideration from

9    the physician. Unlike with the vast majority of drugs, which doctors never have to

10   purchase (such as virtually any outpatient prescription medication), all, or certainly

11   virtually all, of the Botox sample recipients *also* purchase some Botox, and the

12   receipt of free Botox necessarily lessens the net effective price of those purchases.

13   This is precisely the sort of pricing advantage that the price reporting statutes are

14   intended to capture, so that the government is not treated less favorably then private

15   actors.

16         80.    The new patient rationale is especially flimsy because there is very

17   little doubt about the efficacy of Botox, which utilizes the same mechanism of

18   action whether used for therapeutic or cosmetic purposes – specifically, it relaxes

19   the muscle in which it is injected. In a conversation with the National Account

20   Manager for Botox Cosmetic, who was previously the Botox Therapeutic National

21   Product Manager, the manager told Relator that there was no actual need to sample

22   Botox for new patients because "everyone knows" that it works, or words to that

23   effect. This same Manager also continued that Botox is "hardly sampled" on the

24   therapeutic side given its known efficacy.

25         81.    Nonetheless, in an effort to feign compliance, sales representatives are

26   explicitly trained by Allergan to verbally divorce the provision of samples from

27   price reduction. For example, physicians purchasing ten Botox vials and requesting

28   an eleventh or twelfth vial free would routinely be informed that such samples

SECOND AMENDED COMPLAINT

1    could not be provided in conjunction with an order, however, the requested number

2    of samples could certainly be provided as part of the new patient or training

3    programs. Such scenarios are regularly incorporated into Allergan training

4    procedures, including role playing to instruct sales representatives just how to

5    verbally walk the line of compliance while getting the price reduction physicians

6    want.  The implications of such negotiations were clear: to lower the effective cost

7    of Botox in response to physician demand.

8         82.    Providers receiving free samples acknowledge their receipt through an

9    electronic signature on an electronic tablet. On information and belief, this

10   signature includes a statement acknowledging that the sample received is not for

11   sale. Critically, however, Allergan takes no measures to ensure the samples are not

12   sold, nor does it oversee or corroborate tying of the samples to actual naïve patients

13   or to provider training. Instead, it takes a "see no evil approach" on the strength of

14   this disclaimer alone, the glaring evidence to the contrary notwithstanding.  A

15   physician's assurance that the sample will be used for a new patient or for training

16   in no way absolves Allergan of its own independent price reporting obligations.

17        83.    Allergan's approach contrasts sharply (and unfavorably) with sample

18   programs for "buy-and-bill" drugs the Department of Health Services Office of

19   Inspector General have approved in advisory opinions in the past. In one such

20   example, the sample program focused exclusively on affirmative, documented

21   patient requests for a product trial, thorough recordkeeping to ensure the drug was

22   used for that new patient and that the patient does not receive multiple trials, and

23   close evaluation of a sample volume that would be appropriate for the physician

24   that would be administering the drug (with a hard cap per practice for good

25   measure). OIG Advisory Opinion No. 08-04, available at

26   https://oig.hhs.gov/fraud/docs/advisoryopinions/2008/AdvOpn08-04.pdf (last

27   visited Feb. 5, 2008). Allergan put no comparable safeguards in place regarding its

28   Botox sampling precisely because the programs were pretextual. Their true purpose

SECOND AMENDED COMPLAINT

1    was to reduce the price for providers without having to deliver that same benefit to

2    the government.

3        84.    In addition, although these samples must be accounted for due to their

4    connection to purchased product, it is also worth noting separately that samples

5    provided to physicians' offices at no cost, which are then sold to patients, do not

6    qualify for any "nominal" price exception to price reporting requirements. Under

7    the "nominal price" exception, the provision of free pharmaceutical product that is

8    not "contingent on any purchase requirement" and not for "resale by the recipient"

9    is appropriately excluded from Best Price and ASP calculations.   However, give

10   the widespread resale of free Botox samples by physicians' offices, and Allergan's'

11   knowledge and/or reckless disregard of the same, the samples were not subject to

12   the "nominal price" exception, and must have been included in the relevant

13   calculations and reporting for this independent reason as well.

14       **D.    The Natrelle Gel Breast Implant Trial Program was a vehicle for kickbacks and price reporting violations.**

15

16       85.    In addition to Botox, Allergan also manufacturers Natrelle Gel breast

17   implants.  Natrelle implants are FDA approved for cosmetic breast augmentation

18   procedures as well as therapeutic usages for breast reconstruction. Breast

19   reconstruction includes primary reconstruction to replace breast tissue that has been

20   removed due to cancer or trauma or that has failed to develop properly due to a

21   severe breast abnormality, as well as revision surgery to correct or improve the

22   result of a primary breast reconstruction surgery.[8]

23       86.    As Allergan breast implant competitors Mentor World Wide and

24   Sientra Inc. began to deeply discount prices on their competing implants, Allergan's

25   breast implant products, including Natrelle Gel, began to lose market share.

26       87.    In or about 2011, Allergan launched a bundled sales program referred

27   to as the Natrelle Gel Trial Program ("NGTP"). The program was designed to

28   ────────────────

[8] Natrelle indications available at: https://www.natrelle.com/#isi

1   expose patients to additional Allergan products, including Botox, and drive Natrelle

2   usage.[9]

3       88.     As part of the NGTP, patients were eligible to receive either a free

4   sample of 20 units of Botox cosmetic, or a free trial of Latisse®, another Allergan

5   product, with purchase of Natrelle implants.  In addition, the Natrelle patient would

6   also be encouraged to "refer a friend" to participate in these benefits. When that

7   friend also enrolled in the program, they too would be eligible for either 20 units of

8   Botox cosmetic, or a free trial of Latisse.  These offers were redeemed for free

9   Botox, the more expensive drug, over Latisse approximately 80% of the time.

10      89.     Nationally, the annual value of free samples of Botox distributed as

11  part of the NGTP was $15.7 million in 2013, $14 million in 2014, and $6 million

12  from January 2015 –April 2015.  (After April 2015, Allergan no longer made this

13  data available to Salesforce, where this data was stored in previous years).

14      90.     Ostensibly a customer benefit program, in practice, and by design,

15  NGTP benefitted physicians, and likely in an amount much higher than reported

16  numbers for the reasons discussed below. Generally, Allergan placed NGTP

17  program implementation in the hands of the health care providers themselves:  a

18  physician's office would fill out forms for both "patient" and "friend" following a

19  Natrelle implant use, without tracking as to whether the resulting free Botox

20  samples were simply kept by physicians and sold to patients in order to reduce their

21  overall product cost.

22      91.     NGTP's benefit was well understood within the company: to reduce

23  the price of Botox and Natrelle to private providers through a bundled arrangement

24  while concealing the effects on prices reported to CMS.

25      92.     The value of the free Botox was further compounded by improper

26  "vial-splitting" by participating physicians. Specifically, Botox Cosmetic's

27

28  [9] The NGTP operated in connection with the Brilliant Distinctions program described in § V.C, *infra*.

SECOND AMENDED COMPLAINT

indication is for 20-24 units. Allergan does not offer Botox vials tailored to Cosmetic indications. Thus, Botox Cosmetic was distributed to physicians in free 50 unit vials as part of NGTP leaving an additional 26-30 units – at least an entire dose – in each vial unaccounted for and unmonitored by Allergan. Allergan turned a blind eye to "vial splitting" and use and sale of the extra Botox provided to physicians that resulted.

### 1. Allergan employees, including Relator, reported rampant abuse in the NGTP.

93.    Throughout the course of his employment, Relator spoke with several Allergan employees about their concerns about the NGTP, rampant abuse of the program, and implications for price reporting:

a.    Relator regularly discussed abuse of the NGTP with a former sales manager at Allergan in the southwestern United States.  In or about fall of 2013 and winter of 2014, Relator and his colleague traded several emails about the abuse, including physicians selling samples of Botox provided through the NGTP (illustrating they were not, in fact, destined for Natrelle patients). During their conversations, this colleague acknowledged the "real problem" for government reimbursement given the rampant abuse of the program, and expressed concern that no action was being taken to correct it.

b.    Relator also frequently discussed the culture of non-compliance surrounding the NGTP with a national sales account manager.  These conversations began in or about 2013 or 2014. This colleague was so concerned about the abuse of the program and potential impact on government reimbursement, she told Relator she took "copious notes" documenting the issues, because if the abuse was discovered outside of Allergan, she did not want to "go down with the ship" or words to that effect. She was removed from several accounts after expressing concern about abuses to Allergan leadership. As recently as August 2017, this

SECOND AMENDED COMPLAINT

colleague expressed to Relator that the NGTP represented a "great risk" to Allergan.

c.      A National Training Manager and Regional Sales Manager from the western United States complained to his superiors, including Ray Bassi, Western Facial Sales Director, numerous times about the NGTP and the fact that Surgical sales representatives (representatives selling Natrelle products, a separate group from Botox sales representatives) were positioning free Botox vials as a form of cost reduction. As a salesman, he grew increasingly frustrated that these "free samples" offered to NGTP physicians impeded his ability to actually sell Botox to those accounts.

d.      In or about December 2014, an Allergan sales representative took a photo of a message sent by a physician to his staff, directing them to "sell the samples" of Botox provided through the NGTP. The sales representative reported the account and the photo to Allergan's Vice President of sales, who took no corrective action.

e.      In or about August 2017, a nurse contacted an Allergan sales representative in California via email to report that the physician she worked for was selling Botox samples received through NGTP to patients. This reported information was provided to the Western Area Director, but no corrective action was taken.

f.      In or about September 2017, a sales representative and National Training Manager from the southern United States approached David Moatazedi and the Western Area Director and expressed similar concerns about the NGTP, and Allergan's unwillingness to take action against accounts abusing the program.

94.     The examples above are merely representative of the numerous Allergan employees Relator is aware of that expressed concern to Allergan leadership over NGTP abuse.  These reports demonstrate that samples provided through NGTP were reducing the cost of Botox to physicians.  The samples took

SECOND AMENDED COMPLAINT

the place of product the physicians would have otherwise had to purchase, and their overall cost of Botox was reduced as a result.

95.    In or about December 2017, Relator and a Plastic Surgery Representative met with a physician in southern California. During that meeting, the Plastic Surgery Representative explained the workings of the NGTP to the physician, who remarked that the program "cannot be right" because it is "inviting doctors to commit fraud" in that any product provided for free "will be sold," or words to that effect. Indeed, that physician, who is an advisor to Allergan, was so concerned that he stated he was "obligated to call David Moatazedi" because "doctors are going to abuse this program." The physician requested the representative get back to him with further information confirming the NGTP actually functioned as it did.

### 2.    Providing Botox and Natrelle in bundled arrangements reduced the effective price of Botox to providers.

96.    As the examples above suggest, the NGTP program served to sharply reduce physicians' overall cost of Botox by providing free Botox bundled together with Natrelle products. As a package, this deal also reduced the price of Natrelle – which was facing its own set of cheaper competitive products.  Surgical sales representatives (as opposed to Botox sales representatives) were trained to maximize these savings benefits to encourage Natrelle purchases. They were even taught to have physician accounts retroactively access free Botox samples on behalf of *former* Natrelle patients.

97.    Some examples of price reduction through the NGTP from just Relator's territory include the following:

a.    Dr. M. H. received a total of at least 1,792 free Botox samples in conjunction with the NGTP from August 2015 – July 2017, amounting to a total dollar value of $536,985 in free Botox. During that time period, Dr. M. H. purchased just $26,000 in Botox, indicating that approximately 95% of his total

Botox inventory was received at no cost. Advertisements from Dr. M.H.'s office indicated he sold free samples of Botox to customers outside of the NGTP program. Relator raised the ongoing abuse within Allergan, including the advertisements, and his concerns were dismissed due to "larger forces at play."

        b.     Dr. D.K. received a total of at least 1,042 free Botox samples in conjunction with the NGTP from the year 2012 - August 2017, amounting to a total dollar value of $313,121 in free Botox samples. During that time period, Dr. D.K. purchased just $21,873 in Botox, indicating that approximately 93% of his total Botox inventory was received at no cost.

        c.     Dr. J.D. received a total of at least 112 free Botox samples in conjunction with the NGTP from January 2017 - August 2017, amounting to a total dollar value of $33,656 in free Botox samples. During that time period, Dr. J.D. purchased just $10,800 in Botox, indicating that approximately 68% of his total Botox inventory was received at no cost.

        d.     Dr. W.B. received a total of at least 183 free Botox samples in conjunction with the NGTP from the year 2016-August 2017, amounting to a total dollar value of $54,991.50 in free Botox samples. During that time period, Dr. W.B. purchased just $1,116 in Botox, indicating that approximately 98% of his total Botox inventory was received at no cost.

