1   Robert J. Nelson (State Bar No. 132797)
    rnelson@lchb.com
2   Nimish R. Desai (State Bar No. 244953)
    ndesai@lchb.com
3   LIEFF CABRASER HEIMANN &
    BERNSTEIN, LLP
4   275 Battery Street, 29th Floor
    San Francisco, CA  94111-3339
5   Telephone:  (415) 956-1000
    Facsimile:  (415) 956-1008
6
7   *Attorneys for Relator*
8   [Additional counsel listed on signature page]
9
10              **UNITED STATES DISTRICT COURT**
11              **CENTRAL DISTRICT OF CALIFORNIA**
12
13  UNITED STATES ex rel.                 Case No. 8:18-cv-00203 JVS (KESx)
    TERRENCE BARRETT, and on
14  behalf of various States,             **RELATOR'S NOTICE OF MOTION
                                          AND MOTION FOR ATTORNEYS'**
15                Plaintiff,              **FEES, COSTS, AND EXPENSES**
16      v.                                Judge:      Hon. James V. Selna
17  ALLERGAN, INC.,
18                Defendant.
19
20
21
22
23
24              **REDACTED DOCUMENT**
25
26
27
28

2772311.8

## NOTICE OF MOTION AND MOTION FOR RELATOR'S MOTION FOR ATTORNEYS' FEES, COSTS, AND EXPENSES

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on May 1, 2023 at 1:30 p.m., or as soon thereafter as the matter may be heard before the Honorable James V. Selna of the United States District Court for the Central District of California, located at Ronald Reagan Federal Building, United States Courthouse, 411 West Fourth Street, Courtroom 10C, Santa Ana, California 92701-4516, Relator will and hereby does move the Court, pursuant to 31 U.S.C. § 3730(d)(2) and analogous state law provisions, for an Order directing Defendant Allergan to pay Relator's reasonable attorneys' fees, costs, and expenses in the following amounts: (i) $5,905,807 in attorneys' fees for work performed by Lieff Cabraser Heimann and Bernstein, LLP, and $64,220 for work performed by the Piacentile Law Firm; (ii) $978,131 in reasonable costs and expenses incurred in the successful litigation of this matter; and (iii) $122,109 in attorneys' fees for the work related to this Motion, with the final amount to be updated on reply.

This motion is based on this notice of motion and motion, the accompanying memorandum of points and authorities, the declaration of Nimish R. Desai and supporting exhibits, the accompanying declaration of Dr. Joseph Piacentile and its supporting exhibit, and the pleadings and papers on file in this action. Pursuant to Local Rule 7-3, the parties have thoroughly discussed the substance of this motion in numerous telephonic conferences, and have been unable to reach resolution; Relator's counsel notified Allergan by email and phone of its intent to bring this motion, and Allergan's counsel indicated it would oppose.

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION FOR RELATOR'S MOTION FOR ATTORNEYS' FEES, COSTS, AND EXPENSES ................................................. i

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 2

   I.    Relator alleged a complex fraudulent price reporting scheme. ................... 2

   II.   Relator's counsel successfully resolved this case five years after filing, including three years of intensive litigation. ..................................... 3

ARGUMENT ...................................................................................................... 5

   I.    Relator is entitled to reasonable attorneys' fees and costs. ........................... 5

   II.   LCHB's lodestar is reasonable, well-supported, and should be awarded in full. ................................................................................................ 6

       A.   LCHB's hourly rates are reasonable and regularly approved. .......... 6

           1.   Using LCHB's 2022 rates ensures fair and reasonable compensation for delayed payment in this years-long case. ..................................................................................... 9

           2.   If the Court does apply historical rates, counsel request a modest upward adjustment. .................................................. 11

       B.   LCHB's hours prosecuting this case to a favorable outcome were spent reasonably and productively. ........................................ 11

           1.   LCHB investigated and developed the technical and complex liability theories in this case. ................................. 12

           2.   Counsel efficiently pursued necessary discovery from Allergan. ...................................................................... 12

           3.   Counsel efficiently analyzed the resulting productions to support depositions, expert work, and to prepare the case for summary judgment and trial. ................................... 14

           4.   Counsel took nineteen document-heavy and lengthy depositions, and secured testimony from third party witnesses. ................................................................. 15

           5.   LCHB worked with a team of experts to opine on statutory pricing, statistical analysis, consumer surveys, and damages. ............................................................. 16

           6.   LCHB responded to discovery requests from Allergan. ...... 17

           7.   Counsel pursued the evidence to prove up Relator's claims and sought Court intervention only when necessary. ................................................................. 17

           8.   LCHB negotiated a settlement figure, then helped usher the settlement through the government review process. .................................................................. 18

**TABLE OF CONTENTS**
**(continued)**

Page

C.   Counsel staffed the case appropriately and exercised reasonable billing judgment in the requested hours. ..................... 19

D.   The *Kerr* factors weigh strongly in favor of the requested fees. ...................................................................................... 21

1.   Novelty, difficulty, and undesirability of the case and questions involved ................................................. 21

2.   Skill required to litigate the case ......................................... 22

3.   Contingent nature of the fee and opportunity cost ............. 22

4.   Comparative and stand alone quality of the result ............. 23

III.   LCHB's reasonable costs and expenses should be reimbursed. ............... 24

IV.   The Piacentile Law Firm's lodestar is reasonable and should be approved. ...................................................................................... 24

V.   Relator is entitled to fees for this motion. .................................................... 25

CONCLUSION ............................................................................................................. 25

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Bellospirito v. Byrne,*
   No. SA CV 08-729-JVS(E), 2009 WL 10741538 (C.D. Cal. Apr. 3, 2009) .............. 10

*Blanchard v. Bergeron,*
   489 U.S. 87 (1989) ....................................................................................................... 11

*Brown v. DIRECTV, LLC,*
   Case No. 13-CV-1170-DMG (Ex), Dkts. 529 (C.D. Cal. March 3, 2023) ................... 7

*Cabrales v. County of Los Angeles,*
   935 F.2d 1050 (9th Cir. 1991) ..................................................................................... 18

*Camacho v. Bridgeport Fin., Inc.,*
   523 F.3d 973 (9th Cir. 2008) .......................................................................................... 6

*Charlestown Cap. Advisors, LLC v. Acero Junction, Inc.,*
   No. 18 CV 4437 JGK BCM, 2021 WL 1549916 (S.D.N.Y. Apr. 20, 2021) ................ 8

*Clark v. City of Los Angeles,*
   803 F.2d 987 (9th Cir. 1986) ....................................................................................... 25

*Cottle v. Plaid Inc.,*
   No. 4:20-cv-03056-DMR, Dkt. 184 (N.D. Cal., July 20, 2022) .................................. 7

*Ellis v. Google, LLC,*
   No. CGC-17-561299 (S.F. Super. Ct. Oct. 25, 2022) ................................................... 7

*Farbotko v. Clinton County of New York,*
   433 F.3d 204 (2d Cir. 2005) ........................................................................................... 9

*Fischer v. SJB-P.D. Inc.,*
   214 F.3d 1115 (9th Cir. 2000) ....................................................................................... 5

*Fox v. Vice,*
   563 U.S. 826 (2011) ....................................................................................................... 6

*Franchek v. Workrite Ergonomics, LLC,*
   No. 16-cv-02789-JSW (DMR), 2022 WL 3137928 (N.D. Cal. May 9, 2022). 5, 10, 25

*Gates v. Deukmejian,*
   987 F.2d 1392 (9th Cir. 1992) ................................................................................. 9, 10

*Gonzalez v. City of Maywood,*
   729 F.3d 1196 (9th Cir. 2013) ..................................................................................... 25

*Hensley v. Eckerhart,*
   461 U.S. 424 (1983) ........................................................................................... 5, 6, 18

*Hunter v. Nature's Way Prod., LCC,*
   No. 3:16-CV-532-WQH-AGS, 2020 WL 71160 (S.D. Cal. Jan. 6, 2020) ................... 8

*In re Anthem, Inc. Data Breach Litig.,*
   No.15-MD-02617-LHK, 2018 WL 3960068 (N.D. Cal. Aug. 17, 2018). ..................... 7

*In re Apple Inc. Device Performance Litig.,*
   No. 5:18-MD-02827-EJD, 2023 WL 2090981 (N.D. Cal. Feb. 17, 2023) ................ 23

*In re Intuit Data Litig.,*
   No. 15-CV-1778-EJD-SVK, 2019 WL 2166236 (N.D. Cal. May 15, 2019) .............. 7

# TABLE OF AUTHORITIES
## (continued)

**Page**

*In re The Boeing Co. Derivative Litig.,*
No. C.A. No. 2019-0907-MTZ (Del. Ch. Mar. 22, 2022)........................................ 7

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.,*
No. 2672 CRB (JSC), 2017 WL 1047834, (N.D. Cal. Mar. 17, 2017) .............. 7, 8, 23