98.    Including these samples into price calculations would materially impact on the price paid by government payors for therapeutic usages. On information and belief, Allergan did not report the NGTP program as "bundled sales" or free goods "contingent" on the purchase of Natrelle – an Allergan product – in compliance with its requirements for Best Price and ASP reporting in its quarterly reporting from 2011 onward.

99.    Notably, because these purchasers and others received overwhelmingly more free Botox than the amount they actually purchased through

SECOND AMENDED COMPLAINT

1    regular channels, the effective "Best Price" is necessarily far less than any price the

2    government receives for the same drug.

3        100.    These practices were not limited to Relator's geographic region or to

4    his specific client accounts – they span throughout the country. For example, a

5    Senior Regional Manager from the southeastern United States gulf region directly

6    informed Relator of numerous "egregious" accounts in the NGTP program in her

7    state.  This same employee also informed Relator that she maintained a collection

8    of all the emails she sent complaining of NGTP issues to Allergan leadership,

9    because she wanted proof that she did not agree with the program and the abuse

10    allowed to occur within it.

11        101.    Allergan's scheme was done knowingly, as outlined above. Numerous

12    Cosmetic Sales Managers and sales representatives, including Relator, complained

13    of widespread abuse in the NGTP program to numerous members of Allergan's

14    leadership. Allergan leadership either ignored these complaints, or reprimanded

15    those who expressed concern. Relator personally sent dozens of emails raising

16    concern and detailing abuses of these accounts to Allergan leadership, and

17    requesting intervention and assistance. Relator's and others' concerns were

18    disregarded time and time again.

19        102.    In one email, a Los Angeles Plastic Surgery Regional Manager at

20    Allergan informed Relator that Dr. D.K. was one of Allergan's "largest accounts in

21    the LA area and it would no question lead him to switching the implant business

22    [away from Natrelle] with the low ball pricing he is being offered by Mentor." In

23    another, Ray Bassi, Western Facial Sales Director, Allergan, directed Relator to

24    "hold off" on involving Allergan's compliance team with respect to his concerns

25    about the NGTP program. In spite of this direction, internal emails indicate

26    Allergan leadership's awareness of the "VERY obvious" issues and abuses within

27    the NGTP program, and concerns regarding NGTP's compliance with a corporate

28    integrity agreement Allergan had entered with the federal government.

SECOND AMENDED COMPLAINT

103.    On information and belief, abuse of the NGTP continues today.

104.    Allergan should have included bundled and contingent sales arrangements for the sale of Natrelle and Botox in its calculation and reporting of the effective ASP and Best Price for Botox, and accurately reported that price to CMS. Allergan should have reported samples provided to physicians that were then sold to patients, as those samples do not fall within any "nominal" price exception to Best Price or ASP reporting requirements as they served to reduce the price paid by the physicians. Based on Relator's intimate knowledge of the inherent structure of these programs, and on information and belief, Allergan failed to account for these practices in its calculations, thus harming the government.

105.    Just as with the training and new patient sample programs, Relator alleges that samples provided through NGTP were not included in Allergan's price reporting because (a) the reported ASP is fully accounted for by formal discount and rebate programs, meaning that samples are necessarily being excluded, and (b) the program was pretextual based on how it was administered, as discussed above.

106.    In addition, the NGTP implicates the Anti-Kickback Statute. Natrelle is frequently used in government reimbursable breast reconstructions. On information and belief, many surgeons participating in the NGTP performed reconstruction cases as well as cosmetic (e.g., augmentation) cases. By providing free Botox to these physicians, Allergan was attempting, at least in part, to improperly influence and corrupt the surgeons' decision-making related to the choice of breast implant for reconstruction cases.

107.    Allergan used kickbacks to reward and secure physician loyalty to Allergan drugs. The NGTP operated to provide unlawful kickbacks to physicians in the form of price discounts of Allergan products to leverage the "power of the portfolio" and encourage these physicians to prescribe Allergan products, including Natrelle Gel and Botox for both therapeutic and cosmetic purposes.

SECOND AMENDED COMPLAINT

**E.**    **Allergan regularly provides Botox samples to providers as
compensation for valuable services.**

108.    In addition to the regular provision of samples as a general practice,
physicians are also specifically provided with free Botox samples as compensation
for treatment and services provided to company leadership, family and friends. For
example:

a.    In or about November 2016, Relator was instructed to provide
six 50 unit Botox sample vials, or a value of $1,674, along with other products, to
Dr. R.C. as reimbursement for treatments provided to David Moatazedi, former
Senior Vice President of Allergan Medical, Inc., or his family and friends.

b.    In or about January 2017, Relator was directed to provide three
100 unit Botox vials, or a value of $1,674, along with other products, to Dr. R.C., as
reimbursement for treatments provided for family and friends of Mr. Moatazedi.

c.    In or about February 2017, Relator was directed to provide two
50 unit Botox vials, or a value of $1,116, to Dr. R.C., as reimbursement for
treatment provided for family and friend of Mr. Moatazedi.

d.    In or about March 2017, Relator was directed to provide four
100 unit Botox vials, or a value of $2,232, to Dr. R.C., as reimbursement for
treatment provided for family and friends of Mr. Moatazedi.

e.    In or about June 2017, Relator was directed to provide four 100
unit Botox vials, or a value of $2,232, to Dr. R.C., as reimbursement for treatment
provided for family and friends of Mr. Moatazedi.

109.    In sum, from November 2016 – July 2017, Dr. R.C. received a total
value of at least $18,853 in Botox samples known to Relator as compensation for
treatment for Mr. Moatazedi, his family, and friends. On information and belief, at
least nine members of the Allergan Executive Team have similarly utilized Doctor
R.C.'s services and provided samples in lieu of payments for those services.

SECOND AMENDED COMPLAINT

110.   In addition, Dr. R.C. received numerous Botox samples for providing Botox injection training programs, including samples in excess of what was necessary for the training, in consideration for his services.

111.   Although samples were provided to Dr. R.C. in compensation for services provided to Allergan leadership and for training and other programs, internally, these samples were recorded as part of the Naïve Patient sample program.

112.   On information and belief, several physicians in addition to Dr. R.C. likewise received compensation in free samples for provision of services to Allergan leadership and providing injection training services.  For example, a sales representative from California informed Relator about text messages she received instructing her to provide Botox samples to a physician's office as compensation for treatment of the Vice President of Plastic Surgery, Jeff Erhardt's, sister in laws' treatments from that physician.  That sales representative also detailed mishandling of injectable samples outside of the formal, sanitary processes, which resulted in a formal compliance investigation in January 2018.

113.   Use of Botox to compensate for valuable services was not limited to Allergan executives and leadership. For example, a California based sales representative (later, Sales Manager), was known to Relator to pay for his expensive haircuts by directing his hair stylist to a particular physician to receive Botox treatments. Further, a Regional Sales manager in the Los Angeles area was surprised to learn, after assuming her role in or about 2015, that her predecessor had promised to provide a physician with free product, including Botox and Juvederm, in exchange for the physician paying his property taxes.

114.   Samples provided to physicians for the provision of services to Allergan leadership and other employees are not "nominal" in price. They are "contingent" on purchase requirements, in that they are tied to conditions of

SECOND AMENDED COMPLAINT

performance or consideration, namely, the provision of services to Allergan family and friends.

115.   The provision of a vast amount of free samples in connection with physician-administered drugs and other services of value demonstrates that Allergan could not have properly taken those concessions into consideration when submitting statutorily mandated Best Price and ASP information to CMS. Thus, Allergan knowingly made false statements to the Government when it failed to take these samples into account when it reported the relevant pricing information to the Government.

116.   Given the widespread and, in practice, deceptive nature of the free sample program, Allergan would have been unable to accurately account for the samples in its Best Price and ASP reporting and calculations for Botox.

**F.    The Brilliant Distinctions program delivers still additional price reduction to physicians that goes unreported by Allergan.**

117.   In or about September 2009 Allergan launched its "Brilliant Distinctions" program. Brilliant Distinctions is a nationwide initiative impacting approximately 17,000 physician and medical professional accounts with an average rebate value of approximately $16,000 per account.

118.   Specifically, as part of the Brilliant Distinctions program, physicians issue points (with a monetary value) for treatments to patients with Allergan products, and then accept redemption of those points in payment for patient services. A patient receiving treatments involving Allergan products, including Botox, is eligible to receive 100-1000 points in the program for each service, with a coupon value of $10-$100. For example, one treatment of Botox Cosmetic generates 200 Brilliant Distinctions points, or a $20 value.

119.   Although Allergan characterizes Brilliant Distinctions as a "customer loyalty" program, the program functions to provide cash directly to physicians. Abuse of the program occurs because a vast number of physicians redeem and

SECOND AMENDED COMPLAINT

1    administer the program's rebate rewards on their patients' behalves, in what

2    Allergan has internally referred to as "White Glove Service."

3        120.   Under this arrangement, following purchase of an Allergan product,

4    including Botox, a rebate code is generated directly to the physician. The physician

5    then inputs the rebate code he or she has generated – whether known to the patient

6    or not – and money is deposited directly into the physician's bank account within 2-

7    3 days.

8        121.   In private conversations with Regional Sales Managers, Relator has

9    confirmed that Regional Sale Managers have noted a "majority," or "about 70%" of

10   their accounts operate "White Glove Service."  In practice, this means that

11   physicians' offices can issue points and redeem cash at will, with oversight and

12   compliance largely dependent on an honor system subject to rampant abuse.

13       122.   This improper use of the Brilliant Distinctions program is openly

14   acknowledged at Allergan. In or about January 2011, at a national sales meeting in

15   San Antonio, Texas, a then Executive Director of Customer Loyalty presented on

16   the Brilliant Distinctions program. While on stage, she stated that the Brilliant

17   Distinctions program was a way to give physicians "free money." As she explained,

18   although the cash rebates could not "legally" be provided directly to physicians,

19   "we have to give it to your patient so your patients can give it to you," or words to

20   that effect.

21       123.   In private conversations with Relator, in or about January 2018, this

22   now former Executive Director related that her warnings and complaints to

23   Allergan leadership about Brilliant Distinctions abuse were dismissed.

24       124.   In this intentionally unmonitored landscape, physicians administering

25   the program on behalf of their patients received Brilliant Distinctions points and

26   effectively exchanged them for money, at times based on fictional patients or

27   services not actually provided.  Indeed, from 2009 to present, the Los Angeles sales

28   region alone provided a total of $10 million in Brilliant Distinctions

SECOND AMENDED COMPLAINT

reimbursements to 319 doctors.  Allergan did not monitor or ensure that the rebates accrued to actual patients.

a.      As one example, from 2009 through August 2017, Dr. R.C. claimed $203,185 through the Brilliant Distinctions program, 58% of which – or $117,847.30 – was applied to purchases of Botox, effectively reducing the price he paid for Botox products after the fact by this significant sum.  In addition, this same physician received $688,809 in payment from Allergan from 2013-2016, ostensibly for speaker fees and training programs.

b.      In or about May 2015, Relator complained directly about the abuses in this account, including that the physician "redeems more product than he bought" and that "his patients don't even know they have been signed up [for Brilliant Distinctions]. He signs them up without their knowledge, processes the treatments and pockets the amount of most distributions."  In response to Relator's complaints, Ray Bassi acknowledged the abuse, stating the physician "lacks integrity" as to how he abused the rewards programs, but resisted any changes to the amount of free product and rewards provided.

c.      Similarly, from January 2017 through August 2017, Dr. R.L. redeemed a total of $250,000 through the Brilliant Distinctions program. During the year 2017, he purchased a total of $245,000 in Allergan products, demonstrating that the cash he obtained from the program in eight months exceeded the value of products he purchased for the entire year.

d.      These abuses, such as cashing out patient points, adding treatment for extra points on services not rendered, and creating fictitious patient accounts through which to collect cash directly to the practice, were reported to Allergan, without result, by Allergan employees, as well as physician office employees from offices including Dr. R. S., and large practices including L.A.

125.  In addition to those listed above, numerous accounts in Relator's area received impressive sums through the Brilliant Distinctions program, including, for

SECOND AMENDED COMPLAINT

1    example: $558,900 to C.R., of which 85% stemmed from Botox points; $455,805 to

2    D.J., of which 72% stemmed from Botox points; and $333,7070 to L.R., of which

3    70% stemmed from Botox points.