*In re Wash. Pub. Power Supply Sys. Sec. Litig.,*
19 F.3d 1291 (9th Cir. 1994)................................................................ 9, 11, 23

*In re Zurn Pex Plumbing Prods. Liab. Litig.,*
No. 08-MDL-1958 ADM/AJB, 2013 WL 716460 (D. Minn. Feb. 27, 2013)........... 10

*Jenkins v. Nat'l Grid USA Serv. Co., Inc.,*
No. 2:15-cv-01219-JS-ARL, Dkt. 760 (E.D.N.Y. June 24, 2022) .............................. 7

*Kanawi v. Bechtel Corp.,*
No. C 06-05566 CRB, 2011 WL 782244 (N.D. Cal. Mar. 1, 2011) ......................... 23

*McGrath v. County of Nevada,*
67 F.3d 248 (9th Cir. 1995)................................................................................... 5

*Missouri v. Jenkins,*
491 U.S. 274 (1989)......................................................................................... 9, 20

*Morales v. City of San Rafael,*
96 F.3d 359 (9th Cir. 1996)................................................................................... 5

*Moreno v. City of Sacramento,*
534 F.3d 1106 (9th Cir. 2008).............................................................................. 11

*Newton v. Equilon Enterprises, LLC,*
411 F. Supp. 3d 856 (N.D. Cal. 2019)................................................................... 9

*Pacheco v. Ford Motor Co.,*
No. 2:18-cv-09006-ODW (ASx), 2022 WL 845108 (C.D. Cal. Mar. 22, 2022) ........ 8

*Perez v. Rash Curtis & Assocs.,*
No. 4:16-CV-03396-YGR, 2020 WL 1904533 (N.D. Cal. Apr. 17, 2020) ................ 8

*Pomerleau v. Health Net of Cal., Inc.,*
No. CV 11-01654 DDP (FMOx), 2012 WL 5829850 (C.D. Cal. Nov. 15, 2012)....... 9

*Pulmonary Assocs. of Charleston PLLC v. Greenway Health, LLC,*
No. 3:19-cv-00167-TCB (N.D. Ga. Dec. 2, 2021) .................................................. 7

*Ramirez v. Trans Union, LLC,*
No. 12-CV-00632-JSC, 2022 WL 17722395 (N.D. Cal. Dec. 15, 2022) ................... 7

*Shaw v. AAA Eng'g & Drafting, Inc.,*
213 F.3d 538 (10th Cir. 2000)................................................................................ 5

*Simring v. Rutgers,*
No. 14-1126, 2015 WL 4620613 (3d Cir. 2015) ..................................................... 9

*Stewart v. Kaiser Found. Health Plan, Inc.,*
No. CGC-21-590966 (S.F. Super. Ct Mar. 10, 2022)............................................... 7

*Thompson v. Gomez,*
45 F.3d 1365 (9th Cir. 1995)................................................................................ 25

*Toven v. Metro. Life Ins. Co.,*
No. CV 06-07260 ABC (RZx), 2009 WL 578538 (C.D. Cal. Mar. 5, 2009) .............. 9

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Troy v. Aegis Senior Cmtys. LLC*,
  No. 16-CV-03991-JSW, 2021 WL 6129106 (N.D. Cal. Aug. 23, 2021)................... 10

*U.S. ex rel. Barrett v. Allergan, Inc.*,
  No. SA-CV 18-203 JVS (KESx), 2019 WL 4675756 (C.D. Cal. Sept. 24, 2019). 3, 12

*U.S. ex rel. Garibaldi v. Orleans Parish*,
  46 F. Supp. 2d 546 (E.D. La. 1999) ............................................................... 11

*U.S. ex rel. Gathman v. CareOne Mgmt. LLC*,
  Civ. A. No. 17-6180 (SDW) (LDW), 2021 WL 4295519 (D.N.J. Aug. 23, 2021)...... 8

*U.S. ex rel. Herndon v. Appalachian Regional Community Head Start, Inc.*,
  674 F. Supp. 2d 773 (W.D. Va. 2009) ............................................................ 20

*U.S. ex rel. Hunt v. Cochise Consultancy*,
  887 F.3d 1081 (11th Cir. 2018)...................................................................... 21

*U.S. ex rel. Liotine v. CDW-Gov't, Inc.*,
  No. 305  CV 00033 DRH PMF, 2013 WL 5366960 (S.D. Ill. Sept. 25, 2013).......... 22

*U.S. ex rel. Luke v. HealthSouth Corp.*,
  No. 2:13-cv-01319-APG-VCF, 2020 WL 1169393 (D. Nev. Mar. 11, 2020) ........... 23

*U.S. ex rel. Maxwell v. Anham USA, Inc.*,
  No. 1:14-cv-156, 2020 WL 4460364 (E.D. Va. Aug. 3, 2020) ................................. 23

*U.S. ex rel. Poulton v. Anesthesia Assocs. of Burlington, Inc.*,
  87 F. Supp. 2d 351 (D. Vt. 2000)................................................................... 11

*U.S. ex rel. Sheldon v. Allergan Sales*,
  *LLC*, 24 F.4th 340 (4th Cir.).......................................................................... 22

*U.S. ex rel. Tommasino v. Guida*,
  No. 10-cv-4644 (JFB) (AKT), 2017 WL 878587,  (E.D.N.Y. Mar. 6, 2017)......... 5, 24

*U.S. v. $186,416.00 in U.S. Currency*,
  642 F.3d 753 (9th Cir. 2011) ........................................................................... 5

*U.S. v. Biotronik, Inc.*,
  No. 2:09-CV-3617-KJM-EFB, 2015 WL 1291371 (E.D. Cal. Mar. 20, 2015) ........... 8

*U.S. v. Malik*,
  *No.* 2:12-CV-306, 2016 WL 6818880  (N.D. Ind. Nov. 18, 2016) ............................ 9

*U.S. v. Prism Autism Found.*,
  No. 3:19-cv-00043-W-BLM, 2022 WL 5264493 (S.D. Cal. Oct. 6, 2022)................ 23

*U.S. v. Stern*,
  818 F. Supp. 1521 (M.D. Fla. 1993)............................................................... 11

*W.S. v. Huntington Beach Union High Sch. Dist.*,
  No. SA CV 151643 JVS (DFMx), 2017 WL 11636676 (C.D. Cal. Oct. 10, 2017)... 10

*WB Music Corp. v. Royce Int'l Broad. Corp. et al.*,
  No. EDCV 16-600 JGB (SPx), 2021 WL 4330876 (C.D. Cal. May 7, 2021)............. 8

*Whealen v. Hartford Life & Accident Ins. Co.*, No. CV 06-4948 PSG (PLAx), 2009 WL
  4063166 (C.D. Cal. Nov. 20, 2009) ................................................................. 9

# TABLE OF AUTHORITIES
### (continued)

**Page**

**Statutes**

31 U.S.C. § 3730...........................................................................................1, 5, 12

**Other Authorities**

Andrew E. Brashier, *The Federal Government's Chief Weapon in Combatting Fraud: The False Claims Act*, 34 Ala. Ass'n Just. J. 60 (2014) .......................................... 22

Claire M. Sylvia, *The False Claims Act: Fraud Against the Government* § 9:9.............. 9

David Freeman Engstrom, Public Regulation of Private Enforcement: Empirical Analysis of DOJ Oversight of Qui Tam Litigation Under the False Claims Act, 107 Nw. U. L. Rev. 1689 (2013)........................................................................... 22

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **INTRODUCTION**

Over five years after he retained counsel to pursue this pharmaceutical pricing fraud case, Relator Terrence Barrett and his counsel secured a settlement that returned ▮▮▮▮▮ to the government. This an excellent outcome, and it is rare. Not many False Claims Act ("FCA") cases continue after the government declines, and very few of those declined cases result in ▮▮▮▮ dollars to the government fisc. This result was only possible due to years of hard fought and challenging litigation, in what can be fairly described as a novel, fast-evolving, and uncertain area of the law.

Relator now respectfully moves for his reasonable attorneys' fees, costs, and expenses, to which a prevailing Relator is entitled under the FCA. *See* 31 U.S.C. § 3730(d)(2).[1] FCA attorneys' fees are measured by lodestar: compensation for the reasonable hours worked charged at reasonable rates. Under that method—and after substantial concessions that reduce Relator's request by well over a half million dollars—Relator seeks $5,905,807 in lodestar for Lieff Cabraser Heimann & Bernstein ("LCHB") (representing 9,869.5 hours of work), $64,220 in lodestar for The Piacentile Law Firm ("PLF") (149.1 hours), and $978,131 in costs and expenses. Counsel made these outlays despite the risk that they would never be compensated for them, a risk which is particularly acute in FCA cases where the government had declined to intervene.