4        126.   These payments to physicians should have impacted the calculations of

5    the Best Price and ASP for Botox, and reduced the government's price for the

6    expensive drug. The Best Price for a given drug must account for "cash discounts"

7    and "rebates." 42 U.S.C. § 1396r–8(c)(1)(C)(ii). Further, the Best Price for a drug

8    must include any "other arrangements" that adjust the price for the drug actually

9    realized by the provider.[10] Essentially these same rules apply for ASP reporting and

10   calculations. § IV.A., *supra*. As described and in practice, the Brilliant Distinctions

11   rebate program operates to provide a rebate or "other arrangement" that directly

12   impacts the price physicians pay for Botox, and should be accounted for in reported

13   price calculations.

14       127.   On information and belief, Allergan does not include the cash rebates

15   flowing from its Brilliant Distinctions program to physicians' offices in its

16   calculation of Best Price and ASP for Botox. Indeed, Relator and other well-placed

17   colleagues understood this program to be a means of surreptitiously *avoiding* the

18   full bore of Allergan's price reporting obligations – meeting aesthetic physician

19   demand for cost reduction, while keeping therapeutic reimbursement levels high.

20   Moreover, as discussed in prior sections, Allergan's reported ASP is fully

21   accounted for by formal discount and rebate programs, meaning that dollars

22   flowing to providers through Brilliant Distinctions are necessarily being excluded.

23       128.   The cash provided to physicians through the Brilliant Distinctions

24   program is also illustrative of a broader pattern at Allergan of providing value and

25   incentives to physicians that utilize Botox in the cosmetic market. For example,

26   Allergan provides office consulting and other services to high-prescribing Botox

27   physicians through its Facial Aesthetics Practice Consultants program.  In this

28
---
[10] *See* CMS Release No. 14, Dec 21, 1994.

SECOND AMENDED COMPLAINT

1    program, Practice Consultants provide, free of charge, consulting services on:

2    practice management, operational efficiency, financial management, human

3    resources, and strategic planning to physicians. These Practice Consultants typically

4    target the top 100 Botox-prescribing accounts. Providing these valuable services

5    helps ensure the continued use and prescription of Botox vis-à-vis less expensive

6    competitor drugs.

7          **G.    Allergan offered Botox and Juvederm in "bundled" arrangements
            to deliver discounted  Botox while evading price reporting
8           requirements.**

9          129.   Juvederm is a prescription injectable gel for facial tissue designed for

10   the correction of moderate to severe facial wrinkles and folds, as well as cosmetic

11   lip augmentation procedures.[11]

12         130.   Juvederm is FDA approved for cosmetic purposes and has no

13   therapeutic indications. As a cosmetic drug, Juvederm is not reimbursable under

14   Medicaid or Medicare, and therefore, is exempt from Best Price and ASP reporting

15   requirements.

16         131.   Because Juvederm is not subject to Best Price and ASP requirements,

17   but is regularly used by cosmetic practitioners that also buy and use Botox,

18   Allergan Facial sales representatives are able to informally and routinely use

19   Juvederm in "bundling" arrangements to effectively discount the price of Botox for

20   physicians while evading these reporting requirements.

21         132.   Specifically, when physicians purchase multiple vials of Botox and

22   request perks, such as additional Botox for free with their order, Facial sales

23   representatives have the additional option of providing free boxes of Juvederm in

24   conjunction with a Botox in order to meet the demanded cost reduction, reducing

25   the net effective price of each.

26

27

28
———————————————
[11] Juvederm information available at: https://www.juvederm.com/

133.   This widespread practice of using Juvederm to reduce the price of
Botox goes unmonitored and unregulated. On at least two occasions – one in or
about January 2018 and again in 2015 – Allergan so thoroughly lost track of
Juvederm samples that it had to "reset" its sample tracking baseline.

134.   This unchecked sample provision was encouraged by Allergan
supervisors. For example, during a West Area management team conference call on
or about January 5, 2018, the West Area Director, informed participants to tell their
teams not to worry about "discrepancies" in sample tracking, and that Allergan was
"not worried" about accounting for even significant numbers of missing samples, or
words to that effect. Similarly, in or about January 2, 2018, the Filler Marketing
Director affirmed to Relator she expected "discrepancies" in Juvederm sample
tracking.

135.   From approximately August 2010 – November 2015 a sales
representative/Field Sales Training Manager in the southwestern United States
supervised by Relator repeatedly complained about an account requesting free
samples of Botox and Juvederm to reduce the total cost of the products. Relator
escalated the sales representative's concerns to Ray Bassi who, at the time, was
Western Area Director. Bassi informed the sales rep. that she "did the right thing"
in reporting the issues, but soon thereafter, removed her from the account.
Similarly, Allergan leadership had previously removed two other sales
representatives who refused to provide free Botox and Juvederm samples to reduce
the costs on this same account.

136.   A provider's effective price for Botox is significantly reduced when
considered together with the free Juvederm. On information and belief, Allergan
did not report the impact of this common bundling arrangement as part of its price
reporting for Botox.  Due to its failure to accurately calculate and submit the Best
Price and ASP for Botox, Allergan obtained greater reimbursement than it was

1   owed (including through reduced rebates back to the government), and in so doing,

2   submitted false or fraudulent claims to the government.

3   **VI.**   **MATERIALITY**

4      137.   The reporting and rebate system utilized by Medicare Part B,

5   Medicaid, and additional government health insurance programs relies on the

6   manufacturer's honesty in conveying the correct pricing information to the

7   government. Any overstatement of pricing information, intentional or unintentional,

8   will result in overpayments by the government – either as reimbursements under

9   Medicare Part B, or as cost-sharing payments to each state tied to Medicaid rebate

10   payments.

11      138.   In passing the Medicaid Rebate Act, Congress concluded that

12   "Medicaid . . . should have the benefit of the same discounts on single source drugs

13   that other large public and private purchasers enjoy." 1990 U.S.C.C.A.N. at 2108.

14   The federal and state governments have significant financial interest in the Best

15   Price Rebate program. Amounts received by the states from the manufacturers as

16   rebates are "considered to be a reduction in the amount expended under the state

17   plan in the quarter for medical assistance purposes of section 1396b(a)(1) of this

18   title." 42 U.S.C. § 1396R-8(B)(1)(b).

19      139.   The reporting and rebate system relies on the manufacturer's honesty

20   in conveying the correct Best Price and AMP information to CMS. Any

21   overstatement of the Best Price, intentional or unintentional, will result in an

22   underpayment in rebate amounts to each state. In turn, the underpayments to each

23   state result in the federal government's cost-sharing payment to each state to be

24   greater than it otherwise would have been.

25      140.   Similarly, the Government has significant financial interest in ASP

26   reporting that informs Medicare Part B drug pricing. The reporting system relies on

27   the manufacturer's honesty in conveying the correct pricing information to CMS.

28

      SECOND AMENDED COMPLAINT

Any overstatement of the ASP, intentional or unintentional, will result in overpayments to claimants and Allergan, at the expense of the Government.

141. Indeed, as part of its efforts to promote voluntary compliance programs in the health care industry, in or about April 2003, the Office of Inspector General (OIG) of the Department of Health and Human Services published a Compliance Program Guidance for Pharmaceutical Manufacturers.[12] In that Guidance, OIG cautioned that "pharmaceutical manufacturers are responsible for ensuring the integrity of data they generate that is used for government reimbursement purposes." As OIG observed, "[d]iscounting arrangements are prevalent in the pharmaceutical industry and deserve careful scrutiny." Further, OIG emphasized that manufacturers have "a strong financial incentive to hide *de facto* concessions to other purchasers" due to potential impacts on reported price. As such, "any remuneration from a manufacturer to a purchaser, *however characterized*, should be carefully scrutinized." (emphasis added).

142. In its guidance, the OIG specifically instructed drug manufacturers to report prices which "accurately take into account price reductions, cash discounts, free goods contingent on a purchase agreement, rebates, up-front payments, coupons, goods in kind, free or reduced-price services, grants, or other price concessions or similar benefits offered to some or all purchasers." *Id.* at 12. In addition, "[a]ny discount, price concession, or similar benefit offered on purchases of multiple products should be fairly apportioned among the products." While stated in the context of Best Price in that Guidance, this same framework applies to ASP. *See, e.g.*, ¶ 20, *supra*.

143. Allergan knew that the Government would rely upon its reported Best Price to determine whether it fully paid its statutory rebate obligations, and on ASP

---

[12] This Guidance was published prior to the enactment of ASP reporting requirements in 2005, but also addresses Average Wholesale Price – the Medicare Part B price reporting scheme that preceded ASP. Program Guidance available at: https://oig.hhs.gov/fraud/docs/complianceguidance/042803pharmacymfgnonfr.pdf

1    reporting to determine the appropriate Medicare Part B reimbursement. Indeed,

2    absent an accurate reporting of Best Price and ASP from Allergan, the Government

3    has no means of determining that its reimbursements were excessive or that

4    Allergan underpaid quarterly rebates. Allergan failed to accurately report and pay

5    the full rebate due and owing to the respective states administering the Medicaid

6    program, which also caused the federal government to pay more than it otherwise

7    would have to cover its portion of the cost of the drug under the Medicaid program.

8         144.    Allergan knowingly reported false and inflated Best Price and ASP for

9    Botox to the Secretary by failing to account for the various price reduction

10   strategies identified herein.  Thus, Allergan knowingly engaged in the fraudulent

11   conduct described in this Complaint in order to enrich itself.  Indeed, as a direct

12   result of Allergan's failure to report accurate pricing information, the government

13   was harmed in overpaying for Botox on each claim submitted, and receiving an

14   improperly reduced Medicaid rebate each quarter, from in or about 2011 to the

15   present.

16        145.    Allergan's noncompliance, in turn, was material, because it (1) caused

17   the Secretary to underreport unit rebate amounts to the states, (2) caused the states

18   to seek less rebates than they were entitled to from Allergan, (3) caused Allergan to

19   pay less in rebates than it actually owed, and (4) caused the federal government to

20   pay more than it should have in reimbursements in Medicare Part B and other

21   programs reliant on ASP, and in Medicaid federal financial participation funds to

22   the states.

23        146.    Allergan's kickback violations, including through its NGTP in which

24   the sale of Natrelle Gel, a product reimbursable by government programs like

25   Medicare and Medicaid, is induced through the provision of free and discounted

26   Botox, are also material violations. Illegal kickbacks are material to its decision to

27   pay healthcare claims, in part through its requirement that providers certify

28   compliance with the Anti-Kickback Statue as a condition of payment under, and

participation in, government health insurance programs. If the Government had been aware that drugs were prescribed as a result of such prohibited conduct, the Government would not have paid the claims submitted as a result of Allergan's wrongdoing, or would have wanted to pay the correct ASP or Best Price (rather than the inflated one).

## VII.   CLAIMS FOR RELIEF

### CLAIM 1

**Violation of False Claims Act,**
**31 U.S.C. § 3729, *et seq*.**

147.   Relator incorporates by reference the preceding paragraphs of the Complaint as though fully set forth herein.

148.   This is a civil action brought by Relator, on behalf of the United States of America against Defendant under the False Claims Act, 31 U.S.C. §3730(b)(1).

149.   Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented or caused to be presented, and may still be presenting or causing to be presented false or fraudulent claims for payment or approval under the Government Payor Programs to officers, employees, or agents of the United States Government, in violation of 31 U.S.C. § 3729(a)(1)(A).

150.   Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false or fraudulent records and/or statements to get false or fraudulent claims paid under the Government Payor programs in violation of 31 U.S.C. § 3729(a)(1)(B).

151.   Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making,

using, or causing to be made or used, false records or statements material to obligations to pay or transmit money or property to the Government, in violation of 31 U.S.C. § 3729(a)(1)(G).

152.   Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, concealed or improperly avoided or decreased, and may still be concealing or improperly avoiding or decreasing, obligations to pay or transmit money or property to the United States Government, in violation of 31 U.S.C. § 3729(a)(1)(G).

153.   The United States, unaware of the falsity of the claims and/or statements made or caused to be made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for medical care and related management services for recipients of government health insurance programs, such as Medicare and Medicaid, and may receive less than the total amount of funds owed to it by Defendant.

154.   As a result of Defendant's actions as set forth above, the United States has been, and may continue to be, severely damaged.

## **CLAIM 2**

**Violation of the California False Claims Act,
Cal. Gov't Code § 12650, *et seq*.**

155.   Relator incorporates by reference the preceding paragraphs of the Complaint as though fully set forth herein.

156.   This is a civil action brought by Relator on behalf of the State of California against Defendant under the California False Claims Act, Cal. Gov. Code § 12652(c).

157.   Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be

- 43 -                                    SECOND AMENDED COMPLAINT

1   presenting or causing to be presented, false or fraudulent claims for payment or

2   approval, in violation of Cal. Gov't Code § 12651(a)(1).