As detailed below and in the Declaration of Nimish R. Desai and its exhibits,[2] Relator's request is based on hours reasonably, necessarily, and efficiently incurred in prosecuting this case, including analysis of a million-plus page production and several gigabytes of data; evaluation of massive sales, drug sample, and rebate databases; twenty depositions; and nine expert reports. LCHB managed this work with a core team of four lawyers, with tasks appropriately delegated based on seniority. And, the lodestar

---

[1] LCHB met and conferred with Allergan's counsel over several months to avoid litigation over fees, but the parties were unable to reach a resolution.

[2] Unless otherwise noted, all paragraph (¶), section (§), and exhibit cites are to the Desai Declaration.

is based on reasonable rates that courts have repeatedly approved. Likewise, PLF's
modest time was reasonably incurred during the initial investigation of this case. Finally,
LCHB's costs and expenses were reasonably incurred and should be reimbursed.

For all the reasons explained below, LCHB requests that this Court grant
Relator's motion for attorneys' fees, costs, and expenses in full.

## BACKGROUND

A detailed description of Relator's allegations and the litigation history is set forth
in the Desai Declaration (§ II), and is briefly summarized below.

### I.      Relator alleged a complex fraudulent price reporting scheme.

This case concerned Allergan's scheme to inflate the price the Medicare program
pays for Botox, an injectable toxin known popularly as a cosmetic facial wrinkle
reducer. In fact, Botox has a substantially larger therapeutic market for treating medical
conditions, and Medicare Part B is likely the largest payor of Botox therapeutic claims.
This means that the Medicare reimbursement rate, known as the Average Sales Price or
"ASP," is critical to Allergan's revenues and profits. The purpose of ASP reporting is to
ensure the price the government pays reflects the "average" in the private market. Dkt.
29 ("SAC") ¶ 18, 20. The average must include effective price reductions, including any
"discounts" or "rebates," or "free goods" (e.g., samples), offered "contingent on any
purchase requirements." *Id*. ¶ 20.

Relator alleged that, in order to stay competitive in the cosmetic market, Allergan
delivered hundreds of millions of dollars of discounts annually to cosmetic purchasers.
But in order to keep its Medicare revenues elevated, Allergan excluded those discounts
from its price reporting to the government. The discounts took the form of free sample
vials of Botox delivered to the cosmetic providers, and consumer cash rewards that
flowed through these providers. Desai Decl. ¶¶ 8-11.

- 2 -

## II. **Relator's counsel successfully resolved this case five years after filing, including three years of intensive litigation.**

Relator retained LCHB in late 2017 and filed suit in February 2018. In March 2019—after months of meticulous research into the viability of this risky, non-intervened case—Relator filed a Second Amended Complaint, kicking off the litigation phase of the case. Three years later, in February 2022, and on the eve of the first expert deposition, Relator and Allergan reached a settlement in principle. In December 2022, after working through numerous issues between the parties and the government, the parties executed the settlement.

The relatively clean docket sheet masks the intense litigation required to secure this settlement. The Desai Declaration provides a fulsome accounting of the work performed by Relator's counsel from investigation through settlement over the five years this case was active. Desai Decl., §§ II, III.B, and Ex. B. Simply put, proving the existence of a 10-year, nationwide, *knowingly* fraudulent pricing scheme—executed by a nationwide sales and marketing team of hundreds over that time period—required a dogged, careful, and resource-intensive effort. This work included (but was not limited to):

1.      a detailed pre-filing investigation, followed by a fresh re-evaluation following the government's declination, including extensive work with Relator, a well-regarded industry consultant, and potential third party witnesses (Desai Decl., § II.A);

2.      defeating Allergan's motion to dismiss (see *U.S. ex rel. Barrett v. Allergan, Inc*., No. SA-CV 18-203 JVS (KESx), 2019 WL 4675756 (C.D. Cal. Sept. 24, 2019)) (§ II.B);

3.      selecting discovery custodians from a potential roster of many hundreds of current and former Allergan employees, with an eye towards demonstrating nationwide practices (§ II.C);

4.      obtaining (including through motion practice), and then analyzing, 275,000 documents from over 60 custodians, spanning over one million pages, and including over 1.7 terabytes of data files (§ II.C, II.J);

5.      obtaining and analyzing many millions of lines of data regarding Botox sales and Botox drug samples, as well as consumer rebates (§ II.D);

6.      carefully selecting the right witnesses to depose through an expansive but efficient analysis of the scores of custodial files (§ II.E);

7.      taking nineteen fact depositions, from senior Allergan leadership down to sales representatives, each with thousands or tens of thousands of documents in their custodial files, and many with hundreds or thousands of rows of related sales and sample data (§ II.E.2);

8.      securing third party discovery, including favorable testimony from former employees, and the collection and production of over 500,000 pages of healthcare provider marketing materials (§ II.F);

9.      reviewing and challenging Allergan's four privilege logs, including through a motion to compel before Magistrate Judge Scott, leading to the de-designation (voluntary and ordered) of over a hundred documents (§ II.G);

10.     issuing interrogatories and RFAs followed by extensive meet and confer, and motion practice, regarding Allergan's responses (§ II.H);

11.     working with a team of non-testifying and testifying experts, with three experts submitting lengthy, detailed expert reports, and two of them submitting rebuttals (§ II.K); and

12.     negotiating and executing the Settlement (§ II.K).

This was a substantial undertaking on a risky, expansive case, and it was LCHB's persistent yet efficient prosecution that yielded ███████ back to the government.

## ARGUMENT

### I. Relator is entitled to reasonable attorneys' fees and costs.

The FCA is a compulsory fee-shifting statute. The relator "*shall . . . receive . . . reasonable attorneys' fees and costs.*" 31 U.S.C. § 3730(d)(2) (emphasis added). This fee provision was designed to enable whistleblowers to secure competent counsel. Indeed, when amending the statute to provide for fees, Congress specifically recognized that the "[u]navailability of attorneys' fees inhibits and precludes many individuals, as well as their attorneys, from bringing civil fraud suits." *Shaw v. AAA Eng'g & Drafting, Inc.*, 213 F.3d 538, 544 (10th Cir. 2000) (quoting S. Rep. 99–345, at 29 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5294).

"The lodestar approach is the method customarily used to determine attorney fees under fee-shifting statutes" including the FCA. *U.S. v. $186,416.00 in U.S. Currency*, 642 F.3d 753, 755 (9th Cir. 2011). Lodestar is calculated by the number of hours spent multiplied by a reasonable hourly rate. *Morales v. City of San Rafael*, 96 F.3d 359, 363 (9th Cir. 1996). Moving counsel must submit "evidence supporting the hours worked and rates claimed," but are "not required to record in great detail how each minute of his time was expended." *Hensley v. Eckerhart*, 461 U.S. 424, 433, 437 n.12 (1983); *see also Fischer v. SJB-P.D. Inc.*, 214 F.3d 1115, 1121 (9th Cir. 2000) (attorneys can satisfy their burden "by simply listing [their] hours and 'identifying the general subject matter of [their] time expenditures'") (citation omitted).

"There is a *strong presumption* that the lodestar figure represents a reasonable fee." *Morales,* 96 F. 3d at 363 n.8 (emphasis added); *see also Franchek v. Workrite Ergonomics, LLC*, No. 16-cv-02789-JSW (DMR), 2022 WL 3137928, at *2 (N.D. Cal. May 9, 2022) (same). That is particularly so in FCA cases, because reducing attorneys' fees "would discourage attorneys from investing the time and resources necessary to bring a *qui tam* action, thereby undermining the purpose of the FCA." *U.S. ex rel. Tommasino v. Guida*, No. 10-cv-4644 (JFB) (AKT), 2017 WL 878587, at *2 (E.D.N.Y. Mar. 6, 2017). In response, Allergan "bears the burden of providing specific evidence to

- 5 -

challenge the accuracy and reasonableness of the hours charged" should it argue for a reduction. *McGrath v. County of Nevada*, 67 F.3d 248, 255 (9th Cir. 1995). Ultimately though, "[a] request for attorneys' fees should not result in a second major litigation," *Hensley*, 461 U.S. at 437, because "[t]he essential goal in shifting fees [] is to do rough justice, not to achieve auditing perfection." *Fox v. Vice*, 563 U.S. 826, 838 (2011).

## II.   LCHB's lodestar is reasonable, well-supported, and should be awarded in full.

As detailed below, LCHB's requested lodestar is reasonable. ***First***, LCHB timekeepers' 2022 rates are reasonable. The same rates have been submitted to other defendants in fee-shifting cases, and have also been routinely approved by Courts in evaluating LCHB fee motions in other complex litigation. Moreover, this is precisely the type of complex, risky case for which the use of current (i.e., 2023) rates would be appropriate, making LCHB's request for the use of *2022* rates all the more reasonable. ***Second***, LCHB's hours were reasonable, necessary, and its work was efficiently performed; LCHB prosecuted this case with a core team of four lawyers: one partner, one associate, and two staff attorneys (*i.e.*, non-partner track associates).