3       158.   Allergan, in reckless disregard or deliberate ignorance of the truth or

4   falsity of the information involved, or with actual knowledge of the falsity of the

5   information, knowingly made, used or caused to be made or used, and may still be

6   making, using or causing to be made or used, false records or statements material to

7   false or fraudulent claims, in violation of Cal. Gov't Code § 12651(a)(2).

8       159.   Allergan, in reckless disregard or deliberate ignorance of the truth or

9   falsity of the information involved, or with actual knowledge of the falsity of the

10  information, knowingly made, used or caused to be made or used, and may still be

11  making, using or causing to be made or used, false records or statements to conceal,

12  avoid, or decrease an obligation to pay or transmit money to the State of California,

13  or its political subdivisions, in violation of Cal. Gov't Code § 12651(a)(7).

14      160.   The payment or receipt of bribes or kickbacks is prohibited under Cal.

15  Bus. & Prof. Code § 650 and 650.1, and is also specifically prohibited in treatment

16  of Medi-Cal patients pursuant to Cal. Welf. & Inst. Code § 14107.2.

17      161.   Allergan violated Cal. Bus. & Prof. Code § 650 and 650.1 and Cal.

18  Welf. & Inst. Code § 14107.2 by engaging in the conduct alleged herein.

19      162.   Allergan also violated Cal. Gov't Code § 12651(a) by their deliberate

20  and systematic violation of federal and state laws, including the FDCA, federal

21  Anti-Kickback Act, Cal. Bus. & Prof. Code §§ 650-650.1, and Cal. Welf. & Inst.

22  Code § 14107.2, compliance with which are express and implied conditions of

23  payment for claims submitted to the State of California.

24      163.   The State of California, or its political subdivisions, unaware of the

25  falsity of the claims and/or statements made by Allergan, and in reliance on the

26  accuracy of these claims and/or statements, paid, and may continue to pay, for

27  prescription drugs and prescription drug- related management services for

28  recipients of state and state subdivision funded health insurance programs.

SECOND AMENDED COMPLAINT

164.   As a result of Allergan's actions, as set forth above, the State of California and/or its political subdivisions have been, and may continue to be, severely damaged.

## CLAIM 3

### Violation of the Colorado Medical False Claims Act, Colo. Rev. Stat.  § 25.5-4-305, *et seq.*

165.   Plaintiff- Relator incorporates by reference the preceding paragraphs of the Complaint as though fully set forth herein.

166.   This is a civil action brought by Plaintiff-Relator, in the name of the State of Colorado, against Allergan pursuant to the State of Colorado False Claims Act, Colo. Rev. Stat. § 25.5-4-306.

167.   Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval to an officer or employee of the state of Colorado under the Colorado Medical Assistance Act, in violation of Colo. Rev. Stat. § 25.5-4- 305(1)(a).

168.   Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to false or fraudulent claims for payment or approval to an officer or employee of the state of Colorado under the Colorado Medical Assistance Act, in violation of Colo. Rev. Stat. § 25.5-4-305(1)(b).

169.   Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to

1   obligations to pay or transmit money or property to the state in connection with the

2   Colorado Medical Assistance Act, in violation of Colo. Rev. Stat. § 25.5-4-

3   305(1)(f). Allergan, in reckless disregard or deliberate ignorance of the truth or

4   falsity of the information involved, or with actual knowledge of the falsity of the

5   information, concealed or improperly avoided or decreased, and may still be

6   concealing or improperly avoiding or decreasing, obligations to pay or transmit

7   money or property to the state in connection with the Colorado Medical Assistance

8   Act, in violation of Colo. Rev. Stat. § 25.5-4-305(1)(f).

9       170.   Colo. Rev. Stat. Ann. § 25.5-4-414(2)(a) prohibits the solicitation or

10  receipt of any remuneration, including any kickback, bribe or rebate, directly or

11  indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or

12  service for which payment may be made in whole or in part under the Colorado

13  Medicaid program.

14      171.   Allergan violated Colo. Rev. Stat. Ann. § 25.5-4-414 by engaging in

15  the conduct alleged herein, and further violated the Colorado Medicaid False

16  Claims Act by their deliberate and systematic violation of federal and state laws,

17  including the FDCA, federal Anti-Kickback Act, and Colo. Rev. Stat. Ann. § 25.5-

18  4-414, compliance with which are express and implied conditions of payment for

19  claims submitted to the State of Colorado.

20      172.   The State of Colorado, or its political subdivisions, unaware of the

21  falsity of the claims and/or statements made or caused to be made, and in reliance

22  on the accuracy of these claims and/or statements, paid, and may continue to pay,

23  for prescription drugs and drug-related management services for recipients of state

24  and state subdivision-funded health insurance programs.

25

26

27

28

       SECOND AMENDED COMPLAINT

**CLAIM 4**

**Violation of the Connecticut False Claims Act for State-Administered Health
or Human Services Programs
Conn. Gen. Stat. § 4-274,** *et seq.*

173.    This is a civil action brought by Plaintiff-Relator, on behalf of the State of Connecticut, against Allergan under the Connecticut False Claims Act for State-Administered Health or Human Services Programs, Conn. Gen. Stat. § 4-277.

174.    Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Connecticut, or its political subdivisions, false or fraudulent claims for payment or approval under a state-administered health or human services program; in violation of Conn. Gen. Stat. § 4-275(1).

175.    Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to secure the payment or approval by the State of Connecticut, or its political subdivisions, false or fraudulent claims under a state-administered health or human services program, in violation of Conn. Gen. Stat. § 4-275(2).

176.    Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Connecticut, or its political subdivisions, under a state-administered health or human services program, in violation of Conn. Gen. Stat. § 4-275(8).

SECOND AMENDED COMPLAINT

177.   Conn. Gen. Stat. § 53a-161c prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the Connecticut Medicaid program.

178.   Allergan violated Conn. Gen. Stat. § 53a-161c by engaging in the conduct alleged herein.

179.   Allergan further violated the Connecticut False Claims Act by their deliberate and systematic violation of federal and state laws, federal Anti-Kickback Act, and Conn. Gen. Stat.§ 53a-161c, compliance with which are express and implied conditions of payment for claims submitted to the State of Connecticut.

180.   As a result of Allergan's actions, as set forth above, the State of Connecticut and/or its political subdivisions have been, and may continue to be, severely damaged.

## CLAIM 5

### Violation of the Delaware False Claims and Reporting Act, Del. Code Ann. Tit. 6, § 1201 *et seq.*

181.   Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

182.   This is a civil action brought by of Plaintiff-Relator, on behalf of the State of Delaware, against Allergan under the Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, § 1203(b).

183.   Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Delaware, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Del. Code Ann. tit. 6, § 1201(a)(1).

SECOND AMENDED COMPLAINT

184.   Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Delaware, or its political subdivisions, in violation of Del. Code Ann. tit. 6, § 1201(a)(2).

185.   Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Delaware, or its political subdivisions, in violation of Del. Code Ann. tit. 6, § 120l(a)(7).

186.   Del. Code Ann. tit. 31, § 1005 prohibits the solicitation or receipt of any remuneration (including kickbacks, bribes or rebates) directly or indirectly, overtly or covertly, in cash or in kind in return for the furnishing of any medical care or services for which payment may be made in whole or in part under any public assistance program.

187.   Allergan violated Del. Code Ann. tit. 31, § 1005 by engaging in the conduct alleged herein.

188.   Allergan further violated Del. Code Ann. tit. 6, § 1201(a) by their deliberate and systematic violation of federal and state laws, including the FDCA, the Anti- Kickback Act, and Del. Code Ann. tit. 31, § 1005, compliance with which are express and implied conditions of payment for claims submitted to the State of Delaware.

189.   The State of Delaware, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Allergan, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for

SECOND AMENDED COMPLAINT

prescription drugs and prescription drug-related management services for recipients
of healthcare programs funded by the State of Delaware.

190.   As a result of Allergan's actions, as set forth above, the State of
Delaware and/or its political subdivisions have been, and may continue to be,
severely damaged.

## CLAIM 6

### Violation of the District of Columbia False Claims Act,
### D.C. Code § 2-381.03, *et seq.*

191.   Plaintiff-Relator incorporates herein by reference the preceding
paragraphs of this Complaint as though fully set forth herein.

192.   This is a civil action brought by Plaintiff-Relator, on behalf of the
District of Columbia, against Allergan under the District of Columbia False Claims
Act, D.C. Code § 2-381.03(b).

193.   Allergan, in reckless disregard or deliberate ignorance of the truth or
falsity of the information involved, or with actual knowledge of the falsity of the
information, knowingly presented, or caused to be presented, and may still be
presenting or causing to be presented, to an officer or employee of the District, or
its political subdivisions, false or fraudulent claims for payment or approval, in
violation of D.C. Code § 2-381.02(a)(l).

194.   Allergan, in reckless disregard or deliberate ignorance of the truth or
falsity of the information involved, or with actual knowledge of the falsity of the
information, knowingly made, used, or caused to be used, and may still be making,
using, or causing to be made or used, false records or statements to get false claims
paid or approved by the District, or its political subdivisions, in violation of D.C.
Code § 2-381.02(a)(2).

195.   Allergan, in reckless disregard or deliberate ignorance of the truth or
falsity of the information involved, or with actual knowledge of the falsity of the
information, knowingly made, used, or caused to be made or used, and may still be

SECOND AMENDED COMPLAINT

making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the District, or its political subdivisions, in violation of D.C. Code § 2-381.02(a)(7).

196.   D.C. Code § 4-802(c) prohibits soliciting, accepting, or agreeing to accept any type of remuneration for "(1) Referring a recipient to a particular provider of any item or service or for which payment may be made under the District of Columbia Medicaid Program, or (2) Recommending the purchase, lease, or order of any good, facility, service, or item for which payment may be made under the District of Columbia Medicaid Program."

197.   Allergan violated D.C. Code § 4-802(c) by engaging in the conduct alleged herein.

198.   Allergan further violated D.C. Code§ 2-381.02(a) by their deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, D.C. Code§ 4-802(c), compliance with which are express and implied conditions of payment for claims submitted to the District of Columbia

199.   The District of Columbia, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Allergan, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of health insurance programs funded by the District.

200.   As a result of Allergan's actions, as set forth above, the District of Columbia and/or its political subdivisions have been, and may continue to be, severely damaged.

## CLAIM 7

### Violation of the Florida False Claims Act,
### Fla. Stat. § 68.081 *et seq.*

201.   Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

SECOND AMENDED COMPLAINT

202.   This is a civil action brought by Plaintiff-Relator, on behalf of the
State of Florida, against Allergan under the Florida False Claims Act, Fla. Stat. §
68.083(2).

203.   Allergan, in reckless disregard or deliberate ignorance of the truth or
falsity of the information involved, or with actual knowledge of the falsity of the
information, knowingly presented or caused to be presented, and may still be
presenting or causing to be presented, to an officer or employee of the State of
Florida, or its agencies, false or fraudulent claims for payment or approval, in
violation of Fla. Stat. § 68.082(2)(a).

204.   Allergan, in reckless disregard or deliberate ignorance of the truth or
falsity of the information involved, or with actual knowledge of the falsity of the
information, knowingly made, used, or caused to be made or used, and may still be
making, using or causing to be made or used, false records or statements to get false
or fraudulent claims paid or approved by the State of Florida, or its agencies, in
violation of Fla. Stat. § 68.082(2)(b).

205.   Allergan, in reckless disregard or deliberate ignorance of the truth or
falsity of the information involved, or with actual knowledge of the falsity of the
information, knowingly made, used or caused to be made or used, and may still be
making, using or causing to be made or used, false records or statements to conceal,
avoid, or decrease an obligation to pay or transmit money to the State of Florida, or
its agencies, in violation of Fla. Stat. § 68.082(2)(g).

206.   Fla. Stat. § 409.920(2)(a) makes it a crime to "[k]nowingly charge,
solicit, accept, or receive anything of value, other than an authorized copayment
from a Medicaid recipient, from any source in addition to the amount legally
payable for an item or service provided to a Medicaid recipient under the Medicaid
program or knowingly fail to credit the agency or its fiscal agent for any payment
received from a third-party source;" or "[k]nowingly solicit, offer, pay, or receive
any remuneration, including any kickback, bribe, or rebate, directly or indirectly,

overtly or covertly, in cash or in kind, in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made, in whole or in part, under the Medicaid program, or in return for obtaining, purchasing, leasing, ordering, or arranging for or recommending, obtaining, purchasing, leasing, or ordering any goods, facility, item, or service, for which payment may be made, in whole or in part, under the Medicaid program."