### A.   LCHB's hourly rates are reasonable and regularly approved.

LCHB is a plaintiffs-side law firm specializing in complex civil litigation. It is among the largest firms in the U.S. that exclusively represents plaintiffs, and has earned a national reputation for professional integrity and the successful prosecution of its clients' claims. Through its dedicated *qui tam* practice group, LCHB represents whistleblowers in a wide range of cases, including healthcare fraud, defense contractor fraud, and securities and financial fraud. Desai Decl. § III.A. As explained below, LCHB's rates are reasonable and commensurate with its attorneys' experience, reputation, and the prevailing rates in this district. *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 980 (9th Cir. 2008).

LCHB has applied its reasonable and customary hourly rates for all timekeepers, and Allergan does not object to the hourly rates for LCHB partners and associates (i.e.

1  Mr. Desai, Ms. Geman, and Ms. McBride). Ex. E.

2       LCHB's requested rates are the same as or comparable to rates approved in other,

3  large complex cases, including in the past year. This includes rates for partners,

4  associates, staff attorneys,[3] and staff. *See Ramirez v. Trans Union, LLC*, No. 12-CV-

5  00632-JSC, 2022 WL 17722395, at *9 (N.D. Cal. Dec. 15, 2022) (approving LCHB

6  hourly rates ranging "from $1,325 to $560 for partners and associates, and $485-$455

7  for 'litigation support' and paralegals"); *Ellis v. Google, LLC,* No. CGC-17-561299

8  (S.F. Super. Ct. Oct. 25, 2022) (approving LCHB rates including $475/hour for staff

9  attorneys); *Brown v. DIRECTV, LLC*, Case No. 13-CV-1170-DMG (Ex), Dkts. 529, 538

10  (C.D. Cal. March 3, 2023) (Hutchinson declaration listing LCHB hourly rates, including

11  $475/hour for LCHB staff attorneys, and order approving fees).[4]

12       LCHB's rates reflect the experience and background of the attorneys who

13  litigated this matter. Desai Decl. § III.C. For example, Mr. Desai ($920), a Berkeley

14  Law graduate, has over 15 years of experience including numerous successful complex

15  whistleblower and class action cases. *Id.* Ms. McBride ($580), a Stanford Law graduate,

16  has nearly 8 years of legal experience, including more than five years in plaintiffs' side

17  litigation with LCHB. *Id.* Each of the staff attorneys who performed substantial work on

18  the case ($475) has *more* than a decade of legal experience (including over 20 years for

---

[3] LCHB staff attorneys are full-time employees who receive salaries, office space, and other similar benefits. There are many reasons why these attorneys choose their non-partner-track positions (e.g., more flexible and predictable hours), but this does not change the fact that they are skilled and experienced lawyers who perform the same type and quality of work as partner-track associates (and even partners). Desai Decl. ¶ 121.

[4] *See also* recent cases approving LCHB rates: *Cottle v. Plaid Inc.*, No. 4:20-cv-03056-DMR, Dkt. 184 at *18-19 (N.D. Cal., July 20, 2022); *In re The Boeing Co. Derivative Litig.*, No. C.A. No. 2019-0907-MTZ, at *10 (Del. Ch. Mar. 22, 2022); *Stewart v. Kaiser Found. Health Plan, Inc.*, No. CGC-21-590966 (S.F. Super. Ct Mar. 10, 2022); *Jenkins v. Nat'l Grid USA Serv. Co., Inc.*, No. 2:15-cv-01219-JS-ARL, Dkt. 760 at *9-10 (E.D.N.Y. June 24, 2022); *Pulmonary Assocs. of Charleston PLLC v. Greenway Health, LLC*, No. 3:19-cv-00167-TCB, at *5-8 (N.D. Ga. Dec. 2, 2021); *In re Intuit Data Litig.*, No. 15-CV-1778-EJD-SVK, 2019 WL 2166236, at *1 (N.D. Cal. May 15, 2019); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 2672 CRB (JSC), 2017 WL 1047834, at *5 (N.D. Cal. Mar. 17, 2017); *In re Anthem, Inc. Data Breach Litig.*, No.15-MD-02617-LHK, 2018 WL 3960068, at *17 (N.D. Cal. Aug. 17, 2018).

Ms. Ashur and Ms. Nutting), and substantial experience with complex corporate fraud cases. § III.B.[5] A blended hourly rate of $598 for all timekeepers further supports the overall reasonableness of the rates (as well as the appropriate delegation of assignments across the team, as discussed below).[6]  Finally, in addition to meeting with repeated judicial approval, LCHB's rates are well in line with the 2021 Real Rate Report: The Industry's Leading Analysis of Law Firm Rates, Trends, and Practices. The Report provides Los Angeles rates of $412 to $841 for associates, $527 to $1,145 for partners, and a median rate of $255 for paralegals. Report at 10, 26, 32.

Moreover, LCHB's rates are less expensive than rates charged by Allergan's counsel, Arnold & Porter. *U.S. ex rel. Gathman v. CareOne Mgmt. LLC*, Civ. A. No. 17-6180 (SDW) (LDW), 2021 WL 4295519, at *3 (D.N.J. Aug. 23, 2021) (considering defendant's hourly rates in assessing reasonableness of relator's counsel's rates); *U.S. v. Biotronik, Inc.*, No. 2:09-CV-3617-KJM-EFB, 2015 WL 1291371, at *6 (E.D. Cal. Mar. 20, 2015) (similar). Allergan counsel would not disclose their rates during meet and confer, but recent public filings place them at or above LCHB's. *See Charlestown Cap. Advisors, LLC v. Acero Junction, Inc.*, No. 18 CV 4437 JGK BCM, 2021 WL 1549916, at *1 (S.D.N.Y. Apr. 20, 2021) ($1,065 per hour for partners and $500 for first year associate in 2020); *WB Music Corp. v. Royce Int'l Broad. Corp. et al.*, No. EDCV 16-600 JGB (SPx), 2021 WL 4330876, at *4 (C.D. Cal. May 7, 2021) (2021 rates of $976.50 for senior counsel, $706.50 for associate).

In sum, LCHB's hourly rates are well "within the range of reasonableness" and should be approved.  *Pacheco v. Ford Motor Co.*, No. 2:18-cv-09006-ODW (ASx), 2022 WL 845108, at *4 (C.D. Cal. Mar. 22, 2022).

---

[5] LCHB utilized its skilled staff attorneys to perform both offensive and defensive discovery work in this work in this case.

[6] *See, e.g., Perez v. Rash Curtis & Assocs.,* No. 4:16-CV-03396-YGR, 2020 WL 1904533, at *20 (N.D. Cal. Apr. 17, 2020) (finding blended hourly rate of $634.48 reasonable); *Hunter v. Nature's Way Prod., LCC,* No. 3:16-CV-532-WQH-AGS, 2020 WL 71160, at *7 (S.D. Cal. Jan. 6, 2020) (same for $708); *Volkswagen,* 2017 WL 1047834, at *5 (approving blended average hourly billing rate of $529 per hour).

1.   **Using LCHB's 2022 rates ensures fair and reasonable compensation for delayed payment in this years-long case.**

FCA cases widely approve lodestar awards at current rates. That practice is also consistent with the Ninth Circuit's guidance. However, LCHB seeks compensation based only on 2022 rates (with the exception of fees for this motion, litigated entirely in 2023). This yields a material reduction in lodestar of some $510,000, demonstrating the reasonableness of LCHB's request.

The Ninth Circuit has stated that providing "[f]ull compensation *requires* charging *current rates* for all work done during the litigation, or by using historical rates enhanced by an interest factor." *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1305 (9th Cir. 1994) (emphasis added). This is because "compensation received several years [later]… is not equivalent to the same dollar amount received reasonably promptly as the legal services are performed." *Missouri v. Jenkins*, 491 U.S. 274, 283 (1989).