207.   Fla. Stat. § 456.054(2) also prohibits the offering, payment, solicitation, or receipt of a kickback to a healthcare provider, whether directly or indirectly, overtly or covertly, in cash or in kind, in exchange for referring or soliciting patients.

208.   Allergan violated Fla. Stat. § 409.920(c) and (e) and § 456.054(2) by engaging in the conduct alleged herein.

209.   Allergan further violated Fla. Stat. § 68.082(2) by their deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-kickback Act, Fla. Stat. § 409 .920( c) and (e) and § 456.054(2) , compliance with which are express and implied conditions of payment for claims submitted to the State of Florida.

210.   The State of Florida, or its agencies, unaware of the falsity of the claims and/or statements made by Allergan, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of health insurance plans funded by the State of Florida or its agencies.

211.   As a result of Allergan's actions, as set forth above, the State of Florida and/or its agencies have been, and may continue to be, severely damaged.

SECOND AMENDED COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CLAIM 8

### Violation of the Georgia False Medicaid Claims Act,
### Ga. Code Ann. § 49-4-168 *et seq.*

212.   Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

213.   This is a civil action brought by Plaintiff-Relator, on behalf of the State of Georgia, against Allergan pursuant to the Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168.2(b).

214.   Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to the Georgia Medicaid program false or fraudulent claims for payment or approval, in violation of Ga. Code Ann. § 49-4-168.1(a)(1).

215.   Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Georgia Medicaid program, in violation of Ga. Code Ann. § 49-4-168.1(a)(2).

216.   Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Georgia, or its political subdivisions, in violation of Ga. Code Ann. § 49-4-168.1(a)(7).

217.   Allergan further violated the Georgia False Medicaid Claims Act by their deliberate and systematic violation of federal and state laws, including the

SECOND AMENDED COMPLAINT

FDCA and the federal Anti-Kickback Act, , compliance with which are express and
implied conditions of payment for claims submitted to the State of Georgia.

218.   The State of Georgia, or its political subdivisions, unaware of the
falsity of the claims and/or statements made by Allergan, and in reliance on the
accuracy of these claims and/or statements, paid, and may continue to pay, for
prescription drugs and prescription drug- related management services for
recipients of Medicaid.

219.   As a result of Allergan's actions, as set forth above, the State of
Georgia and/or political subdivisions have been, and may continue to be, severely
damaged.

## CLAIM 9

### Violation of the Hawaii False Claims Act,
### Haw. Rev. Stat. § 661-21 *et seq.*

220.   Plaintiff-Relator incorporates herein by reference the preceding
paragraphs of this Complaint as though fully set forth herein.

221.   This is a civil action brought by Plaintiff-Relator, on behalf of the
State of Hawaii, against Allergan under the Hawaii False Claim Act, Haw. Rev.
Stat. § 661-25.

222.   Allergan, in reckless disregard or deliberate ignorance of the truth or
falsity of the information involved, or with actual knowledge of the falsity of the
information, knowingly presented or caused to be presented, and may still be
presenting or causing to be presented, to an officer or employee of the State of
Hawaii, or its political subdivisions, false or fraudulent claims for payment or
approval, in violation of Haw. Rev. Stat. § 661-21(a)(l).

223.   Allergan, in reckless disregard or deliberate ignorance of the truth or
falsity of the information involved, or with actual knowledge of the falsity of the
information, knowingly made, used or caused to be made and used, and may still be
making, using or causing to be made or used, false records or statements to get false

SECOND AMENDED COMPLAINT

1    or fraudulent claims paid or approved by the State of Hawaii, or its political

2    subdivisions, in violation of Haw. Rev. Stat. § 661-21(a)(2).

3          224.   Allergan, in reckless disregard or deliberate ignorance of the truth or

4    falsity of the information involved, or with actual knowledge of the falsity of the

5    information, knowingly made, used or caused to be made or used, and may still be

6    making, using or causing to be made or used, false records or statements to conceal,

7    avoid, or decrease an obligation to pay or transmit money to the State of Hawaii, or

8    its political subdivisions, in violation of Haw. Rev. Stat. § 661-21(a)(6).

9          225.   Allergan further violated Haw. Rev. Stat. § 661-21(a) by their

10   deliberate and systematic violation of federal and state laws, including the FDCA

11   and Anti-kickback Act, , compliance with which are express and implied conditions

12   of payment for claims submitted to the State of Hawaii.

13         226.   The State of Hawaii, or its political subdivisions, unaware of the falsity

14   of the claims and/or statements made by Allergan, and in reliance upon the

15   accuracy of these claims and/or statements, paid, and may continue to pay, for

16   prescription drugs and prescription drug- related management services for

17   recipients of state funded health insurance programs.

18         227.   As a result of Allergan's actions, as set forth above, the State of

19   Hawaii and/or its political subdivisions have been, and may continue to be, severely

20   damaged.

21                                   **CLAIM 10**

22                   **Violation of the Illinois False Claims Act,**
                       **740 Ill. Comp. Stat. § 175/1 *et seq*.**
23

24         228.   Plaintiff-Relator incorporates herein by reference the preceding

     paragraphs of this Complaint as though fully set forth herein.
25

26         229.   This is a civil action brought by Plaintiff-Relator, on behalf of the

27   State of Illinois, against Allergan under the Illinois False Claims Act, 740 Ill.

     Comp. Stat. 175/4(b).
28

SECOND AMENDED COMPLAINT

230.    Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of 740 Ill. Comp. Stat. 175/3(a)(1)(A).

231.    Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to get false or fraudulent claims paid or approved by the State of Illinois, or its political subdivisions, in violation of 740 Ill. Comp. Stat. 175/3(a)(1)(B).

232.    Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to conceal, avoid or decrease an obligation to pay or transmit money to the State of Illinois, or its political subdivisions, in violation of 740 Ill. Comp. Stat. 175/3(a)(1)(G).

233.    In addition, 305 Ill. Comp. Stat. 5/8A-3(b) of the Illinois Public Aid Code (Vendor Fraud and Kickbacks) prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the Illinois Medicaid program.

234.    Allergan violated 305 Ill. Comp. Stat. 5/8A-3(b) by engaging in the conduct alleged herein.

235.    Allergan furthermore violated 740 Ill. Comp. Stat. 175/3(a) by their deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, and the Illinois Vendor Fraud and Kickback statute,

SECOND AMENDED COMPLAINT

compliance with which are express and implied conditions of payment for claims submitted to the State of Illinois.

236.   The State of Illinois, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Allergan, and in reliance on the accuracy of those claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of state funded health insurance programs.

237.   As a result of Allergan's actions, as set forth above, the State of Illinois and/or its political subdivisions have been, and may continue to be, severely damaged.

## CLAIM 11

**Violation of the Indiana False Claims and Whistleblower Protection Act,
Ind. Code § 5-11-5.5 *et seq.***

238.   Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

239.   This is a civil action brought by Plaintiff-Relator, on behalf of the State of Indiana, against Allergan under the Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5-4(a).

240.   Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally presented, or caused to be presented, and may still be presenting or causing to be presented, false claims to the State of Indiana, or its political subdivisions, for payment or approval, in violation of Ind. Code § 5-11-5.5-2(b)(l).

241.   Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or

SECOND AMENDED COMPLAINT

1   statements to obtain payment or approval of false claims from the State of Indiana,

2   or its political subdivisions, in violation of Ind. Code § 5-11-5.5-2(b)(2).

3       242.   Allergan, in reckless disregard or deliberate ignorance of the truth or

4   falsity of the information involved, or with actual knowledge of the falsity of the

5   information, knowingly or intentionally made, used, or caused to be made or used,

6   and may still be making, using, or causing to be made or used, false records or

7   statements to avoid an obligation to pay or transmit money to the State of Indiana,

8   or its political subdivisions, in violation of Ind. Code § 5-11-5.5-2(b)(6).

9       243.   Ind. Code § 12-17.6-6-12 prohibits the solicitation or receipt of any

10  remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly

11  or covertly, in cash or in kind in return for furnishing any item or service for which

12  payment may be made in whole or in part under the Indiana Medicaid program.

13      244.   Allergan violated Ind. Code § 12-17.6-6-12 by engaging in the conduct

14  alleged herein.

15      245.   Allergan further violated Indiana's False Claims Act by their

16  deliberate and systematic violation of federal and state laws, including the FDCA,

17  federal Anti-Kickback Act, and Ind. Code § 12-17.6-6-12, compliance with which

18  are express and implied conditions of payment for claims submitted to the State of

19  Indiana.

20      246.   The State of Indiana, or its political subdivisions, unaware of the

21  falsity of the claims and/or statements made by Allergan, and in reliance on the

22  accuracy of those claims and/or statements, paid, and may continue to pay, for

23  prescription drugs and prescription drug-related management services for recipients

24  of state funded health insurance programs.

25      247.   As a result of Allergan's actions, as set forth above, the State of

26  Indiana and/or its political subdivisions have been, and may continue to be,

27  severely damaged.

28

## CLAIM 12

### Violation of the Iowa False Claims Act,
**Iowa Code § 685.1,** *et seq.*

248.    Plaintiff-Relator incorporates by reference the preceding paragraphs of the Complaint as though fully set forth herein.

249.    This is a civil action brought by Plaintiff-Relator on behalf of the State of Iowa against Allergan under the State of Iowa False Claims Act, Iowa Code § 685.3(2)(a).

250.    Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented, or caused to be presented, and may still be presenting or causing to be presented, a false claim for payment or approval, in violation of Iowa Code § 685.2(1)(a).

251.    Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, a false record or statement to obtain payment or approval of false claims by the State of Iowa, in violation of Iowa Code § 685.2(1)(b).

252.    Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to obligations to pay or transmit money or property to the state of Iowa, in violation of Iowa Code § 685.2(1)(g).

253.    Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, concealed or improperly avoided or decreased, and may still be

1   concealing and improperly avoiding or decreasing obligations to pay or transmit

2   money to the State of Iowa, in violation of Iowa Code § 685.2(1)(g).

3         254.   Allergan furthermore violated the Iowa False Claims Law, Iowa Code

4   § 685.1, et seq. by their deliberate and systematic violation of federal and state

5   laws, including the FDCA, federal Anti-Kickback Act, compliance with which are

6   express and implied conditions of payment for claims submitted to the State of

7   Iowa.

8         255.   The State of Iowa, unaware of the falsity of the claims and/or

9   statements made or caused to be made by Allergan, and in reliance on the accuracy

10  of those claims and/or statements, paid, and may continue to pay, for prescription

11  drugs and drug-related management services for recipients of state funded health

12  insurance programs.

13        256.   As a result of Allergan's actions, as set forth above, the State of Iowa

14  has been, and may continue to be, severely damaged.

15                              **<u>CLAIM 13</u>**

16  **Violation of the Louisiana Medical Assistance Programs Integrity Law,**
    **La. Rev. Stat. Ann. § 46:437.1 *et seq.***

17
18        257.   Plaintiff-Relator incorporates herein by reference the preceding

    paragraphs of this Complaint as though fully set forth herein.
19
20        258.   This is a civil action brought by Plaintiff-Relator, on behalf of the

21  State of Louisiana's medical assistance programs, against Allergan under the

    Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. §
22
    46:439.1.
23
24        259.   Allergan, in reckless disregard or deliberate ignorance of the truth or

25  falsity of the information involved, or with actual knowledge of the falsity of the

    information, knowingly presented, or caused to be presented, and may still be
26
    presenting or causing to be presented, false or fraudulent claims, in violation of La.
27
    Rev. Stat. Ann. § 46:438.3(A).
28

SECOND AMENDED COMPLAINT

260.   Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly engaged in misrepresentation, and may still be engaging in misrepresentation, to obtain, or attempt to obtain, payment from medical assistance programs funds, in violation of La. Rev. Stat. Ann. § 46:438.3(B).

261.   Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly submitted, and may continue to submit, claims for goods, services or supplies which were medically unnecessary or which were of substandard quality or quantity, in violation of La. Rev. Stat. Ann. § 46:438.3(D).

262.   In addition, La. Rev. Stat. Ann. § 46:438.2(A) prohibits the solicitation, receipt, offering or payment of any financial inducements, including kickbacks, bribes and/or rebates, directly or indirectly, overtly or covertly, in cash or in kind, for furnishing healthcare goods or services paid for in whole or in part by the Louisiana medical assistance programs.

263.   Allergan violated La. Rev. Stat. Ann.§ 46:438.2(A) by engaging in the conduct alleged herein.

264.   Allergan further violated La. Rev. Stat. Ann. § 46:438.3 by their deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act and La. Rev. Stat. Ann.§ 46:438.2(A) , compliance with which are express and implied conditions of payment for claims submitted to the State of Louisiana.