This reasoning finds particular support in FCA cases, where courts have "widely approved" the use of current rates for attorney fee awards. *See* Claire M. Sylvia, *The False Claims Act: Fraud Against the Government* § 9:9 (updated June 2022) (collecting cases and summarizing "[c]ourts [in FCA cases] have generally used the rates charged by lawyers *at the time of the fee award*, even where the work may have been performed much earlier when the lawyer charged a lower rate") (emphasis added). Numerous decisions from this Circuit and beyond are supportive. *See, e.g.*, *Simring v. Rutgers,* No. 14-1126, 2015 WL 4620613, at *3 (3d Cir. 2015) (applying current rates at the time the fee petition was filed in FCA case); *U.S. v. Malik, No.* 2:12-CV-306, 2016 WL 6818880, at *5 (N.D. Ind. Nov. 18, 2016) (same); *Newton v. Equilon Enterprises, LLC*, 411 F. Supp. 3d 856, 882 (N.D. Cal. 2019) ("In calculating the lodestar, it is appropriate for counsel to use their current hourly rates *at the time of the fee motion*." (emphasis added)); *Gates v. Deukmejian*, 987 F.2d 1392, 1406 (9th Cir. 1992) (similar).[7]

---

[7] *See also Pomerleau v. Health Net of Cal., Inc*., No. CV 11-01654 DDP (FMOx), 2012 WL 5829850, at *5 (C.D. Cal. Nov. 15, 2012) (applying current rates to all hours

1    Counsel respectfully submit that 2022 rates (rather than historical) are appropriate

2   for LCHB to be fairly compensated for its resource-intensive work in prosecuting this

3   case. The several years-long duration of these efforts—and the commensurate "length of

4   the delay in payment"—strongly support the use of the rates LCHB seeks. *Gates*, 987

5   F.2d at 1407 (three years is a "particularly onerous" delay in payment where significant

6   lodestar was accrued); *see also Troy v. Aegis Senior Cmtys. LLC*, No. 16-CV-03991-

7   JSW, 2021 WL 6129106, at *3 (N.D. Cal. Aug. 23, 2021) (current rates appropriate

8   when cases were filed "between three and five years ago").

9    Counsel note that this Court has previously applied historical rates to calculate

10   attorneys' fees in certain cases. But those were not FCA cases and not remotely near the

11   complexity and scope of this one, and thus should not guide the result here. *Cf.*

12   *Bellospirito v. Byrne*, No. SA CV 08-729-JVS, 2009 WL 10741538, at *7 (C.D. Cal.

13   Apr. 3, 2009) (Selna, J.) (individual, pro se § 1983 litigation regarding tax withholding

14   issues); *W.S. v. Huntington Beach Union High Sch. Dist.*, No. SA CV 151643 JVS

15   (DFMx), 2017 WL 11636676, at *4 (C.D. Cal. Oct. 10, 2017) (Selna, J.) (individual

16   action regarding access to public education for student).

17    By contrast, and for the reasons set out above and § II.D.1., below, this case is

18   just the kind of "highly complex and time-consuming" litigation that calls for the use of

19   current rates to compensate counsel appropriately. *Huntington Beach*, 2017 WL

20   11636676, at *4; *see also Franchek*, 2022 WL 3137928, at *6 (collecting cases on the

21   Ninth Circuit view that *qui tam* cases are "complicated" and involve "complex legal and

22   factual issues").

23   _____

24   billed); *Whealen v. Hartford Life & Accident Ins. Co*., No. CV 06-4948 PSG (PLAx),
     2009 WL 4063166, at *5 (C.D. Cal. Nov. 20, 2009) ("The Court finds that awarding

25   fees based upon [attorney]'s current hourly rate appropriately compensates counsel for
     the delay in payment."); *Toven v. Metro. Life Ins. Co*., No. CV 06-07260 ABC (RZx),

26   2009 WL 578538, at *4 (C.D. Cal. Mar. 5, 2009) (using prevailing market rate for fees
     at time of filing "to compensate for the delay"); *Farbotko v. Clinton County of New

27   *York*, 433 F.3d 204, 210 n.11 (2d Cir. 2005) ("[W]e have held that the rates used by the
     district court to calculate the lodestar amount should be current rather than historic

28   hourly rates." (citation omitted)); *In re Zurn Pex Plumbing Prods. Liab. Litig*., No. 08-
     MDL-1958 ADM/AJB, 2013 WL 716460, at *4 (D. Minn. Feb. 27, 2013) (collecting
     cases applying current rates).

**2.      If the Court does apply historical rates, counsel request a
modest upward adjustment.**

If the Court were inclined to apply historical rates, counsel respectfully request

that the Court apply either an interest enhancement or lodestar multiplier to provide

adequate compensation for the years LCHB has carried this litigation. *In re Wash.*, 19

F.3d at 1305 ("Full compensation requires charging current rates . . . *[or] historical

rates enhanced by an interest factor*.") (emphasis added); *U.S. v. Stern*, 818 F. Supp.

1521, 1522 (M.D. Fla. 1993 *vacated in part on other grounds,* 932 F. Supp. 277 (M.D.

Fla. 1993) (applying lodestar multiplier of 1.5 in FCA case due to novelty and difficulty

of the legal questions presented); *U.S. ex rel. Garibaldi v. Orleans Parish*, 46 F. Supp.

2d 546, 572 (E.D. La. 1999) *vacated on other grounds*, 244 F.3d 486 (5th Cir. 2001)

(1.5 multiplier where, like here, FCA action involved novel and difficult questions); *U.S.

ex rel. Poulton v. Anesthesia Assocs. of Burlington, Inc.*, 87 F. Supp. 2d 351, 359 (D. Vt.

2000) (ten percent upward adjustment due to "real risk-of-not-prevailing issues").

Here, for all the reasons set out in the Desai Declaration and § D, below, all of the

relevant factors weigh strongly in favor of an enhancement. Thus, were the Court to

apply historical rates, Relator respectfully requests a modest multiplier of 1.17, which

would bring the total award in line with 2022 rates.

**B.      LCHB's hours prosecuting this case to a favorable outcome were
spent reasonably and productively.**

"[C]ounsel for prevailing parties should be paid…for *all* time reasonably

expended." *Blanchard v. Bergeron*, 489 U.S. 87, 91 (1989) (emphasis added). "By and

large, the court should defer to the winning lawyer's professional judgment as to how

much time he was required to spend on the case." *Moreno v. City of Sacramento*, 534

F.3d 1106, 1112 (9th Cir. 2008). That is especially true here because "lawyers are not

likely to spend unnecessary time on contingency fee cases…[t]he payoff is too

uncertain." *Id.*

LCHB invested 9,869.5 hours in this case. ¶ 150; Ex. A at 1. These hours were

reasonably necessary to its prosecution. Detailed descriptions of the major categories of

work – and the strategic reasons for undertaking that work – are outlined in § II of the Desai Declaration. Where practicable, counsel has provided estimates of time associated with some of those categories. Exhibit B breaks out this work by time period, and § III.B. of the Declaration discusses LCHB's work by each category of timekeeper. Finally, while the Declaration cannot practically capture all of the many tasks and assignments during this 5-year case, LCHB has also submitted all of its detailed time, comprised of over 5,100 entries, in Exhibit A.

### 1.  LCHB investigated and developed the technical and complex liability theories in this case.

Beginning in late 2017, counsel conducted a months-long investigation into the technical price reporting liability theories in this case, prepared the statutorily-required disclosure statement (31 U.S.C. § 3730(b)(2)), and filed suit under seal. While under seal for a year, counsel continued to hone the case, ultimately filing an amended complaint in September 2018 that advanced a primary theory of Medicare ASP reporting violations. Dkt. 1, 15. Desai Decl. § II.A. After the government declined, the complaint was unsealed in November 2018. Dkt. 18. LCHB conducted a fresh evaluation, including retaining and consulting with a respected statutory pricing expert, to evaluate whether to advance the case without the government. Thereafter, LCHB filed the second amended complaint in March 2019. Dkt. 29.

Allergan moved to dismiss (Dkt. 40-1), and Relator opposed in a thorough opposition that addressed myriad, dispositive arguments, including many arguments unique to FCA practice. Dkt. 43. The Court denied Allergan's motion in full. *U.S. ex rel. Barrett*, 2019 WL 4675756, at *7.

### 2.  Counsel efficiently pursued necessary discovery from Allergan.

The vast majority of counsel's time was dedicated to the extensive fact discovery efforts in this case, which began in earnest in the summer of 2019 and continued apace for over two years, through the close of fact discovery in November 2021. As detailed in the Desai Declaration (§ II), and summarized below, LCHB executed a careful and

difficult discovery strategy that was critical to the case's successful resolution.

The scope of the case presented unique challenges. The statutory damages period extended over 10 years, and during that time, many hundreds of Allergan employees were directly involved in the sale, marketing, and price reporting of Botox. Desai Decl. ¶¶ 40 (approximately ███ current and former Allergan employees involved in distributing Botox samples). Allergan declined the Magistrate Judge's invitation to stipulate to commonality in practices across geography or time, which would have helped limit the necessary number of discovery custodians or discoverable time period. *Id.*, ¶ 43. Moreover, Allergan was expected to vigorously argue that Relator would need to prove precisely which of ███ of individual sample transactions and consumer rebates should have been included in price reporting, as opposed to the program-wide arguments Relator intended to pursue, thus requiring a great deal of transaction-level detail. *Id.*, ¶¶ 42, 51. Adding to the complexity, Relator also needed to satisfy FCA's scienter requirement, heightening the importance of Allergan management's knowledge.