265.   The State of Louisiana, its medical assistance programs, political subdivisions and/or the Department, unaware of the falsity of the claims and/or statements made by Allergan, or their actions as set forth above, acted in reliance, and may continue to act in reliance, on the accuracy of Allergan's claims and/or statements in paying for prescription drugs and prescription drug-related management services for medical assistance program recipients.

SECOND AMENDED COMPLAINT

266.    As a result of Allergan's actions, as set forth above, the State of Louisiana, its medical assistance programs, political subdivisions and/or the Department have been, and may continue to be, severely damaged.

## CLAIM 14

### Violation of the Maryland False Health Claims Act, Md. Code Ann. Health-Gen. § 2-601, et seq.

267.    Plaintiff-Relator incorporates by reference the preceding paragraphs of the Complaint as though fully set forth herein.

268.    This is a civil action brought by Plaintiff-Relator on behalf of the State of Iowa against Allergan under the State of Maryland False Health Claims Act, Md. Code Ann. Health-Gen. § 2-604(a)(1)(i).

269.    Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented, or caused to be presented, and may still be presenting or causing to be presented, a false claim for payment or approval, in violation of Md. Code Ann. Health-Gen. § 2-602(a)(1).

270.    Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, a false record or statement to obtain payment or approval of false claims by the State of Iowa, in violation of Md. Code Ann. Health-Gen. § 2-602(a)(2).

271.    Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to

SECOND AMENDED COMPLAINT

1  obligations to pay or transmit money to the State of Iowa, in violation of Md. Code

2  Ann. Health-Gen. § 2-602(a)(7).

3      272.   Allergan, in reckless disregard or deliberate ignorance of the truth or

4  falsity of the information involved, or with actual knowledge of the falsity of the

5  information, concealed or improperly avoided or decreased, and may still be

6  concealing or improperly avoiding or decreasing, obligations to pay or transmit

7  money to the State of Iowa, in violation of Md. Code Ann. Health-Gen. § 2-

8  602(a)(8).

9      273.   In addition, MD Code Ann., Criminal Law, § 8-512, prohibits the

10  solicitation or receipt of any remuneration, including any kickback, bribe or rebate,

11  directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing

12  any item or service for which payment may be made in whole or in part under the

13  Maryland Medicaid program.

14      274.   Allergan violated the MD Code Ann., Criminal Law, § 8-512 by

15  engaging in the conduct alleged herein.

16      275.   Allergan further violated the Maryland False Claims Act by their

17  deliberate and systematic violation of federal and state laws, including the FDCA,

18  federal Anti-Kickback Act and Section 8-512 of Maryland's Criminal Law,

19  compliance with which are express and implied conditions of payment for claims

20  submitted to the State of Maryland.

21      276.   The State of Maryland, unaware of the falsity of the claims and/or

22  statements made or caused to be made by Allergan, and in reliance on the accuracy

23  of those claims and/or statements, paid, and may continue to pay, for prescription

24  drugs and drug-related management services for recipients of state-funded health

25  insurance programs.

26      277.   As a result of Allergan's actions, as set forth above, the State of

27  Maryland has been, and may continue to be, severely damaged.

28

SECOND AMENDED COMPLAINT

## CLAIM 15

**Violation of the Commonwealth of Massachusetts False Claims Act,
Mass. Gen. Laws ch. 12, § 5A *et seq.***

278.   Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

279.   This is a civil action brought by Plaintiff-Relator, on behalf of the Commonwealth of Massachusetts, against Allergan under the Massachusetts False Claims Act, Mass. Gen. Laws ch. 12 § 5C(2).

280.   Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of Mass. Gen. Laws ch. 12 § 5B(1).

281.   Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to obtain payment or approval of claims by the Commonwealth of Massachusetts, or its political subdivisions, in violation of Mass. Gen. Laws ch. 12 § 5B(2).

282.   Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the Commonwealth of Massachusetts, or its political subdivisions, in violation of Mass. Gen. Laws ch. 12 § 5B(9).

283.   In addition, Mass. Gen. Laws Ann. ch. 118E § 41 prohibits the solicitation, receipt or offering of any remuneration, including any bribe or rebate,

SECOND AMENDED COMPLAINT

1   directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing

2   any good, service or item for which payment may be made in whole or in part under

3   the Massachusetts Medicaid program.

4       284.   Allergan violated Mass. Gen. Laws Ann. Chap. 118E § 41 by engaging

5   in the conduct alleged herein.

6       285.   Allergan further violated Mass. Gen. Laws Ann. ch. 12 § 5B by their

7   deliberate and systematic violation of federal and state laws, including the FDCA,

8   federal Anti-Kickback Act, Mass. Gen. Law Ann. ch. 118E § 41, compliance with

9   which are express and implied conditions of payment for claims submitted to the

10  State of Massachusetts.

11      286.   The Commonwealth of Massachusetts, or its political subdivisions,

12  unaware of the falsity of the claims and/or statements made by Allergan, and in

13  reliance on the accuracy of these claims and/or statements, paid, and may continue

14  to pay, for prescription drugs and prescription drug-related management services

15  for recipients of health insurance programs funded by the state or its political

16  subdivisions.

17      287.   As a result of Allergan's actions, as set forth above, the

18  Commonwealth of Massachusetts and/or its political subdivisions have been, and

19  may continue to be, severely damaged.

20                          **CLAIM 16**

21      **Violation of the Michigan Medicaid False Claims Act,**
22      **Mich. Comp. Laws § 400.601 _et seq._**

        288.   Plaintiff-Relator incorporates herein by reference the preceding
23
    paragraphs of this Complaint as though fully set forth herein.
24
        289.   This is a civil action brought by Plaintiff-Relator, on behalf of the
25
    State of Michigan, against Allergan under the Michigan Medicaid False Claims
26
    Act, Mich. Comp. Laws § 400.610a(1).
27

28

                            - 66 -                    SECOND AMENDED COMPLAINT

290.   Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or causing to be made, false statements or false representations of material facts in an application for Medicaid benefits, in violation of Mich. Comp. Laws § 400.603(1).

291.   Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made false statements or false representations of a material fact for use in determining rights to a Medicaid benefit, in violation of Mich. Comp. Laws § 400.603(2).

292.   Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly concealed or failed to disclose, and may still be concealing or failing to disclose, an event affecting its initial or continued right to receive a Medicaid benefit, or the initial or continued right of any other person on whose behalf Allergan have applied for or is receiving a benefit with intent to obtain a benefit to which Allergan were not entitled or in an amount greater than that to which Allergan were entitled, in violation of Mich. Comp. Laws § 400.603(3).

293.   Allergan, in possession of facts under which it is aware or should be aware of the nature of their conduct and that their conduct is substantially certain to cause the payment of a Medicaid benefit, knowingly made, presented or caused to be made or presented, and may still be presenting or causing to be presented, to an employee or officer of the State of Michigan, or its political subdivisions, false claims under the Social Welfare Act, Mich. Comp. Laws §§ 400.1-400.119b, in violation of Mich. Comp. Laws § 400.607(1).

294.   In addition, Mich. Comp. Laws § 400.604 prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or

service for which payment may be made in whole or in part under the Michigan
Medicaid program.

295.   Allergan violated Mich. Comp. Laws § 400.604 by engaging in the
conduct alleged herein.

296.   Allergan further violated Mich. Comp. Laws § 400.607 by their
deliberate and systematic violation of federal and state laws, including the FDCA,
the federal Anti-Kickback Act, and Mich. Comp. Laws § 400.604, compliance with
which are express and implied conditions of payment for claims submitted to the
State of Michigan.

297.   The State of Michigan, or its political subdivisions, unaware of the
falsity of the claims and/or statements made by Allergan, and in reliance on the
accuracy of these claims and/or statements, paid, and may continue to pay, for
prescription drugs and prescription drug- related management services for
recipients of Medicaid.

298.   As a result of Allergan's actions, as set forth above, the State of
Michigan and/or its political subdivisions have been, and may continue to be,
severely damaged.

## CLAIM 17

### Violation of the Minnesota False Claims Act,
### Minn. Stat. § 15C.01, *et seq.*

299.   Plaintiff-Relator incorporates by reference the preceding paragraphs of
the Complaint as though fully set forth herein.

300.   This is a civil action brought by Plaintiff-Relator on behalf of the State
of Minnesota and its political subdivisions against Allergan under the State of
Minnesota False Claims Act, Minn. Stat. § 15C.05(a).

301.   Allergan, in reckless disregard or deliberate ignorance of the truth or
falsity of the information involved, or with actual knowledge of the falsity of the
information, presented, or caused to be presented, and may still be presenting or

causing to be presented, a false claim for payment or approval to an officer or employee of the state Minnesota or a political subdivision thereof, in violation of Minn. Stat. § 15C.02(a)(1).

302.   Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, a false record or statement to obtain payment or approval of false claims by the State of Minnesota or a political subdivision thereof, in violation of Minn. Stat. § 15C.02(a)(2).

303.   Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Minnesota, in violation of Minn. Stat. § 15C.02(a)(7).

304.   In addition, Minn. Stat. § 256B.0914, prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the Minnesota Medicaid program.

305.   Allergan violated Minn. Stat. § 256B.0914 by engaging in the conduct alleged herein.

306.   Allergan further violated the Minnesota False Claims Act by their deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act and Minn. Stat. § 256B.0914, compliance with which are express and implied conditions of payment for claims submitted to the State of Minnesota.

SECOND AMENDED COMPLAINT

307.    The State of Minnesota, unaware of the falsity of the claims and/or statements made or caused to be made by Allergan, and in reliance on the accuracy of those claims and/or statements, paid, and may continue to pay, for prescription drugs and drug-related management services for recipients of state funded health insurance programs.

308.    As a result of Allergan's actions, as set forth above, the State of Minnesota has been, and may continue to be, severely damaged.

## CLAIM 18

### Violation of the Montana False Claims Act, Mont. Code Ann. § 17-8-401 *et seq.*

309.    Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

310.    This is a civil action brought by Plaintiff-Relator, on behalf of the State of Montana against, Allergan under the Montana False Claims Act, Mont. Code Ann. § 17-8-406(1).

311.    Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Montana, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Mont. Code Ann. § 17-8-403(1)(a).

312.    Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Montana, or its political subdivisions, in violation of Mont. Code Ann. § 17-8-403(1)(b).

SECOND AMENDED COMPLAINT

313.    Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Montana, or its political subdivisions, in violation of Mont. Code Ann. § 17-8-403(1)(g).

314.    In addition, Mont. Code Ann. § 45-6-313 prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the Montana Medicaid program.

315.    Allergan violated Mont. Code Ann. § 45-6-313 by engaging in the conduct alleged herein.

316.    Allergan furthermore violated the Montana False Claims Act by their deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act and Mont. Code Ann. § 45-6-313, compliance with which are express and implied conditions of payment for claims submitted to the State of Montana.

317.    The State of Montana, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Allergan, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of health insurance programs funded by the state or its political subdivisions.

318.    As a result of Allergan's actions, as set forth above, the State of Montana and/or its political subdivisions have been, and may continue to be, severely damaged.

SECOND AMENDED COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CLAIM 19

### Violation of the Nevada False Claims Act,
### Nev. Rev. Stat. § 357.010, *et seq.*

319.    Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

320.    This is a civil action brought by Plaintiff-Relator, on behalf of the State of Nevada, against Allergan under the Nevada False Claims Act, Nev. Rev. Stat. § 357.080(1).

321.    Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false claims for payment or approval, in violation of Nev. Rev. Stat. § 357.040(1)(a).

322.    Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to obtain payment or approval of false claims, in violation of Nev. Rev. Stat. § 357.040(1)(b).

323.    Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Nevada, or its political subdivisions, in violation of Nev. Rev. Stat. § 357.040(1)(g).

324.    In addition, Nev. Rev. Stat. § 422.560 prohibits the solicitation, acceptance or receipt of anything of value in connection with the provision of

SECOND AMENDED COMPLAINT

1   medical goods or services for which payment may be made in whole or in part

2   under the Nevada Medicaid program.

3       325.   Allergan violated Nev. Rev. Stat. § 422.560 by engaging in the

4   conduct alleged herein.

5       326.   Allergan further violated Nev. Rev. Stat. § 357.040(1) by their

6   deliberate and systematic violation of federal and state laws, including the FDCA,

7   federal Anti-Kickback Act and Nev. Rev. Stat. § 422.560, compliance with which

8   are express and implied conditions of payment for claims submitted to the State of

9   Nevada.

10      327.   The State of Nevada, or its political subdivisions, unaware of the

11  falsity of the claims and/or statements made by Allergan, and in reliance on the

12  accuracy of these claims and/or statements, paid, and may continue to pay, for

13  prescription drugs and prescription drug- related management services for

14  recipients of health insurance programs funded by the state or its political

15  subdivisions.