Counsel's challenge was first to select a set of custodians sufficient to implicate Allergan's entire sample and rebate programs over the entire country and 10-plus years or, barring that, efficiently implicating an identifiable subset of those transactions. *Id.*, ¶¶ 42-44. Thereafter, counsel had to negotiate search terms that would be reasonably likely to reveal probative evidence. *Id.*, ¶ 46. Each of these steps required painstaking and time-consuming work (often done with the aid of our experts), extensive meet-confer, and ultimately motion practice over Allergan's document custodians, search terms, and sources of discoverable information. § II.J.

Apart from documents, LCHB attorneys also prepared and served numerous written discovery requests on Allergan over the course of fact discovery. This included four sets of interrogatories totaling fourteen individual requests, and eighteen requests for admission, which targeted key concessions from Allergan about the detailed policies and methodologies used to calculate its reported prices for Botox. These requests also sought to, and succeeded in, fleshing out Allergan's defenses to further inform

- 13 -

affirmative litigation strategy. § II.H.

### 3. Counsel efficiently analyzed the resulting productions to support depositions, expert work, and to prepare the case for summary judgment and trial.

The net result of the efforts above was an enormous document production: just under 275,000 documents from over 60 custodians, spanning over 1 million pages, and including 91,000 native data files that took up at least 1,764 GB of space. Allergan also produced very large and complex datasets tracking sales and samples of Botox Cosmetic to provider accounts, sales of its Natrelle breast implants (relevant to the Anti-Kickback claim), and its consumer rebate transactions.

Commensurate with the scale of productions, LCHB dedicated resources and hours to review, analyze, and synthesize the massive documentary record. LCHB did this efficiently, deploying two staff attorneys who were empowered to run complex, iterative searches to locate the best documents, prepare for depositions, prepare detailed memoranda regarding a wide range of topics (*e.g.*, Allergan's sample marketing programs, its pricing strategies, and its rebate programs), locate key documents to support our experts' evaluations and opinions, and collect and synthesize evidence to support our liability arguments. Desai Decl., ¶¶ 48-52, 124-25. By contrast, counsel eschewed rote, linear review, or review solely for the purpose of objective coding. *Id.*, ¶ 48. Each staff attorney was expected to help build the case, and reported directly to the partner on the case regularly by phone and email to report their progress, defend their approach, and strategize next steps. *Id.* ¶ 126. Notwithstanding the massive volume of documents produced in discovery, these two LCHB attorneys performed the vast majority of the document analysis and related discovery work, which avoided inefficiencies and duplication or work. *See id.*, ¶¶ 122, 143.

In addition, LCHB associate Katherine McBride led an effort to challenge Allergan's 1,200-plus entry privilege log. This required careful review and motion practice, and resulted in the de-designation of over 100 documents. *Id.*, § II.G.

**4.**      **Counsel took nineteen document-heavy and lengthy**
**depositions, and secured testimony from third party witnesses.**

The document analysis work was particularly essential to the depositions that
followed. Desai Decl., ¶ 65. Relator deposed five corporate designees on complex topics
including Allergan's statutory pricing policies; organization structure and key personnel
across multiple departments; the various sample and rewards programs for Botox; and
multiple relevant databases. *Id.*, ¶¶ 57-60. This required analysis of over 40,000
documents produced by that time, with an eye towards establishing company-wide
practices, procedures, and personnel over the lengthy statutory period. *Id.*, ¶ 59.

Relator took another fourteen 30(b)(1) depositions. For senior personnel over
sales, marketing, and price reporting, the relevant custodial files had approximately
230,000 documents, including one key witness with almost 80,000 documents. *Id.*, ¶ 62.
For the sales representatives, counsel had to first select which of the 34 employees to
depose through a careful balancing of geographic and temporal representation, and the
strength of the evidence with which they were associated; together, those witnesses had
another 400,000 documents. *Id.*, ¶ 65. The resulting depositions were lengthy, with
nearly 400 exhibits marked by Relator. Many depositions featured distilled subsets of
Botox sales and drug sample data that counsel prepared with the help of our experts to
identify the witnesses' specific sales and sample transactions. *Id.*, ¶ 67. All told, these
depositions required substantial preparation, and these efforts yielded critical testimony
and a factual record in strong support of Relator's claims. Exs. N, O.

This was individually and collectively a heavy lift, but counsel kept it as
streamlined as possible. LCHB's staff attorneys prepared detailed searches to make
recommendations on witnesses to depose, as well as recommending documents to use at
the depositions. *Id.*, ¶¶ 63, 65, 124. Mr. Desai and Ms. McBride took all of the
depositions, and efficiencies in their preparation increased as the depositions progressed,
ultimately averaging well less than 20 hours of preparation time for each of the 30(b)(1)
depositions. *Id.*, ¶ 69.

- 15 -                    RELATOR'S MTN FOR ATTYS' FEES, COSTS, & EXPENSES
                                                                              CASE NO. 8:18-CV-00203 JVS (KESX)

Finally, in parallel to these efforts, counsel secured favorable testimony from former employees, including by deposition for one former employee, and declarations from another two. This, too, was time-consuming but important work for advancing the case. *Id.*, ¶ 72; Exs. P, Q.

### 5. LCHB worked with a team of experts to opine on statutory pricing, statistical analysis, consumer surveys, and damages.

LCHB retained well-credentialed experts early in fact discovery to vet and develop Relator's liability theories, guide fact discovery, and assess the evidence obtained in discovery. Three of these experts went on to serve in a testifying capacity.[8]

**Dr. Rena Conti**, Associate Professor of Markets, Public Policy and Law at Boston University. Counsel worked with Dr. Conti over the course of two years to prepare this case, culminating in her January 2022 report, in which she opined that Allergan's drug samples and consumer rebate programs should have been included in its reported prices. Desai Decl. ¶ 99. Dr. Conti went on to submit a detailed rebuttal to Allergan's liability expert. Exs. I, J. The thorough document analysis and well-planned depositions helped support Dr. Conti's work, which cited and relied upon many hundreds of Allergan documents and virtually all of the depositions.

**Dr. Christopher Baum**, Professor of Economics and Social Work at the Department of Economics and School of Social Work at Boston College. Dr. Baum applied advanced econometric and statistical techniques to Allergan's enormous datasets to opine that Allergan distributed samples "contingent" on purchases. This was a laborious and expensive process, but critically important to head off arguments from Allergan that there was no systemic misconduct at the company. Desai Decl. ¶ 101. Dr. Baum submitted a rebuttal report to a similar analysis by Allergan's expert. Exs. K, L.

**Sarah Butler,** Managing Director at NERA Economic Consulting. Counsel worked closely with Ms. Butler and her team as they designed and conducted surveys to

---

[8] Relator submits copies of each final report to illustrate for the Court the extensive, evidence-driven work necessary to create the compelling final presentations.

assess whether consumers actually receive free Botox Cosmetic samples. This countered Allergan's litigation position that the samples distributed to providers were used for free treatments for patients, potentially implicating various exceptions to statutory price reporting. Ex. M. Ms. Butler also helped select a sample of provider accounts from which counsel collected marketing materials (108,000 files spanning over 500,000 pages), to further undercut this defense. Desai Decl. ¶ 74.

This work was managed principally by Mr. Desai, with substantial assistance from Ms. McBride and Mr. Leggett. Desai Decl. § II.K (describing efforts in support of expert discovery).

### 6.   LCHB responded to discovery requests from Allergan.

Counsel also spent significant time responding to Allergan's discovery requests. *Id.*, § II.I. Counsel produced nearly 3,700 pages of documents on Relator's behalf (with the number of documents reviewed even greater). *Id.* Counsel also prepared responses to Allergan's eighteen interrogatories, including numerous contention interrogatories seeking identification of all evidence that supported Relator's liability case. This required citation to literally hundreds of supportive documents identified through the targeted search efforts described above. *Id.*, ¶¶ 84-86, Ex. H.

LCHB also prepared for and defended Mr. Barrett at his day-long deposition, which demanded thorough analysis of the record to ensure an adequate and prepared defense. *Id.*, ¶ 87. His custodial file included another 240,000 documents. *Id.*, ¶ 65.

### 7.   Counsel pursued the evidence to prove up Relator's claims and sought Court intervention only when necessary.

LCHB also spent significant time meeting and conferring with Allergan, and the parties resolved countless issues in this manner. Desai. Decl. ¶¶ 89-90. However, there were also disputes for which Relator sought rulings from Magistrate Judge Scott. *Id.*, ¶¶ 90-97. These included bringing offensive motions to: expand the relevant time period in Allergan's production of responsive documents (Dkt. 77); increase the number of sales custodians in Allergan's ESI productions (Dkt. 80); seek text message discovery

from certain custodians (Dkt. 81); advance a text message spoliation argument (Dkt. 114); compel further responses to Allergan's interrogatory and RFA responses (Dkt. 140); and compel production of documents Allergan had improperly withheld on a claimed privilege (Dkt. 130). For each, Relator agreed to use Judge Scott's informal dispute procedures to minimize the burden, time, and cost to all parties and the Court.