16      328.   As a result of Allergan's actions, as set forth above, the State of

17  Nevada and/or its political subdivisions have been, and may continue to be,

18  severely damaged.

19                              **<u>CLAIM 20</u>**

20

21              **Violation of the New Jersey False Claims Act,**
                 **N.J. Stat. Ann. § 2A:32C-1, *et seq.***

22      329.   Plaintiff-Relator incorporates herein by reference the preceding

23  paragraphs of this Complaint as though fully set forth herein.

24      330.   This is a civil action brought by Plaintiff-Relator, on behalf of the

25  State of New Jersey, against Allergan pursuant to the New Jersey Fraud False

26  Claims Act, N.J. Stat. Ann. § 2A:32C-5(b).

27      331.   Allergan, in reckless disregard or deliberate ignorance of the truth or

28  falsity of the information involved, or with actual knowledge of the falsity of the

SECOND AMENDED COMPLAINT

information, knowingly or intentionally presented or caused to be presented, and may still be presenting or causing to be presented, to an employee, officer or agent of the State of New Jersey, or to any contractor, grantee, or other recipient of State funds, false or fraudulent claims for payment or approval, in violation of N.J. Stat. Ann. § 2A:32C-3(a).

332.  Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of New Jersey, or its political subdivisions, in violation of N.J. Stat. Ann. § 2A:32C-3(b).

333.  Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of New Jersey, or its political subdivisions, in violation of N.J. Stat. Ann. § 2A:32C-3(g).

334.  In addition, N.J. Stat. Ann. § 30:4D-17 prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the New Jersey Medicaid program.

335.  Allergan violated N.J. Stat. Ann. § 30:4D-17 by engaging in the conduct alleged herein.

336.  Allergan further violated the New Jersey False Claims Act by their deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act and N.J. Stat. Ann. § 30:4D-17, compliance with which

SECOND AMENDED COMPLAINT

1   are express and implied conditions of payment for claims submitted to the State of

2   New Jersey.

3        337.   The State of New Jersey, or its political subdivisions, unaware of the

4   falsity of the claims and/or statements made by Allergan, and in reliance on the

5   accuracy of these claims and/or statements, paid, and may continue to pay, for

6   prescription drugs and prescription drug- related management services for

7   recipients of Medicaid.

8        338.   As a result of Allergan's actions, as set forth above, the State of New

9   Jersey and/or its political subdivisions have been, and may continue to be, severely

10  damaged.

11                                **CLAIM 21**

12          **Violation of the New Mexico Medicaid False Claims Act,**
                     **N.M. Stat. Ann. § 27-14-1, *et seq.***
13

14       339.   Plaintiff-Relator incorporates by reference the preceding paragraphs of

     the Complaint as though fully set forth herein.
15

16       340.   This is a civil action brought by Plaintiff-Relator on behalf of the State

     of New Mexico against Allergan under the State of New Mexico Medicaid False
17
     Claims Act, N.M. Stat. Ann. § 27-14-7(B).
18

19       341.   Allergan, in reckless disregard or deliberate ignorance of the truth or

20  falsity of the information involved, or with actual knowledge of the falsity of the

     information, presented or caused to be presented, and may still be presenting or
21
     causing to be presented, a false or fraudulent claim for payment under the Medicaid
22
     program, in violation of N.M. Stat. Ann. § 27-14-4(A).
23

24       342.   Allergan, in reckless disregard or deliberate ignorance of the truth or

25  falsity of the information involved, or with actual knowledge of the falsity of the

     information, made, used or caused to be made or used, and may still be making,
26
     using or causing to be made or used, false records or statements to obtain false or
27

28

SECOND AMENDED COMPLAINT

fraudulent claims under the Medicaid program paid for or approved by the state, in violation of N.M. Stat. Ann. § 27-14-4(C).

343.  Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of New Mexico or one of its political subdivisions, relative to the Medicaid program, in violation of N.M. Stat. Ann. § 27-14-4(E).

344.  In addition, N.M. Stat. Ann. § 30-44-7, *et seq*. prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the New Mexico Medicaid program.

345.  Allergan violated N.M. Stat. Ann. § 30-44-7, *et seq*. by engaging in the conduct alleged herein.

346.  Allergan further violated N.M. Stat. Ann. § 27-14-1, *et seq*. by their deliberate and systematic violation of federal and state laws, including the FDCA and federal Anti-Kickback Act, compliance with which are express and implied conditions of payment for claims submitted to the State of New Mexico.

347.  The State of New Mexico, or its political subdivisions, unaware of the falsity of the claims and/or statements made or caused to be made by Allergan, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and drug- related management services for recipients of health insurance programs funded by the state or its political subdivisions.

SECOND AMENDED COMPLAINT

348.   As a result of Allergan's actions, as set forth above, the State of New Mexico or its political subdivisions have been, and may continue to be, severely damaged.

## CLAIM 22

### Violation of the New York False Claims Act, N.Y. State Fin. Law § 187 *et seq.*

349.   Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

350.   This is a civil action brought by Plaintiff-Relator, on behalf of the State of New York, against Allergan under the New York False Claims Act, N.Y. State Fin. Law § 190(2).

351.   Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of N.Y. State Fin. Law § 189(1)(a).

352.   Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of N.Y. State Fin. Law § 189(1)(b).

353.   Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to an obligation to pay or transmit money to the State of New York, or its political subdivisions, in violation of N.Y. State Fin. Law § 189(1)(g).

SECOND AMENDED COMPLAINT

354.    In addition, New York law prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the New York Medicaid program. NY Soc. Serv. § 366-d.

355.    Allergan violated NY Soc. Serv. § 366-d by engaging in the conduct alleged herein.

356.    Allergan further violated the New York State False Claims Act by their deliberate and systematic violation of federal and state laws, including the FDCA, the federal Anti-Kickback Act, and NY Soc. Serv. § 366-d, compliance with which are express and implied conditions of payment for claims submitted to the State of New York.

357.    The State of New York, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Allergan, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug- related management services for recipients of health insurance programs funded by the state or its political subdivisions.

358.    As a result of Allergan's actions, set forth above, the State of New York and/or its political subdivisions have been, and may continue to be, severely damaged.

## <u>CLAIM 23</u>

**Violation of the North Carolina False Claims Act,**
**N.C. Gen. Stat. § 1-605, *et seq.***

359.    Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

SECOND AMENDED COMPLAINT

360.   This is a civil action brought by Plaintiff-Relator, on behalf of the State of North Carolina, against Allergan under the North Carolina False Claims Act, N.C. Gen. Stat. § 1-608(b).

361.   Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of N.C. Gen. Stat. § 1-607(a)(1).

362.   Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of N.C. Gen. Stat. § 1-607(a)(2).

363.   Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of North Carolina, or its political subdivisions, in violation of N.C. Gen. Stat. § 1-607(a)(7).

364.   In addition, N.C. Gen. Stat. § 108A-63 prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the North Carolina Medicaid program.

365.   Allergan violated N.C. Gen. Stat. § 108A-63 by engaging in the conduct alleged herein.

366.   Allergan further violated the North Carolina False Claims Act by their deliberate and systematic violation of federal and state laws, including the FDCA,

SECOND AMENDED COMPLAINT

federal Anti-Kickback Act and N.C. Gen. Stat. § 108A-63, compliance with which are express and implied conditions of payment for claims submitted to the State of North Carolina.

367.   The State of North Carolina, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Allergan, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of health insurance programs funded by the state or its political subdivisions.

368.   As a result of Allergan's actions, as set forth above, the State of North Carolina and/or its political subdivisions have been, and may continue to be, severely damaged.

## **CLAIM 24**

### **Violation of the Oklahoma Medicaid False Claims Act,**
### **Okla. Stat. tit. 63, § 5053, *et seq.***

369.   Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

370.   This is a civil action brought by Plaintiff-Relator, on behalf of the State of Oklahoma, against Allergan pursuant to the Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63, § 5053.2(B)(1).

371.   Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Oklahoma, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Okla. Stat. tit. 63, § 5053.1(B)(1).

372.   Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or

SECOND AMENDED COMPLAINT

1    causing to be made, false records or statements to get false or fraudulent claims

2    paid or approved by the State of Oklahoma, or its political subdivisions, in violation

3    of Okla. Stat. tit. 63, § 5053.1(B)(2).

4         373.   Allergan, in reckless disregard or deliberate ignorance of the truth or

5    falsity of the information involved, or with actual knowledge of the falsity of the

6    information, knowingly made, used, or caused to be made or used, and may still be

7    making, using or causing to be made or used, false records or statements to conceal,

8    avoid, or decrease an obligation to pay or transmit money to the State of Oklahoma,

9    or its political subdivisions, in violation of Okla. Stat. tit. 63, § 5053.1(B)(7).

10        374.   In addition, Okla. Stat. tit. 56, § 1005 prohibits the solicitation or

11   receipt of any remuneration, including any kickback, bribe or rebate, directly or

12   indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or

13   service for which payment may be made in whole or in part under the Oklahoma

14   Medicaid program.

15        375.   Allergan violated Okla. Stat. tit. 56, § 1005 by engaging in the conduct

16   alleged herein.

17        376.   Allergan furthermore violated the Oklahoma Medicaid False Claims

18   Act by their deliberate and systematic violation of federal and state laws, including

19   the FDCA, federal Anti-Kickback Act and Okla. Stat. tit. 56, § 1005, compliance

20   with which are express and implied conditions of payment for claims submitted to

21   the State of Oklahoma. The State of Oklahoma, or its political subdivisions,

22   unaware of the falsity of the claims and/or statements made by Allergan, and in

23   reliance on the accuracy of these claims and/or statements, paid, and may continue

24   to pay, for prescription drugs and prescription drug- related management services

25   for recipients of Medicaid.

26        377.   As a result of Allergan's actions, as set forth above, the State of

27   Oklahoma and/or its political subdivisions have been, and may continue to be,

28   severely damaged.

SECOND AMENDED COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **CLAIM 25**

### **Violation of the Rhode Island False Claims Act,**
### **R.I. Gen. Laws § 9-1.1-1 *et seq.***

378.   Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

379.   This is a civil action brought by Plaintiff-Relator, on behalf of the State of Rhode Island, against Allergan pursuant to the Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-4(b).

380.   Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Rhode Island or a member of Rhode Island's National Guard, false or fraudulent claims for payment or approval, in violation of R.I. Gen. Laws § 9-1.1-3(a)(1).

381.   Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or causing to be made, false records or statements to get false or fraudulent claims paid or approved by the State of Rhode Island, or its political subdivisions, in violation of R.I. Gen. Laws § 9-1.1-3(a)(2).

382.   Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Rhode Island, or its political subdivisions, in violation of R.I. Gen. Laws § 9-1.1-3(a)(7).

383.   In addition, R.I. Gen. Laws § 40-8.2-9 prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or

SECOND AMENDED COMPLAINT

indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the Rhode Island Medicaid program.

384.   Allergan violated R.I. Gen. Laws § 40-8.2-9 by engaging in the conduct alleged herein.

385.   Allergan further violated the Rhode Island False Claims Act by their deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act and R.I. Gen. Laws § 40-8.2-9, compliance with which are express and implied conditions of payment for claims submitted to the State of Rhode Island.

386.   The State of Rhode Island, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Allergan, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug- related management services for recipients of Medicaid.

387.   As a result of Allergan's actions, as set forth above, the State of Rhode Island and/or its political subdivisions have been, and may continue to be, severely damaged.

## CLAIM 26

**Violation of the Tennessee Medicaid False Claims Act,
Tenn. Code Ann. § 71-5-181, *et seq.***

388.   Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

389.   This is a civil action brought by Plaintiff-Relator, on behalf of the State of Tennessee, against Allergan under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-183(b).

390.   Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the

SECOND AMENDED COMPLAINT

1   information, knowingly presented or caused to be presented, and may still be

2   presenting or causing to be presented, to the State of Tennessee, or its political

3   subdivisions, false or fraudulent claims for payment under the Medicaid program,,

4   in violation of Tenn. Code Ann. § 71-5-182(a)(1)(A).