Counsel's positions, many of which were successful,[9] were all well within the realm of reasonable advocacy. To the extent Allergan challenges fees on some of these disputes, the Court should reject such second guessing. *Cf. Moreno*, 534 F.3d at 1112 (describing appropriate deference to the "winning lawyer's professional judgment" on time and strategy). Nor is complete victory required on every dispute for counsel to be compensated for their efforts. Rather, precedent is clear that *all* work performed "that contribute[s] to" the successful outcome is compensable. *Cabrales v. County of Los Angeles*, 935 F.2d 1050, 1052 (9th Cir. 1991); *see also Hensley,* 461 U.S. at 435 ("[T]he fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit.").

### 8.  LCHB negotiated a settlement figure, then helped usher the settlement through the government review process.

After more than a year of talks in parallel to intensive litigation efforts, the parties ultimately reached a Settlement in principle in February 2022, on the eve of the first expert deposition. Desai Decl. § II.L. Thereafter, Relator worked to secure the government's approval of the Settlement, even as it conflicted with Allergan on some key provisions that threatened the deal. *Id.* In recognition of the significant recovery and the exceptional efforts by Relator and his counsel in pursuing the case to resolution, Relator was awarded a 28.2% share of the settlement, just under the 30% maximum.

---

[9] *See, e.g*., Dkt. 101 (granting in part Relator's motions to compel text message discovery and to extend Relevant Time Period); Dkt. 137 (conducting privilege review in response to Relator's earlier motion and ordering Allergan to produce documents for which Relator challenged privilege designations); Dkt. 144, November 8, 2021 Discovery Hearing Transcript (ordering Allergan to supplement RFA responses).

**C.**     **Counsel staffed the case appropriately and exercised reasonable
billing judgment in the requested hours.**

Not only did LCHB focus on work that was necessary for the case's successful
prosecution, it performed that work efficiently. Virtually all of the work was performed
by a core litigation team of one partner (Mr. Desai), one associate (Ms. McBride), and
two staff attorneys (Mr. Leggett and Ms. Ashur). A third staff attorney (Ms. Nutting)
assisted for a five month period during the height of fact depositions and in advance of
serving expert reports. Desai Decl. ¶ 114. These five timekeepers account for 88% of all
hours, and 90% of lodestar. This structure avoided duplication and yielded efficiencies
in institutional knowledge as the case developed.

Even within this very lean team, LCHB properly assigned and delegated tasks
wherever possible. Notably, LCHB's overall blended hourly rate is $598, about the rate
of a senior associate at the firm. This efficient staffing and appropriate delegation of
assignments is also amply demonstrated by the distribution of hours in this case.
Together, non-partner timekeepers logged ***three times*** as many hours as the partners on
the case. Focusing just on the lawyers, the associates and staff attorneys logged roughly
two-thirds of all hours, and ***2.7 times*** the combined partner hours:

**Table 7: Summary of Hours and Lodestar by Title**

|  | Hours | % | Lodestar | % |
|---|---|---|---|---|
| Staff | 1,000 | 10.1 | 471,334 | 8.0 |
| Associates / Staff Attorneys | 6,469 | 65.5 | 3,222,495 | 54.6 |
| Partners | 2,401 | 24.3 | 2,211,978 | 37.5 |
| Total | 9,869.5 |  | $5,905,807 |  |

The same story emerges from a focus on each category of timekeeper. Desai
Decl., § III.B. Mr. Desai (2,348 hours) accounts for most of the firm's partner hours. He
focused on tasks appropriate for senior lawyers: depositions, experts, hearings, case
strategy, settlement, managing all other timekeepers, and leading meet-confer opposite
partners at Arnold & Porter. ¶ 116. Ms. McBride (1,426 hours), as the sole associate on

the case, focused on legal research and briefing and various discovery work, but also took on tasks appropriate for more senior lawyers, such as overseeing some expert work, supervising certain staff attorneys projects, and handling a discovery hearing opposite a senior partner at Arnold & Porter. *Id.*, ¶ 120.

The staff attorneys (together, 5,043 hours)—each with 10 or 20 years of experience but billed at junior associate rates—aided in all manner of day-to-day discovery issues typically handled by associates and junior partners. In addition to independently leading the document review and analysis efforts of the million-page production, they also aided with custodian selection and search term strategy, detailed issue memos on a wide range of complex topics, collecting and synthesizing evidence for use in later stages of the case, preparing for depositions, and gathering documents for our experts. [10] *Id.*, ¶ 129.

The remaining 10% of LCHB's hours are attributable to LCHB's qualified legal support staff, including members of our litigation support department and paralegals (together 1,000 hours). Desai Decl., § III.B.4-5. The use of experienced professionals to perform substantive tasks—such as noticing depositions and preparing exhibits and filings—that might otherwise be performed by first- or second-year associates is cost efficient and compensable. *See Missouri*, 491 U.S. at 284; *see also U.S. ex rel. Herndon v. Appalachian Regional Community Head Start, Inc*., 674 F. Supp. 2d 773 (W.D. Va. 2009) (FCA case concluding paralegal time is properly recoverable).

Finally, in addition to appropriately litigating and staffing the case, LCHB has also exercised discretion to substantially reduce the hours and lodestar submitted. The firm has removed a total of approximately 219 hours and $132,407 in lodestar that were otherwise properly incurred, including hours by timekeepers who materially aided the

---

[10] As in any long, complex, and demanding case, there was undoubtedly bleeding of these responsibilities in both directions. But the Court should reject any effort by Allergan to second-guess those efforts now. *Cf. Moreno*, 534 F.3d at 1115 (the district court "may not attempt to impose its own judgment regarding the best way to operate a law firm, nor to determine if different staffing decisions *might* have led to different fee requests") (emphasis added).

litigation. Desai Decl. ¶ 149 (describing categories that were removed). Further, as previously explained, LCHB has applied its 2022 rates to the lodestar, instead of current, 2023 rates, which reduces the request by an additional $510,000.

Such reductions individually and collectively demonstrate the reasonableness of LCHB's fees.

### D.     The *Kerr* factors weigh strongly in favor of the requested fees.

The reasonableness of LCHB's hours worked is supported by the detailed descriptions above, and further supported by the factors articulated by the Ninth Circuit in *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 69–70 (9th Cir. 1975).  A number of these factors are "subsumed" within the initial calculation of hours reasonably expended at a reasonable rate and addressed above. *Entrepreneur Media, Inc. v. Entrepreneurs Opportunities LLC*, No. SA CV 171341 JVS (KESx), 2018 WL 4859264, at *1 (C.D. Cal. Mar. 7, 2018). Relevant *Kerr* factors are considered in turn below.

#### 1.     Novelty, difficulty, and undesirability of the case and questions involved

FCA cases are generally risky and difficult, and that risk increases dramatically when the government declines to intervene, depriving the case of the imprimatur of official support. "**[O]nly about 10 percent of non-intervened cases result in recovery**." *U.S. ex rel. Hunt v. Cochise Consultancy*, 887 F.3d 1081, 1087 (11th Cir. 2018) (*citing* David Freeman Engstrom, Public Regulation of Private Enforcement: Empirical Analysis of DOJ Oversight of Qui Tam Litigation Under the False Claims Act, 107 Nw. U. L. Rev. 1689, 1720-21 (2013)).[11]

The complexity of this case stands out even within the already difficult category of declined litigation. Relator alleged a pricing fraud case based on a complicated statute and regulations that are rarely litigated, and on conduct that spanned over 10 years and

---

[11] Another study paints a similarly stark picture: "over 90% of [qui tam] cases [are] dismissed when the whistleblower has to plow ahead without government intervention." Andrew E. Brashier, *The Federal Government's Chief Weapon in Combatting Fraud: The False Claims Act*, 34 Ala. Ass'n Just. J. 60, 62 (2014).

was executed by hundreds of employees. The litigation posed hotly contested – and generally untested – questions about whether and when any one of millions of individual samples and rebates must be included in reported prices. Desai Decl. ¶¶ 12-13.

On the law, Relator faced the prospect of numerous, potentially case dispositive defenses raised by Allergan, most notably, that its own "reasonable interpretation" of its price reporting obligations precluded the requisite finding of scienter. Indeed, the defense counsel in this case used this very argument to defeat a *different* statutory pricing FCA case against Allergan, just as the parties here were moving into expert discovery. That decision was later affirmed via an evenly split *en banc* panel, and a petition for certiorari is pending. *U.S. ex rel. Sheldon v. Allergan Sales, LLC*, 24 F.4th 340 (4th Cir.), opinion *vacated on reh'g en banc*, 49 F.4th 873 (4th Cir. 2022).