5        391.   Allergan, in reckless disregard or deliberate ignorance of the truth or

6   falsity of the information involved, or with actual knowledge of the falsity of the

7   information, knowingly made, used or caused to be made or used, and may still be

8   making, using or causing to be made or used, false or fraudulent records or

9   statements to get false or fraudulent claims under the Medicaid program paid for or

10  approved by the State of Tennessee, or its political subdivisions, in violation of

11  Tenn. Code Ann. § 71-5-182(a)(1)(B).

12       392.   Allergan, in reckless disregard or deliberate ignorance of the truth or

13  falsity of the information involved, or with actual knowledge of the falsity of the

14  information, knowingly made, used, or caused to be made or used, and may still be

15  making, using or causing to be made or used, false or fraudulent records or

16  statements to conceal, avoid or decrease an obligation to pay or transmit money to

17  the State of Tennessee, or its political subdivisions, relative to the Medicaid

18  program, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(D).

19       393.   Allergan violated Tenn. Code Ann. § 71-5-182(a)(l) by their deliberate

20  and systematic violation of federal and state laws, including the FDCA and Anti-

21  Kickback Act, compliance with which are express and implied conditions of

22  payment for claims submitted to the State of Tennessee.

23       394.   The State of Tennessee, or its political subdivisions, unaware of the

24  falsity of the claims and/or statements made by Allergan, and in reliance on the

25  accuracy of these claims and/or statements, paid, and may continue to pay, for

26  prescription drugs and prescription drug-related management services for recipients

27  of the Medicaid program.

28

SECOND AMENDED COMPLAINT

395.   As a result of Allergan's actions, as set forth above, the State of
Tennessee and/or its political subdivisions have been, and may continue to be,
severely damaged.

### CLAIM 27

**Violation of the Texas Medicaid Fraud Prevention Act,
Tex. Hum. Res. Code Ann. § 36.001 *et seq.***

396.   Plaintiff-Relator incorporates herein by reference the preceding
paragraphs of this Complaint as though fully set forth herein.

397.   This is a civil action brought by Plaintiff-Relator, on behalf of the
State of Texas against, Allergan under the Texas Medicaid Fraud Prevention Act,
Tex. Hum. Res. Code Ann. § 36.101(a).

398.   Allergan, in reckless disregard or deliberate ignorance of the truth or
falsity of the information involved, or with actual knowledge of the falsity of the
information, knowingly made or caused to be made, and may still be making or
causing to be made, false statements or misrepresentations of material fact that
permitted Allergan to receive a benefit or payment under the Medicaid program that
was not authorized or that was greater than the benefit or payment that was
authorized, in violation of Tex. Hum. Res. Code Ann. § 36.002(1).

399.   Allergan, in reckless disregard or deliberate ignorance of the truth or
falsity of the information involved, or with actual knowledge of the falsity of the
information, knowingly concealed or failed to disclose, or caused to be concealed
or not disclosed – and may still be concealing or failing to disclose, or causing to be
concealed or not disclosed  –  information that permitted Allergan to receive a
benefit or payment under the Medicaid program that was not authorized or that was
greater than the payment that was authorized, in violation of Tex. Hum. Res. Code
Ann. § 36.002(2).

400.   Allergan, in reckless disregard or deliberate ignorance of the truth or
falsity of the information involved, or with actual knowledge of the falsity of the

SECOND AMENDED COMPLAINT

1  information, knowingly made, caused to be made, induced or sought to induce, and

2  may still be making, causing to be made, inducing or seeking to induce, false

3  statements or misrepresentations of material fact concerning information required to

4  be provided by a federal or state law, rule, regulation or provider agreement

5  pertaining to the Medicaid program, in violation of Tex. Hum. Res. Code Ann. §

6  36.002(4)(B).

7       401.   Allergan, in reckless disregard or deliberate ignorance of the truth or

8  falsity of the information involved, or with actual knowledge of the falsity of the

9  information, knowingly made, and may still be making, claims under the Medicaid

10  program for services or products that were inappropriate, in violation of Tex. Hum.

11  Res. Code Ann. § 36.002(7)(C).

12       402.   In addition, § 36.002(5) imposes liability on one who "knowingly

13  pays, charges, solicits, accepts, or receives, in addition to an amount paid under the

14  Medicaid program, a gift, money, a donation, or other consideration as a condition

15  to the provision of a service or product or the continued provision of a service or

16  product if the cost of the service or product is paid for, in whole or in part, under

17  the Medicaid program."

18       403.   Allergan violated § 36.002(5) by engaging in the conduct alleged

19  herein.

20       404.   Allergan violated Hum. Res. Code § 36.002 by their deliberate and

21  systematic violation of federal and state laws, including the FDCA, federal Anti-

22  Kickback Act and § 36.002(5) , compliance with which are express and implied

23  conditions of payment for claims submitted to the State of Texas.

24       405.   The State of Texas, or it political subdivisions, unaware of the falsity

25  of the claims and/or statements made by Allergan, and in reliance on the accuracy

26  of these claims and/or statements, paid, and may continue to pay, for prescription

27  drugs and prescription drug-related management services for recipients of

28  Medicaid.

SECOND AMENDED COMPLAINT

406.   As a result of Allergan's actions, as set forth above, the State of Texas and/or its political subdivisions have been, and may continue to be, severely damaged.

## CLAIM 28

### Violation of the Vermont False Claims Act,
### 32 V.S.A. § 630, *et seq.*

407.   Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

408.   This is a civil action brought by Plaintiff-Relator, on behalf of the State of Vermont, against Allergan under the State of Vermont False Claims Act, 32 V.S.A. § 632(b)(1).

409.   Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Vermont, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of 32 V.S.A. § 631(a)(1).

410.   Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Vermont, or its political subdivisions, in violation of 32 V.S.A. § 631(a)(2).

411.   Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal,

1  avoid, or decrease an obligation to pay or transmit money to the State of Vermont,

2  or its political subdivisions, in violation of 32 V.S.A. § 631(a)(9).

3      412.  In addition, 33 V.S.A. § 141(d) prohibits the solicitation, receipt or

4  offering of any remuneration, including any bribe or rebate, directly or indirectly,

5  overtly or covertly, in cash or in kind in return for furnishing any good, service or

6  item for which payment may be made in whole or in part under the Vermont

7  Medicaid program.

8      413.  Allergan violated 33 V.S.A. § 141(d) by engaging in the conduct

9  alleged herein.

10      414.  Allergan furthermore violated Vermont's False Claims Act, 32 V.S.A.

11  §631(a), by their deliberate and systematic violation of federal and state laws,

12  including the FDCA, federal Anti-Kickback Act, and 33 V.S.A. § 141(d),

13  compliance with which are express and implied conditions of payment for claims

14  submitted to the State of Vermont.

15      415.  The State of Vermont, or its political subdivisions, unaware of the

16  falsity of the claims and/or statements made by Allergan, and in reliance upon the

17  accuracy of these claims and/or statements, paid, and may continue to pay, for

18  prescription drugs and prescription drug-related management services for recipients

19  of state funded health insurance programs.

20      416.  As a result of Allergan's actions, as set forth above, the State of

21  Vermont and/or its political subdivisions have been, and may continue to be,

22  severely damaged.

23                    **<u>CLAIM 29</u>**

24      **Violation of the Virginia Fraud Against Taxpayers Act,**

25             **Va. Code Ann. § 8.01-216.1, *et seq.***

      417.  Plaintiff-Relator incorporates herein by reference the preceding

26  paragraphs of this Complaint as though fully set forth herein.

27

28

      SECOND AMENDED COMPLAINT

418.   This is a civil action brought by Plaintiff-Relator, on behalf of the Commonwealth of Virginia, against Allergan under the Commonwealth of Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.5(A).

419.   Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the Commonwealth of Virginia, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Va. Code Ann. § 8.01-216.3(A)(1).

420.   Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Commonwealth of Virginia, or its political subdivisions, in violation of Va. Code Ann. § 8.01-216.3(A)(2).

421.   Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the Commonwealth of Virginia, or its political subdivisions, in violation of Va. Code Ann. § 8.01-216.3(A)(7).

422.   In addition, Va. Code Ann. § 32.1-315 prohibits the solicitation, receipt or offering of any remuneration, including any bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any good, service or item for which payment may be made in whole or in part under the Virginia Medicaid program.

SECOND AMENDED COMPLAINT

423.   Allergan violated Va. Code Ann. § 32.1-315 by engaging in the conduct alleged herein.

424.   Allergan furthermore violated Virginia's Fraud Against Tax Payers Act, Va. Code Ann. § 8.01-216.3a, by their deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, and Va. Code Ann. § 32.1-315, compliance with which are express and implied conditions of payment for claims submitted to the Commonwealth of Virginia.

425.   The Commonwealth of Virginia, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Allergan, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of state funded health insurance programs.

426.   As a result of Allergan's actions, as set forth above, the Commonwealth of Virginia and/or its political subdivisions have been, and may continue to be, severely damaged.

## **CLAIM 30**

**Violation of the Washington Medicaid Fraud False Claims Act,
Wash. Rev. Code § 74.66.005, *et seq.***

427.   Plaintiff-Relator incorporates by reference the preceding paragraphs of the Complaint as though fully set forth herein.

428.   This is a civil action brought by Plaintiff-Relator on behalf of the State of Washington against Allergan under the Washington State Medicaid Fraud False Claims Act, Wash. Rev. Code § 74.66.050(1).

429.   Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval under

SECOND AMENDED COMPLAINT

the state of Washington Medicaid program, in violation of Wash. Rev. Code § 74.66.020(1)(a).

430.    Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims to get false or fraudulent claims paid or approved by the state of Washington Medicaid program, in violation of Wash. Rev. Code § 74.66.020(1)(b).

431.    Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to obligations to pay or transmit money or property to the state of Washington Medicaid program, in violation of Wash. Rev. Code § 74.66.020(1)(g).

432.    Allergan, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, concealed or improperly avoided or decreased, and may still be concealing or improperly avoiding or decreasing, obligations to pay or transmit money or property to the state of Washington Medicaid program, in violation of Wash. Rev. Code § 74.66.020(1)(g).

433.    In addition, Wash. Rev. Code 74.09.240, prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the Washington Medicaid program.

434.    Allergan violated Wash. Rev. Code 74.09.240 by engaging in the conduct described herein.

SECOND AMENDED COMPLAINT

435.   Allergan furthermore violated the Washington Medicaid Fraud Act, Wash. Rev. Code 74.66.005, *et seq.*, by their deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, and Wash. Rev. Code 74.09.240, compliance with which are express and implied conditions of payment for claims submitted to the State of Washington.

436.   The State of Washington, unaware of the falsity of the claims and/or statements made or caused to be made by Allergan, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and drug-related management services for recipients of state-funded health insurance programs.

437.   As a result of Allergan's actions, as set forth above, the State of Washington and/or its political subdivisions have been, and may continue to be, severely damaged.

## VIII. <u>PRAYER FOR RELIEF</u>

WHEREFORE, Relator prays for judgment against Defendant as follows:

A.   That Defendant be ordered to cease and desist from submitting any more false claims, or further violating the FCA;

B.   That judgment be entered in the United States of America's favor and against Defendant in the amount of each and every false or fraudulent claim or retention of funds, multiplied as provided for in 31 U.S.C. § 3729(a)(1), plus a civil penalty of not less $5,500 or more than $11,000 per claim or violation as provided by 31 U.S.C. § 3729(a)(1), as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, to the extent such multiplied penalties shall fairly compensate the United States of America for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

C.   That judgment be entered in the favor of each state that has asserted claims in Claims for Relief 2 through 30 above or and against Defendant in the

1   amount of each and every false or fraudulent claim or retention of funds, plus civil

2   penalties and multipliers;

3       D.      That Relator be awarded the maximum amount allowed pursuant to 31

4   U.S.C. § 3730(d) and state laws;

5       E.      That judgment be granted for Relator against Defendant for all costs,

6   including, but not limited to, court costs, litigation costs, expert fees, and all

7   attorneys' fees incurred by Relator in the prosecution of this suit; and

8       G.      That Relator be granted such other and further relief as the Court

9   deems just and proper.

10                          **JURY DEMAND**

11      Pursuant to Federal Rule of Civil Procedure 38(b), Relator demands a jury

12  trial for all claims and issues so triable.

13

14  Dated:       March 27, 2019          Respectfully submitted,

15                                       LIEFF CABRASER HEIMANN &
                                         BERNSTEIN, LLP
16

17                                       By:  _____
                                                 Nimish R. Desai
18

19                                       Robert J. Nelson (CA 132797)
                                         rnelson@lchb.com
20                                       Nimish R. Desai (CA 244953)
                                         ndesai@lchb.com
21                                       LIEFF CABRASER HEIMANN &
                                         BERNSTEIN, LLP
22                                       275 Battery Street, 29th Floor
                                         San Francisco, CA  94111-3339
23                                       Telephone:  415.956.1000
                                         Facsimile:  415.956.1008
24

25                                       *Attorneys for Relator*

26

27

28

SECOND AMENDED COMPLAINT