That LCHB was able to secure a favorable recovery for the government and Relator in spite of this complexity underscores the reasonableness of LCHB's fees.

### 2.      Skill required to litigate the case

Given these challenges and complexities, the case required a law firm like LCHB with deep FCA experience and demonstrated success in large-scale litigation against well-resourced defendants. This further supports the fee request. Desai Decl., § III.A. *See U.S. ex rel. Liotine v. CDW-Gov't, Inc.*, No. 305  CV 00033 DRH PMF, 2013 WL 5366960, at *3 (S.D. Ill. Sept. 25, 2013) (acknowledging "the specialized skills required to adequately litigate FCA cases" in affirming grant of attorney fees).

### 3.      Contingent nature of the fee and opportunity cost

Counsel invested heavily in the case despite the risk that they would never be compensated, having taken the case on contingency. This risk was especially acute given the limited odds for success in declined FCA cases. Counsel's substantial outlay in the face of these risks strongly supports the requested fee. "When counsel takes cases on a contingency fee basis, and litigation is protracted, the risk of no payment after years of litigation justifies a significant fee award." *In re Apple Inc. Device Performance Litig.*, No. 5:18-MD-02827-EJD, 2023 WL 2090981, at *15 (N.D. Cal. Feb. 17, 2023)

(citation omitted); *In re Wash.*, 19 F.3d at 1299 (similar). This ensures competent

representation for plaintiffs who may not otherwise be able to afford it.

Moreover, the significant resources dedicated to this case required LCHB to "turn

down opportunities to work on other cases to devote the appropriate amount of time,

resources, and energy necessary to responsibly handle this complex case" on behalf of

the government. *In re Volkswagen*, 2017 WL 1047834, at *3. These years (and hours) of

hard-fought litigation impeded LCHB from pursuing other profitable cases, including

those that could have reached resolution sooner, or through less intensive efforts. Desai

Decl. ¶¶ 141-143 (describing limitations caused by the time and resources dedicated to

this case). This factor, too, supports the reasonableness of the fee. *See Kanawi v. Bechtel

Corp.,* No. C 06-05566 CRB, 2011 WL 782244, at *2 (N.D. Cal. Mar. 1, 2011).

### 4.      Comparative and stand alone quality of the result

Allergan agreed to pay $⬛⬛⬛⬛⬛ to resolve this case, exclusive of costs and

fees. By comparison, of the 10% of declined cases that actually result in a settlement or

judgment, the significant majority (nearly 70%) do so for less than ⬛⬛⬛⬛.[12] The

government recognized the significance of Relator and his counsel's efforts by awarding

Relator a 28.2% share of the recovered funds, toward the upper end of the available

range. *See U.S. v. Prism Autism Found.,* No. 3:19-cv-00043-W-BLM, 2022 WL

5264493, at *8 (S.D. Cal. Oct. 6, 2022) ("Here, the 20% [relator's share] award

demonstrates the level of contribution Relator and her counsel brought to the case.");

*U.S. ex rel. Maxwell v. Anham USA, Inc.,* No. 1:14-cv-156, 2020 WL 4460364, at *7

(E.D. Va. Aug. 3, 2020) (28.5% relators' share supported settlement significance); *U.S.

ex rel. Luke v. HealthSouth Corp.*, No. 2:13-cv-01319-APG-VCF, 2020 WL 1169393,

at *5 (D. Nev. Mar. 11, 2020) (similar).

Moreover, while lodestar is the relevant measure of FCA attorneys' fees, the

---

[12] Ralph Mayrell, *Digging Into FCA Stats*, Law360 (July 13, 2021), available at
https://www.law360.com/articles/140243 ("In qui tam cases where defendants
eventually settled with the government or a court entered a judgment against the
defendant, 40% ended in a payment of a million or less, and nearly 70% of cases ended
in a payment of $5 million or less.").

1   requested fees are also reasonable in proportion to the substantial recovery obtained. If

2   granted, the requested fees and costs award would represent ▮▮▮ of the total payments

3   by Allergan to resolve the case. FCA courts routinely award attorneys' fees far in excess

4   of this comparative amount. *See U.S. ex rel. Tommasino*, 2017 WL 878587, at *2-3

5   (declining to reduce attorneys' fees and collecting cases where fees awarded far

6   outweighed the recovery).

7       In sum, the excellent result obtained is yet another point in favor of the requested

8   fees here.

9   **III.    LCHB's reasonable costs and expenses should be reimbursed.**

10      LCHB has spent (and carried on its books) a total of $978,131 in hard costs to

11  date to advance Relator's claims. LCHB seeks no multiplier or interest on this invested

12  capital, only reimbursement for these reasonable expenses fronted. The largest category

13  of costs was for expert work.  This is unsurprising given that the case continued up

14  through expert rebuttal reports, and the nature and complexity of the reports they

15  presented. The second highest cost, nearly $100,000, are funds LCHB spent for vendors

16  necessary to take nineteen depositions. These and other costs sought are all squarely of

17  the kind necessary and reimbursable in complex civil litigation. Desai Decl. § III.F.

18  **IV.    The Piacentile Law Firm's lodestar is reasonable and should be approved.**

19      Relator also seeks to recover the modest fees incurred by co-counsel, The

20  Piacentile Law Firm, in the amount of $64,220. The Piacentile firm worked diligently

21  and quickly on Relator's pre-filing investigation, before bringing in LCHB to aid its

22  investigation and pursue the case as lead counsel. *See* Piacentile Decl. ¶ 6. The firm

23  removed almost one-third of its lodestar before submitting this request, and its

24  experienced *qui tam* lawyers and investigators charge reasonable rates. *Id.* ¶ 5.

25      For the same reasons noted above, should the Court opt to apply historical rates,

26  Relator's counsel request a modest 1.17 multiplier.[13]

27

28

---

[13] Counsel can also provide PLF's historical rate lodestar should the Court so require.

**V.        Relator is entitled to fees for this motion.**

Relator is also entitled to recover the attorneys' fees incurred in preparing and

litigating this fee application—so-called "fees on fees." *Gonzalez v. City of Maywood*,

729 F.3d 1196, 1210 (9th Cir. 2013). Courts routinely make such awards to reimburse

prevailing parties who are compelled to litigate for the fees to which they are entitled.

*See, e.g., Franchek,* 2022 WL 3137928, at *13 (awarding fees on fees in FCA matter);

*Thompson v. Gomez*, 45 F.3d 1365, 1366 (9th Cir. 1995); *Clark v. City of Los Angeles*,

803 F.2d 987, 992 (9th Cir. 1986). Counsel dedicated reasonable hours to researching

and preparing this motion and the supporting documentation, including the detailed

work of auditing and preparing time entries to exercise appropriate billing judgment and

facilitate the Court's and Allergan counsel's review. As such, Counsel seeks

reimbursement for 149.3 hours for a total of $122,109, subject to adjustment for any

additional hours spent to prepare a reply brief and attend the hearing, to be included in

that forthcoming filing.

## CONCLUSION

For the reasons set forth herein and in the accompanying declarations, Relator

respectfully requests that the Court order Allergan to pay Relator: (i) $5,905,807 in

attorneys' fees for work performed by LCHB, and $64,220 for work performed by the

Piacentile Law Firm; (ii) $978,131 in costs and expenses incurred in the successful

litigation of this matter; and (iii) $122,109 in attorneys' fees for LCHB's work related to

this Motion, with the final amount to be updated on reply.

Dated: March 31, 2023            LIEFF CABRASER HEIMANN &
                                 BERNSTEIN, LLP


                                 By:    *s/ Nimish R. Desai*
                                 _____
                                 Robert J. Nelson (State Bar No. 132797)
                                 rnelson@lchb.com
                                 Nimish R. Desai (State Bar No. 244953)
                                 ndesai@lchb.com
                                 LIEFF CABRASER HEIMANN &
                                 BERNSTEIN, LLP

1   275 Battery Street, 29th Floor
    San Francisco, CA  94111-3339
2   Telephone:  415.956.1000
    Facsimile:  415.956.1008
3

4   Rachel Geman (admitted *pro hac vice*)
    rgeman@lchb.com
5   Katherine McBride
    kmcbride@lchb.com
6   LIEFF CABRASER HEIMANN &
    BERNSTEIN, LLP
7   250 Hudson Street, 8th Floor
    New York, NY 10013-1413
8   Telephone:  212-355-9500
    Facsimile:  212-355-9592
9
    *Attorneys for Relator*
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# PROOF OF SERVICE

On March 31, 2023, a copy of Relator's Motion for Attorneys' Fes, Costs, and Expenses was served electronically through the Court's electronic filing system upon all Parties appearing on the Court's ECF service list.

I declare under penalty of perjury under the laws of the United States that the above is true and correct.

Executed on March 31, 2023 at New York, NY.

*/s/ Katherine McBride*